1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JESSE I. SANTANA, et al.,                No.  2:15-cv-00794 KJM-EFB

12
              Plaintiff,
13

14        v.                                  ORDER

15

16   THE COUNTY OF YUBA, et al.,

17
              Defendant.
18

19

20

21

22

23

24

25

26

27

28

1

1

TABLE OF CONTENTS

**I.     Background** ............................................................................................ **4**

  A.   Allegations ......................................................................................... 4

    1.   Civil Settlement Negotiations in 2007 ........................................ 4

    2.   Santana's Judicial Application and the Criminal Prosecution ........... 8

  B.   Procedural History of this Case ........................................................ 11

**II.    Special Motions to Strike** ................................................................ **13**

  A.   In General ......................................................................................... 13

  B.   Anti-SLAPP Motions in Federal Court ............................................. 14

  C.   Protected Activity ............................................................................. 16

    1.   Evans ........................................................................................ 16

    2.   Yuba County Defendants .......................................................... 17

  D.   Unprotected Conduct Illegal as a Matter of Law .............................. 20

**III.   Anti-SLAPP Legal Sufficiency; Federal-Law Motions to DISMISS** ............ **21**

  A.   Legal Sufficiency in an Anti-SLAPP Motion .................................... 21

  B.   Legal Standard on a Motion to Dismiss under Rule 12(b)(6) ............ 21

  C.   Yuba County Defendants .................................................................. 22

    1.   Federal Claims Under 42 U.S.C. § 1983 .................................. 22

    2.   State Law Claims ...................................................................... 39

    3.   Motion for a More Definite Statement ...................................... 41

  D.   City of Marysville and Randall Elliott .............................................. 41

  E.   Judge Scrogin .................................................................................. 44

    1.   Subject Matter Jurisdiction ....................................................... 44

    2.   Judicial Absolute Immunity ...................................................... 46

    3.   State Law Claims and Immunities ............................................. 50

  F.   Timothy Evans .................................................................................. 52

    1.   Subject Matter Jurisdiction ....................................................... 52

    2.   State Law Claims ...................................................................... 53

2

3.   Leave to Amend ........................................................................................... 57

**IV. Conclusion.................................................................................................................. 58**

3

In April 2014, a jury acquitted attorneys Jesse Santana and David Vasquez of all charges of bribing a witness and obstructing justice.  In this civil lawsuit, filed after the criminal trial's conclusion, Santana and Vasquez contend the prosecution was part of a plan to thwart Santana's appointment to the Sutter County Superior Court. The defendants all move to dismiss under Rule 12 of the Federal Rules of Civil Procedure, and several also filed special motions to strike the complaint under California Civil Code of Civil Procedure section 425.16, the state's "anti-SLAPP" statute.

The court held a hearing on August 7, 2015.  Jaime Leaños appeared for Santana and Vasquez.  Lauren Calnero appeared for Yuba County, Patrick McGrath, John Vacek, Mary Barr, and Gene Stober.  John Whitesides appeared for the City of Marysville and Randall Elliot. Michael Fox appeared for Judge Julia Scrogin.  Wendy Green appeared for Timothy Evans.  After considering the parties' briefing and the arguments at hearing, the court grants the motions to dismiss, in part with leave to amend, and grants in part and denies in part the special motions to strike without prejudice to renewal.

I.      BACKGROUND

    A.      Allegations

The story of Santana's and Vasquez's complaint spans several years.  At this stage, their case rests on only allegations, but on a motion to dismiss, the court regards these allegations as true.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Santana and Vasquez allege as follows.

        1.      Civil Settlement Negotiations in 2007

A little more than eight years ago, in early November 2007, Detective Randall Elliott of the Marysville Police Department met with Socorro Acevedo, her mother, and her sister about an alleged case of abuse.  Compl. ¶ 34, ECF No. 1.  Acevedo, at the time younger than eighteen, told Elliott that Joseph Griesa, her boss at a local towing company, had physically and sexually abused her at work.  *Id.*  She showed Elliott some sexual text messages she had received from Griesa.  *Id.* ¶ 50.  After the interview, Elliott attempted to investigate her story by making a pretextual phone call to Griesa, but was unsuccessful.  *Id.* ¶ 51.  He told Acevedo it would be a

/////

4

tough case to prosecute because the trial would likely come down to a he-said, she-said credibility contest.  *Id.*  But he suggested Acevedo could pursue a civil remedy.  *Id.* ¶¶ 35–36.

After Elliott told Acevedo and her family the police could probably not help them, he again contacted Griesa, the alleged abuser, who was a former probation officer.  *Id.* ¶ 52.  Elliott said he was investigating Acevedo's allegations that Griesa sexually abused Acevedo, gave him a copy of the relevant Penal Code sections, and told him to talk to a lawyer before saying anything.  *Id.*  Griesa agreed.  *Id.*  He hired David Vasquez.  *Id.* ¶ 53.  Vasquez called Elliott, who told him about the charges he was investigating.  *Id.*  Vasquez said he would be on vacation, and asked that Elliott wait to forward the results of his investigation to the District Attorneys' Office until after he returned and had a chance to review the case and talk about it with Griesa.  *Id.* ¶ 54.  Elliott agreed to wait.  *Id.*

Later the same month, Elliott heard from Acevedo's sister that Griesa had begun removing his computer, video camera, and other things from his office.  *Id.* ¶ 55.  She said these items contained evidence of the alleged abuse and would corroborate Acevedo's story, so Elliott should obtain a warrant and search Griesa's office.  *Id.* ¶ 56.  It was a late Friday afternoon, and Elliott thought it would take hours to prepare an affidavit and obtain a warrant from a judge and much longer to search the tow yard where Griesa worked.  *Id.* ¶ 57.  He said a warrant would not be worth the effort because a search would turn up no evidence.  *Id.* ¶ 58.  He reiterated his impression that the case would come down to a credibility contest between Griesa and Acevedo, and never obtained a warrant.  *Id.* ¶ 58.

In the meantime, Acevedo and her family had contacted an attorney, Jesse Santana.  *Id.* ¶ 37.  They told him the interview with Elliott had left them feeling helpless.  *Id.*  Santana agreed to represent them pro bono and reassured them of their option to seek compensation from Griesa in a civil case.  *Id.* ¶¶ 38, 41.  Santana said the family had some time before they needed to file a complaint, and that he could attempt to negotiate a settlement with Griesa, but because Acevedo was younger than eighteen, a judge would need to approve any agreement.  *Id.* ¶ 39.  Acevedo told Santana she preferred to keep the lurid details of the ordeal private; she feared that if her father learned about the abuse, he could suffer a stroke, and that if

1   her brother learned about it, he would take matters into his own hands.  *Id.* ¶ 40.  She said she

2   didn't want to testify about the abuse in court or file any criminal charges.  *Id.*  Santana agreed to

3   pursue a settlement with Griesa and avoid the publicity of a civil complaint or criminal case.

4   *Id.* ¶ 41.

5           Griesa had similar conversations with Vasquez.  *Id.* ¶¶ 69–70.  Griesa was

6   concerned that if Acevedo's allegations were made public, they would be extremely damaging to

7   his reputation, to his high school coaching position, and to his business.  *Id.* ¶ 69.  Vasquez told

8   Griesa that sexual assault victims generally choose not to testify about the abuse in open court,

9   and that if the District Attorney learned Acevedo would not testify, charges might not be filed.

10  *Id.* ¶ 78.  Vasquez cautioned this was no guarantee, and a criminal case was always a possibility,

11  *id.*, but Griesa said he was not worried about a criminal prosecution and asked Vasquez how to

12  handle the civil suit, *id.* ¶ 70.  Vasquez said he could attempt to resolve the case out of court and

13  avoid any public disclosure of Acevedo's allegations, and Griesa asked him to try.  *Id.* ¶¶ 70–71.

14  In a follow-up meeting, Vasquez cautioned Griesa again he could make no guarantees about the

15  criminal case, but the two discussed a possible good-faith payment of $50,000 to encourage civil

16  settlement discussions.  *Id.* ¶¶ 70, 72.  Vasquez deposited the money into his client trust account

17  and cautioned Griesa that any final settlement would need court approval; Griesa urged Vasquez

18  to avoid any publicity and danger to himself and the family business.  *Id.* ¶ 73.

19          At some point, Santana contacted Vasquez.  *Id.* ¶ 42.  The two discussed a possible

20  settlement, and eventually $100,000 was proposed as a fair amount.  *Id.*  Santana reported the

21  results of his negotiations to Acevedo and her family and reminded them they would need to

22  obtain court approval.  *Id.* ¶ 43.  Santana drafted a proposed civil release, which he forwarded to

23  Vasquez.  *Id.* ¶ 44.  When Vasquez learned Acevedo preferred not to testify in court against

24  Griesa, he requested an addition to the draft:  Acevedo would promise to "exercise any privilege

25  she may have pursuant to law, not to testify in any proceedings."  *Id.* ¶ 45.  No one objected to

26  this amendment.  *Id.*  A later draft agreement provided as follows:

27          In consideration of the sum of one hundred thousand dollars
            ($100,000.00), Socorro Acevedo will request that criminal charges
28          not be filed against Joe Griesa, and will exercise any privilege she

6

> may have pursuant to law, not to testify in any proceedings, and she will not file any civil action, arising out of the underlying facts, against Joe Griesa. Joe Griesa will pay $50,000.00 now and the remaining $50,000.00 within 60 days. In exchange, Socorro Acevedo forever releases and discharges Joe Griesa from all claims, demands, damages, actions, and causes of action of every kind and nature in any way related to Joe Griesa's interactions with Socorro Acevedo.

*Id.* In December 2007, about a month after Acevedo and her family first met with Detective Elliott, she and her mother signed a release that included the language quoted above. *Id.* ¶¶ 45–46. Acevedo made it clear she wanted to put the episode behind her and move away to college. *Id.* ¶¶ 46–47. Santana again reminded them the settlement would not be final until Griesa signed the release and it was approved by a judge. *Id.* ¶ 48.

During these negotiations, no criminal case was filed, but Griesa understood the criminal case was always a possibility. *Id.* ¶ 77. He saw the settlement payment as a business decision because he could not afford public disclosure. *Id.* ¶ 79. Griesa never spoke to Santana about Acevedo or her claims, and Santana never attempted to dissuade Acevedo from testifying against Griesa. *Id.* ¶ 79.

Vasquez contacted Detective Elliott to tell him about the possible civil settlement between Acevedo and Griesa. *Id.* ¶ 60. Elliott said this could be a good resolution to the case. *Id.* ¶ 61. But Elliott never documented his awareness of these negotiations or his impression that a civil settlement could be a good resolution. *Id.* ¶ 62. Vasquez also spoke about the proposed settlement with Melanie Bendorf, a Yuba County Deputy District Attorney. *Id.* ¶ 60. And Santana called Elliott to say he was representing Acevedo and that she wanted to avoid a criminal prosecution, put the ordeal behind her, and move out of town for college. *Id.* ¶ 63. Finally, Griesa contacted Elliott to talk about the release and his agreement to pay $100,000. *Id.* ¶ 76. Elliott told Griesa to get a second opinion. *Id.*

Soon after speaking to Santana and Vasquez, Elliott finalized a report of his investigation and submitted it to the District Attorney's office. *Id.* ¶ 65. Rather than recommending criminal charges be filed against Griesa, Elliott recommended charges against Santana and Vasquez. *Id.*

1    The settlement agreement between Griesa and Acevedo never became final.

2    Acevedo changed her mind about the release, *id.* ¶ 66, and Griesa never signed it, *id.* ¶ 80.

3    Acevedo never received the $50,000 deposited in Vasquez's trust account, and the money was

4    returned to Griesa.  *Id.* ¶ 81.  Griesa found a new lawyer, Timothy Evans.  *Id.* ¶ 83.  Acevedo also

5    found a new lawyer.  *Id.* ¶ 68.  Santana called Detective Elliott to tell him Acevedo had a new

6    attorney and that she wanted to say more about crimes Griesa had committed against her.  *Id.*

7    ¶¶ 67–68.  Santana was not paid.  *See id.* ¶ 41.  Elliott said Acevedo could call him if she wanted.

8    *Id.* ¶ 67.  Santana offered to give Elliott the name and number of her new lawyer, but Elliott said

9    he was not interested.  *Id.* ¶ 68.

10                2.        Santana's Judicial Application and the Criminal Prosecution

11    Before Santana took on his representation of Acevedo, he had submitted his

12    application to the Governor's office for an appointment to a vacant seat on the Sutter County

13    Superior Court.  *Id.* ¶ 82.  He was a prominent Hispanic lawyer with a strong support base among

14    the Hispanic community.  *Id.*  Vasquez was one of his supporters.  *Id.*

15    Susan Green, a former Sutter County District Attorney, had applied for the same

16    vacant seat.  *Id.*  Among her supporters were Judge Julia Scrogin of the Sutter County Superior

17    Court, Yuba County District Attorney Patrick McGrath, Yuba County Deputy District Attorneys

18    Melanie Bendorf and John Vacek, Detective Elliott, and Griesa's new attorney, Timothy Evans.

19    *Id.* ¶ 83.  Each preferred Green over Santana for the judgeship.  *Id.* ¶ 84.  They knew the

20    Governor would be announcing an appointment as early as June 2008; soon after they learned

21    Santana had applied, they concocted the criminal investigation and prosecution against Santana to

22    scuttle his application and sully his reputation.  *Id.* ¶¶ 85–86, 90.  The plan was to charge Vasquez

23    to cover up their ulterior motive; he was "collateral damage."  *Id.* ¶ 85.  In anticipation of

24    Santana's application, the conspirators held a "secret meeting" to discuss the filing of unfounded

25    criminal charges against him.  *Id.* ¶ 87.

26    Together—along with Yuba County District Attorney Investigators Gene Stober

27    and Mary Barr—Scrogin, McGrath, Bendorf, Vacek, Elliott, and Evans "abused their positions of

28    power, conducted and pursued a negligent and improper investigation, fabricated and pursued

8

1  criminal charges, improperly and illegally empaneled a criminal grand jury, knowingly presented

2  incompetent and irrelevant evidence, withheld exonerating evidence and maliciously prosecuted

3  Jesse Santana and David Vasquez." *Id.* ¶ 88.  Santana and Vasquez were indicted "for conspiracy

4  to obstruct justice, bribery, dissuading a witness, and dissuading a witness for financial gain." *Id.*

5  ¶ 90.

6         With their knowledge and approval, a warrant to search Santana's and Vasquez's

7  law offices was prepared and executed. *Id.* ¶ 92.  They found Griesa's file. *See id.* ¶ 96.  Evans,

8  who at this time represented Griesa, told Griesa the District Attorney's office would not file

9  charges against him if he agreed to cooperate in the investigation of Santana and Vasquez and

10  testify against them. *Id.* ¶ 95.  Griesa agreed to cooperate in the investigation in return for the

11  defendants' promise not to file child molestation and sexual assault charges against him. *Id.*

12  ¶¶ 96–97.

13        In November 2008, Judge Scrogin empaneled a grand jury to oversee Santana's

14  investigation and consider an indictment. *Id.* ¶ 98.  She selected and swore in the grand jurors

15  and presided over a contempt hearing in which Acevedo was compelled to provide testimony to

16  the grand jury against Santana. *Id.*

17        Judge Scrogin "had a history with Santana." *Id.* ¶ 99.  In 2004, when she was a

18  prosecutor, she lost a high-profile murder case against a client of Santana's. *Id.*  Before she

19  empaneled the grand jury in Santana's prosecution, Scrogin had admitted to bias against him

20  arising from her support of Green for the Superior Court judgeship; Scrogin had also written a

21  letter to the Governor in support of Green. *Id.* ¶ 100.  In the months before she presided over the

22  grand jury considering Santana's case, she therefore had consistently recused herself from any

23  case in which Santana appeared as counsel. *Id.* ¶ 101.  But she did not recuse herself from the

24  grand jury proceedings in Santana's case, even after Acevedo's attorney requested her recusal.

25  *Id.* ¶ 103.

26        After Judge Scrogin empaneled the grand jury, McGrath, Bendorf, Vacek, Elliott,

27  and Stober "knowingly fabricated false charges and presented incompetent and irrelevant

28  evidence, withheld exonerating and other information that they were constitutionally obligated to

1    present to the grand jury, unlawfully and illegally obtained an indictment against Jesse Santana

2    and David Vasquez, without probable cause." *Id.* ¶ 105.

3            In January 2009, Green was appointed to the Sutter County Superior Court. *Id.*

4    ¶ 107.  Santana, of course, was not.  In September 2010, he filed a writ with the California Court

5    of Appeal to set aside the indictment against him on account of Judge Scrogin's bias. *Id.* ¶ 108.

6    In an unpublished opinion, the California Court of Appeal found Judge Scrogin was indeed biased

7    and had acted "without fundamental jurisdiction to empanel a grand jury to indict defendant

8    Santana, and her actions toward that end were therefore void." *Santana v. Super. Ct.*,

9    No. C066008, 2012 WL 1777801, at *10 (Cal. Ct. App. May 16, 2012).[1]  The Court of Appeal's

10   decision was issued in 2012, long after Green had been appointed.

11           After the Court of Appeal set aside Santana's indictment, Santana and Vasquez

12   were prosecuted by criminal complaint rather than indictment. *Id.* ¶ 111.  A state magistrate and

13   the California Superior Court and found the prosecution was founded on probable cause. *See*

14   *generally* Marysville & Elliott Req. J. Not. Ex. C, ECF No. 11-2.[2]  The defendants turned the case

15   over to the California State Attorney General's Office.  Compl. ¶ 111.  The case went to trial

16   before a jury on three charges: conspiracy to obstruct justice, dissuading a witness, and

17   dissuading a witness for financial gain, the last against Vasquez only. *Id.*  During the trial, the

18   same district attorneys who had prosecuted the indictment acted as investigators and testified as

19   witnesses against Santana and Vasquez. *Id.* ¶ 112.  On April 25, 2014, after less than an hour of

20   deliberations, the jury found Santana and Vasquez were not guilty of any charge. *Id.* ¶ 113.  After

21   the trial, McGrath was quoted in a local newspaper: "Our investigation was solid and we stand by

22   our prosecution of Mr. Santana and Mr. Vasquez." *Id.* ¶ 114.

23   _____

24           [1] The court takes judicial notice of this decision. *See* Fed. R. Evid. 201 (governing
     judicial notice); *W. Radio Servs. Co. v. Qwest Corp.*, 678 F.3d 970, 976 (9th Cir. 2012) (a court
25   may consider proper subject of judicial notice on a motion to dismiss); *Reyn's Pasta Bella,
     LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n. 6 (9th Cir. 2006) (a court may take judicial notice of
26   public filings in other, related cases).

27           [2] The court grants the unopposed request for judicial notice of this document. *See supra*
     note 1.

28

1

      B.     Procedural History of this Case

2

      Santana and Vasquez filed their complaint in this court on April 13, 2015 against

3 Yuba County, the Yuba County District Attorney's Office, McGrath, Bendorf, Vacek, Barr,

4 Stober, the Marysville Police Department, Elliott, Judge Scrogin, and Evans. *Id.* at 1. They

5 allege five claims: (1) violation of the Fourth Amendment, under 42 U.S.C. §§ 1981 and 1983,

6 against all the defendants except Evans, *id.* ¶¶ 123–28; (2) violation of the Fourteenth

7 Amendment Due Process Clause, under 42 U.S.C. §§ 1981 and 1983, against all the defendants

8 except Evans, *id.* ¶¶ 129–34; (3) malicious prosecution, against all the defendants, *id.* ¶¶ 135–39;

9 (4) negligence, against all the defendants, *id.* ¶¶ 140–43; and (5) intentional infliction of

10 emotional distress, against all the defendants, *id.* ¶¶ 144–47.  They request damages, attorneys'

11 fees, and costs. *Id.* at 28.

12

      The defendants, in four groups, have filed motions to dismiss and special motions

13 to strike.  First, the Yuba County defendants (The County, the District Attorney's Office,

14 McGrath, Bendorf, Vacek, Barr, and Stober) move to dismiss under Federal Rule of Civil

15 Procedure 12(b)(6) and move to strike the complaint under California Code of Civil Procedure

16 section 425.16.  They argue they are state actors and are therefore immune under the Eleventh

17 Amendment to the U.S. Constitution.  They also point out that the complaint attacks actions they

18 undertook as prosecutors and witnesses, so they contend they are entitled to immunity, both under

19 federal and state law.  If they are not immune, the Yuba County defendants argue Santana and

20 Vasquez cannot state a claim for malicious prosecution because the investigation and prosecution

21 were founded on probable cause.  They also argue Santana and Vasquez cannot state a

22 substantive due process claim for malicious prosecution.  And finally, Yuba County argues the

23 complaint's factual allegations are inadequate to show it is liable as a municipality.

24

      As for the complaint's state-law claims, the Yuba County defendants request

25 dismissal of any state claims for lack of jurisdiction if the federal claims are dismissed; and they

26 alternatively request a more definite statement. *See generally* Yuba Mot. Dismiss, ECF No. 19.

27 Their motion to strike is based on similar legal arguments, but also contends that Santana and

28 /////

1    Vasquez cannot support their allegations with evidence.  *See generally* Yuba Mot. Strike, ECF

2    No. 20.

3              Second, the City of Marysville and Detective Elliott move to dismiss for

4    essentially the same reasons as the Yuba County defendants, drawing attention to previous state

5    court decisions finding Santana's and Vasquez's prosecution was based on probable cause.  *See*

6    *generally* Marysville Mot., ECF No. 11-1.

7              Third, Judge Scrogin moves to dismiss, arguing that she is protected by absolute

8    immunity as a judge and immunity as a state actor under the Eleventh Amendment.  Should the

9    court find she is not immune, she argues Santana's and Vasquez's claims are barred both as

10   untimely under the statute of limitations and under the California Government Tort Claims Act.

11   *See generally* Scrogin Mot., ECF No. 16-1.

12             Fourth, Evans moves similarly to dismiss and to strike.  He argues the complaint

13   includes no allegation of his participation in the prosecution itself, and he argues that regardless

14   of his absence from the alleged scheme, the defendants had probable cause to charge plaintiffs.

15   He also argues the court lacks subject matter over the claims against him, which are founded

16   solely on state law.  *See generally* Evans Mot., ECF No. 8-1.  If the state law claims are allowed

17   to proceed in federal court, he argues Santana and Vasquez cannot show he was negligent

18   because he never had an attorney-client relationship with either of them.  He argues they cannot

19   state a claim for intentional infliction of emotional distress because his actions were not beyond

20   the bounds of decency.

21             Santana and Vasquez filed an opposition to each motion.  Opp'n Yuba Dismiss,

22   ECF No. 24; Opp'n Yuba Strike, ECF No. 25; Opp'n Evans, ECF No. 21; Opp'n Marysville,

23   ECF No. 28; Opp'n Scrogin, ECF No. 23.  The defendants each replied.  *See* Yuba Reply

24   Dismiss, ECF No. 29; Yuba Reply Strike, ECF No. 30; Evans Reply, ECF No. 26; Marysville

25   Reply, ECF No. 28; Scrogin Reply, ECF No. 27.

26             As a preliminary matter, although the complaint alleges claims under 42 U.S.C.

27   § 1981, it does not identify the basis of these claims.  On its own motion, the court strikes these

28   allegations and orders a more definite statement of any § 1981 claims.  *See, e.g.*, *Anderson v.*

12

1  *Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 367 & n. 5 (11th Cir. 1996) ("[T]he court,

2  acting *sua sponte*, should have struck the plaintiff's complaint . . . and instructed plaintiff's

3  counsel to file a more definite statement.").

4          The court first addresses the special motions to strike, then the motions to dismiss.

5  II.      SPECIAL MOTIONS TO STRIKE

6          A.      In General

7          California enacted Section 425.16 of the Code of Civil Procedure "to curtail the

8  'disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional

9  rights of freedom of speech and petition for the redress of grievances.'" *Bulletin Displays, LLC v.*

10 *Regency Outdoor Adver., Inc.*, 448 F. Supp. 2d 1172, 1178–79 (C.D. Cal. 2006) (quoting Cal.

11 Civ. Proc. Code § 425.16(a)).  It is meant as a procedural remedy for any person sued in a so-

12 called "strategic lawsuit against public participation," or SLAPP,[3] and provides as follows:

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

17 Cal. Civ. Proc. Code § 425.16(b)(1).  Special motions to strike under this section are commonly

18 referred to as anti-SLAPP motions.  *See, e.g.*, *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261

19 (9th Cir. 2013), *pet. rehr'g en banc denied*, 736 F.3d 1180 (9th Cir. 2013); *Manufactured Home*

20 *Communities, Inc. v. Cnty. of San Diego*, 655 F.3d 1171, 1176 (9th Cir. 2011).

21         The legislature meant Section 425.16 to provide defendants a cheap, early

22 opportunity to squelch meritless litigation.  *Soukap*, 39 Cal. 4th at 278.  An anti-SLAPP motion

23 calls for a "summary judgment-like procedure," *Varian Medical Systems, Inc. v. Delfino*, 35 Cal.

24 4th 180, 192 (2005), that proceeds in two stages:

---

27         [3] The usages "SLAPP action" and "SLAPP suit" are redundant, but common. *See, e.g.*, *Shropshire v. Fred Rappoport Co.*, 294 F. Supp. 2d 1085, 1089 (N.D. Cal. 2003); *Soukup v. Law Offices of Herbert Hafif*, 39 Cal. 4th 260, 279 (2006).

13

> First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . If the court finds that such a showing has been made, it must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim. Only a cause of action that satisfies both prongs of the anti-SLAPP statute—*i.e.*, that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute.

*Soukup*, 39 Cal. 4th at 278–79 (citations and internal quotation marks omitted; emphasis in original). The statute's language must be construed broadly. *Id.* § 425.16(a).

### B.  Anti-SLAPP Motions in Federal Court

When sitting in diversity, a federal district court applies federal procedure and state substantive law. *See, e.g.*, *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010). In 1999, the Ninth Circuit found section 425.16 applies in federal courts. *U.S.* ex rel. *Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 970–73 (9th Cir. 1999); *see also Makaeff*, 736 F.3d at 1182 ("California's anti-SLAPP statute, by creating a separate and additional theory upon which certain kinds of suits may be disposed of before trial, supplements rather than conflicts with the Federal Rules.") (Wardlaw and Callahan, JJ., concurring in denial of rehearing en banc). Sections 425.16(f) and (g),[4] however, impose procedural limitations directly at odds with the Federal Rules of Civil Procedure. *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001); *Bulletin Displays*, 448 F. Supp. 2d at 1180; *Rogers v. Home Shopping Network, Inc.*, 57 F. Supp. 2d 973, 979–82 (C.D. Cal. 1999).

---

[4] Those subparagraphs provide as follows:

(f) The special motion may be filed within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper. The motion shall be scheduled by the clerk of the court for a hearing not more than 30 days after the service of the motion unless the docket conditions of the court require a later hearing.

(g) All discovery proceedings in the action shall be stayed upon the filing of a notice of motion made pursuant to this section. The stay of discovery shall remain in effect until notice of entry of the order ruling on the motion. The court, on noticed motion and for good cause shown, may order that specified discovery be conducted notwithstanding this subdivision.

Cal. Civ. Proc. Code § 425.16(f), (g).

14

1    For example, "[s]ection 425.16 limits discovery and makes further discovery an exception, rather

2    than the rule.  Rule 56 does not limit discovery.  On the contrary, it ensures that adequate

3    discovery will occur before summary judgment is considered." *Metabolife*, 264 F.3d at 846

4    (quoting *Rogers*, 57 F. Supp. 2d at 982).  For this reason, sections 425.16(f) and (g) do not apply

5    to litigation in federal court.[5]  *Id.*  Incorrect application of the federal rules is reversible error.  *Id.*;

6    *see also Makaeff*, 736 F.3d at 1183 (citing Fed. R. Civ. P. 12(d)[6])) (Wardlaw and Callahan, JJ.,

7    concurring in denial of rehearing en banc).

8                   This structure has led some district courts to adopt a tiered approach to anti-

9    SLAPP motions.  First, "[i]f an anti-SLAPP motion is based on legal deficiencies in the

10   complaint, a federal court 'must determine the motion in a manner that complies with the

11   standards set by Federal Rules 8 and 12.'"  *Bulletin Displays*, 448 F. Supp. 2d at 1180 (quoting *In*

12   *re Bah*, 321 B.R. 41, 45 n.6 (9th Cir. B.A.P. 2005)); *accord Rogers*, 57 F. Supp. 2d at 982.

13   Second, "[i]f a defendant makes an anti-SLAPP motion based on the plaintiff's failure to submit

14   evidence to substantiate its claims, the motion is treated as a motion for summary judgment, and

15   discovery 'must be developed sufficiently to permit summary judgment under Rule 56.'"  *Id.*

16   (quoting *In re Bah*, 321 B.R. at 45 n.6); *accord Rogers*, 57 F. Supp. at 982; *see also Metabolife*,

17   264 F.3d at 846–47 (reversing to allow for further discovery); *Shropshire v. Fred Rappoport Co.*,

18   294 F. Supp. 2d 1085, 1099 (N.D. Cal. 2003) ("The Court is unable to resolve this issue at this

19   stage of the proceeding, when no discovery has been permitted, because the applicability of the

20   anti-SLAPP statute turns on disputed questions of fact.").

21

22

23          [5] Some judges have found this limitation so thoroughly "eviscerates" section 425.16 as to
     show its purposes are entirely at odds with the Federal Rules, and therefore completely
24   inapplicable in federal courts.  *Makaeff*, 736 F.3d at 1189 (Watford, Paez, Bea, JJ., and Kozinski,
     CJ., dissenting from denial of rehearing en banc).  But this view does not represent the law of the
25   Circuit.

26          [6] That subsection provides, "If, on a motion under Rule 12(b)(6) or 12(c), matters outside
     the pleadings are presented to and not excluded by the court, the motion must be treated as one
27   for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to
     present all the material that is pertinent to the motion."

28

1    At hearing, the defendants explained that their motions argue both legal and

2    evidentiary deficiencies.  The court therefore first determines whether the defendants have made a

3    "threshold showing that the challenged cause of action is one arising from protected activity."

4    *Soukup*, 39 Cal. 4th at 278(citation and quotation marks omitted).  Then, for claims passing this

5    test, the court addresses the complaint's purported legal deficiencies to determine whether the

6    plaintiffs have "demonstrated a probability of prevailing on the claim."  *Id.* (citation and

7    quotation marks omitted).  Because this analysis essentially overlaps with the remaining motions

8    based on Federal Rule of Civil Procedure 12, separate treatment is unnecessary.  *Cf.* Yuba Mot.

9    Strike 8–9 & n.2 (incorporating by reference the arguments in the concurrent motion to dismiss

10   under Rule 12(b)(6); Yuba Reply Strike 4–5 & n.1 (same).

11   Because the court dismisses the complaint in part with leave to amend, to the

12   extent the defendants challenge the plaintiffs' ability to put forward evidence, the special motions

13   are denied without prejudice to renewal after any amendments to the pleadings and any discovery

14   allowed or required by the Federal Rules.

15   C.      Protected Activity

16   Section 425.16 applies only to state-law claims when those claims are invoked in

17   federal court.  *Hilton v. Hallmark Cards*, 599 F.3d 894, 901 (9th Cir. 2010).  The complaint

18   alleges three state-law claims: malicious prosecution, negligence, and intentional infliction of

19   emotional distress.  Each is based on the same alleged wrongs—the investigation and prosecution

20   of criminal charges against Santana and Vasquez—so they may be considered together.

21   1.      Evans

22   Section 425.16 reaches all claims "arising from any statement or writing made in,

23   or in connection with an issue under consideration or review by, an official proceeding or body."

24   *Jarrow Formulas, Inc. v. LaMarche*, 31 Cal. 4th 728, 734 (2003) (citation and quotation marks

25   omitted).  That is, section 425.16 reaches (1) "any written or oral statement or writing made

26   before a . . . judicial proceeding," (2) "any written or oral statement or writing made in connection

27   with an issue under consideration or review by a . . . judicial body," and (3) "any other conduct in

28   furtherance of the exercise of the constitutional right of petition."  Cal. Civ. Proc. Code

16

§ 425.16(e); *see also Jarrow*, 31 Cal. 4th at 734.  An activity need not be constitutionally protected; rather, the defendant "need only show that the activity falls within the scope of [section 425.16(e)]."  *Haight Ashbury Free Clinics, Inc. v. Happening House Ventures*, 184 Cal. App. 4th 1539, 1549 (2010).  Claims arising from litigation activity, including malicious prosecution claims against attorneys, therefore fall within the reach of section 425.16.  *See, e.g.*, *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1056 (2006); *Zamos v. Stroud*, 32 Cal. 4th 958, 965 (2004); *Jarrow*, 31Cal. 4th at 741.

Here, the complaint alleges Evans supported Green for the Sutter County judgeship, Compl. ¶¶ 83–84, and planned to help cook up charges against Santana and Vasquez to spoil Santana's application, *id.* ¶ 91.  Evans allegedly conspired with the Yuba County defendants to conduct a "negligent and improper investigation," to fabricate evidence, to illegally empanel a grand jury, and to present incompetent and irrelevant evidence in a scheme of malicious prosecution.  *Id.* ¶ 88.  Santana and Vasquez allege that he knew about and approved of a recklessly untruthful application for a warrant to search their offices, *id.* ¶ 92, and that he persuaded Griesa to waive his attorney-client privilege, *id.* ¶¶ 95–97.

In essence, Santana and Vasquez allege Evans helped find evidence to support the criminal prosecution, which he understood would prevent Santana's judicial appointment.  These are litigation activities California courts have found to be protected by the anti-SLAPP statute.  *See, e.g.*, *Jarrow*, 31 Cal. 4th at 741 (bringing and maintaining a case is a protected activity, even if allegedly done maliciously and without probable cause); *Dickens v. Provident Life & Acc. Ins. Co.*, 117 Cal. App. 4th 705, 714 (2004) ("[A] malicious prosecution cause of action predicated upon the claim the defendants . . . were instrumental in bringing upon a criminal prosecution against the plaintiff . . . is subject to an anti-SLAPP motion."); *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman*, 47 Cal. App. 4th 777, 784 (1996) ("communications preparatory to or in anticipation of the bringing of an action or other official proceeding" are protected activities).

2.     Yuba County Defendants

Counties, district attorneys, deputy district attorneys, and investigators are "persons" within the meaning of the anti-SLAPP statute, which protects governmental entities

1    and their representatives.[7]  *See Bradbury v. Super. Ct.*, 49 Cal. App. 4th 1108, 1114–15 (1996)

2    (district attorney's public statements on matters of public concern were subject to protection of

3    section 425.16).  Yuba County, McGrath, Vacek, Bendorf, Barr, and Stober are therefore within

4    the scope of section 425.16.

5                Despite the fact that California courts have extended section 425.16 to district

6    attorneys and litigation activities, the defendants have cited no case to show section 425.16

7    applies to the litigation activities of district attorneys in criminal cases specifically.  *See* Yuba

8    Mot. Strike at 7–8.  Neither has the court located any directly relevant published decision,[8]

9    although in *Miller v. Filter*, 150 Cal. App. 4th 652 (2007), the court held that deputized members

10   of the California District Attorneys' Association were entitled to protection under section 425.16.

11   In *Miller*, a District Attorney had deputized members of the California District Attorneys

12   Association to prosecute a mine for alleged violations of worker safety laws that resulted in a

13   workplace death.  *Id.* at 656–57 & n.1.  The criminal prosecution crumbled when the court found

14   no proof that the safety violations had caused the death.  *Id.* at 657.  The vindicated defendants

15   then brought a civil action, alleging claims of malicious prosecution against the deputized

16   prosecutors, who moved to strike the complaint under section 425.16.  *Id.*  The civil trial court

17   denied the motion, the deputized prosecutors appealed, and the court of appeal reversed.  *Id.*

18                The state court of appeal held that the deputized district attorneys were deputy

19   district attorneys as a matter of law.  *See id.* at 660–65.  Therefore, because "[t]he complaint was

20   based on defendants' filing of the criminal action against plaintiffs and the presentation of

21   _____

22            [7] Section 425.16(d) provides that the anti-SLAPP statute "shall not apply to any
     enforcement action brought in the name of the people of the State of California by the Attorney
23   General, district attorney, or city attorney, acting as a public prosecutor."  Cal. Civ. Proc. Code
     § 425.16(d).  This subparagraph makes the anti-SLAPP remedy unavailable to parties to an action
24   brought by a public prosecutor, *see, e.g., People v. Health Labs. of N. Am., Inc.*, 87 Cal. App. 4th
     442, 448 (2001); it does not prohibit invocation of the anti-SLAPP statute by government
25   representatives.

26            [8] In an unpublished opinion, the California Court of Appeal has held that "[t]he initiation
     and prosecution of [a] criminal case [are] unquestionably protected activities under the anti-
27   SLAPP statute."  *Gaeta v. Silva*, No. H031964, 2008 WL 4573313, at *1 (Cal. Ct. App. Oct. 15,
     2008).

28

                                                    18

1    evidence before the grand jury," the prosecution was a protected activity.  *Id.* at 665–66.  To

2    support this conclusion, the court of appeal cited two civil-litigation cases, *Briggs v. Eden*

3    *Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1115 (1999), and *Dove Audio*, 47 Cal. App.

4    4th at 784.

5            In light of this reasoning, this court concludes that the litigation activities of

6    district attorneys and their deputies in criminal cases are protected activities within the meaning

7    of section 425.16.  Because the anti-SLAPP statute protects persons who are "instrumental in

8    bringing upon a criminal prosecution," *Dickens*, 117 Cal. App. 4th at 714, the court concludes it

9    applies to Investigators Barr and Stober as well.

10           Turning now to the substance of section 425.16's test, the complaint alleges the

11   Yuba County defendants supported Green over Santana for the vacant judgeship, Compl.

12   ¶¶ 82-84, and secretly planned to investigate and charge Santana to derail his candidacy, *id.*

13   ¶¶ 85–87.  They conducted a "negligent and improper investigation, . . . fabricated and pursued

14   criminal charges, improperly empaneled a criminal grand jury, knowingly presented incompetent

15   and irrelevant evidence, withheld exonerating evidence and maliciously prosecuted" Santana and

16   Vasquez.  *Id.* ¶ 88.  They supported their application for a warrant to search Santana's and

17   Vasquez's offices with a recklessly untruthful statement of facts.  *Id.* ¶ 92.  After the case was

18   turned over to the State Attorney General's office, they "participated as investigators and

19   witnesses" in the trial against Santana and Vasquez.  *Id.* ¶¶ 111–12.

20           The thrust of these allegations is simple: the Yuba County defendants planned and

21   executed a criminal prosecution on a deficient evidentiary basis, all in an effort to secure Green's

22   appointment to the bench.  Like Evans's alleged actions, these are litigation activities subject to

23   the protection of section 425.16.  *See also Zucchet v. Galardi*, 229 Cal. App. 4th 1466, 1477

24   (2014) ("[T]rial testimony and statements made to prosecutors preparing for a trial fall under the

25   definition of activity in furtherance of the right to free speech or petition as defined in the anti-

26   SLAPP statute."); *Miller*, 150 Cal. App. 4th at 652 ("the defendants' filing of [a] criminal action

27   against plaintiffs and the presentation of evidence before the grand jury" was protected activity).

28   /////

                                                    19

1          D.      Unprotected Conduct Illegal as a Matter of Law

2                  Although the complaint alleges protected activities within the scope of section

3   425.16, Santana and Vasquez may evade the defendants' motions to strike if the "assertedly

4   protected speech or petitioning activity was illegal as a matter of law." *Flatley v. Mauro*,

5   39 Cal. 4th 299, 305 (2006).  A defendant's conduct is "illegal as a matter of law" if he either

6   concedes his conduct was illegal or if "uncontroverted and conclusive evidence" establishes as

7   much.  *Id.* at 320.  This is a separate question from the plaintiff's probability of prevailing, *i.e.*,

8   the second part of the section 425.16 test, addressed in a separate section below.  *Id.*

9                  Here, although Santana and Vasquez allege the defendants offered false testimony

10  or committed crimes, the defendants deny these allegations.  Neither does uncontested and

11  conclusive evidence establish the defendants' conduct was illegal as a matter of law.  Construed

12  in the light most favorable to Santana and Vasquez, the evidence[9] Santana cites to argue the

13  defendants' conduct was illegal shows only that Evans, McGrath, Bendorf, Judge Scrogin, and

14  Susan Green met at a restaurant in December 2007 and spoke about the vacant judgeship, Jesse

15  Santana, and a possible case related to Santana's and Vasquez's efforts to settle the case against

16  Griesa.  *See* Griesa Dep. 117–19, ECF No. 25-2.  This is far from uncontroverted proof of

17  conspiracy to conduct a malicious prosecution.

18                 In arguing Evans's conduct was illegal as a matter of law, Santana and Vasquez

19  also cite the Court of Appeal's opinion in *Santana v. Superior Court*, vacating Santana's

20  indictment.  *See* Opp'n Evans at 16.  They seem to argue that because Evans gave false

21  testimony, section 425.16's protection evaporates.  *See, e.g.*, *Lefebvre v. Lefebvre*, 199 Cal. App.

22  4th 696, 705 (2011).  But the *Santana* court did not find that Evans gave false testimony; rather, it

23  expressed confusion about why Evans had offered testimony on civil compromise: criminal

24  _____

25          [9] The court considers this evidence in light of the California Supreme Court's decision in
    *Flatley*, *see* 39 Cal. 4th at 305 (referring to "uncontroverted and conclusive evidence," rather than
26  allegations), and the fact that Santana and Vasquez, who oppose the motion, are its proponents.
    Neither are the parties here foreclosed from further investigating the possibility that the
27  defendants' conduct was "illegal as a matter of law" such that a renewed motion under section
    425.16 would be denied.

28

1    charges had not yet been filed, so "the person injured" could not "appear[] before the court in

2    which the action in pending." 2012 WL 1777801 at *7 & n.12 (quoting Cal. Pen. Code § 1378).

3    Evans's testimony to the grand jury was at worst irrelevant or unhelpful to the indictment

4    decision, not illegal.

5            In conclusion, the defendants have met their burden to show plaintiffs' state-law

6    claims arise from protected activity. The court therefore proceeds to an evaluation of the

7    complaint's legal sufficiency, the second stage of the anti-SLAPP inquiry.

8    III.    <u>ANTI-SLAPP LEGAL SUFFICIENCY; FEDERAL-LAW MOTIONS TO DISMISS</u>

9      A.    <u>Legal Sufficiency in an Anti-SLAPP Motion</u>

10          As described above, in the face of an anti-SLAPP motion, a plaintiff must establish

11    a "probability" he will prevail in his claim. Cal. Civ. Proc. Code § 425.16(b)(1); *Bulletin*

12    *Displays*, 448 F. Supp. 2d at 1179. Because the court here tables questions of evidence until

13    discovery is developed, as required by the Federal Rules, the plaintiffs' burden is similar to that

14    they face when confronted by a federal-law motion to dismiss or for judgment on the pleadings.

15    *See, e.g.*, *Metabolife*, 264 F.3d at 840; *Bulletin Displays*, 448 F. Supp. 2d at 1179. In fact, "[i]f a

16    defendant makes a special motion to strike based on alleged deficiencies in the plaintiff's

17    complaint, the motion must be treated in the same manner as a motion under Rule 12(b)(6) . . . ."

18    *Rogers*, 57 F. Supp. 2d at 983.

19      B.    <u>Legal Standard on a Motion to Dismiss under Rule 12(b)(6)</u>

20          A party may move to dismiss for "failure to state a claim upon which relief can be

21    granted." Fed. R. Civ. P. 12(b)(6). The motion may be granted only if the complaint lacks a

22    "cognizable legal theory" or if its factual allegations do not support a cognizable legal theory.

23    *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013). The court

24    assumes these factual allegations are true and draws reasonable inferences from them. *Iqbal*,

25    556 U.S. at 678.

26          A complaint need contain only a "short and plain statement of the claim showing

27    that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), not "detailed factual allegations,"

28    *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). But this rule demands more than

1   unadorned accusations; "sufficient factual matter" must make the claim at least plausible.  *Iqbal*,

2   556 U.S. at 678.  In the same vein, conclusory or formulaic recitations of elements do not alone

3   suffice.  *Id.* (quoting *Twombly*, 550 U.S. at 555).  Evaluation under Rule 12(b)(6) is a context-

4   specific task drawing on "judicial experience and common sense."  *Id.* at 679.  And aside from

5   the complaint, district courts have discretion to examine documents incorporated by reference,

6   *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1159–60 (9th Cir. 2012); affirmative defenses

7   based on the complaint's allegations, *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013);

8   and proper subjects of judicial notice, *W. Radio*, 678 F.3d at 976.

9         Should a motion to dismiss be granted, district courts ordinarily allow the plaintiff

10   leave to amend "when a viable case may be presented."  *Lipton v. Pathogenesis Corp.*, 284 F.3d

11   1027, 1039 (9th Cir. 2002).  However, "liberality in granting leave to amend is subject to several

12   limitations."  *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1058 (9th Cir.

13   2011) (citation and quotation marks omitted).  Leave need not be granted where the amendment

14   of the complaint would cause the opposing party undue prejudice, is sought in bad faith,

15   constitutes an exercise in futility, or creates undue delay.  *Id.*  The court's decision is one of

16   discretion.  *Id.*

17         With these rules in mind, the court addresses the defendants' motions.

18   C.   Yuba County Defendants[10]

19         The Yuba County defendants argue for dismissal of all of the claims against

20   them.[11]  The court considers first the federal law claims, then the state law claims.

21         1.   Federal Claims Under 42 U.S.C. § 1983

22         As a preliminary matter, "[w]hen both a municipal officer and a local government

23   entity are named, and the officer is named only in an official capacity, the court may dismiss the

24

25   —————————————

26   [10] Many arguments raised by the City of Marysville and Detective Elliott apply equally to
     the Yuba County defendants.  In the interest of clarity, the court has addressed these arguments
27   jointly in this section.

     [11] Except for the § 1981 claims, which are not addressed, as noted above.

28

officer as a redundant defendant." *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008); *see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). The official-capacity claims against the individual Yuba County defendants are therefore dismissed with prejudice and without leave to amend.

Santana and Vasquez assert several claims under 42 U.S.C. § 1983. That section provides, in relevant part,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. A claim under § 1983 includes two elements: "(1) the defendants acted under color of law, and (2) their conduct deprived [the plaintiff] of a constitutional right." *Stein v. Ryan*, 662 F.3d 1114, 1118 (9th Cir. 2011) (alteration in original). Here, the defendants challenge only the second element, whether Santana and Vasquez were deprived of a constitutional right.

The complaint alleges violations of the Fourth and Fourteenth Amendments. *See* Compl. at 24–26. At hearing, the plaintiffs clarified they allege both direct violations of these Amendments and independent claims for malicious prosecution to deny them of the same rights. For their part, the Yuba County defendants contend both that they are immune from liability and that the substantive allegations against them are inadequately pled. The court addresses first the immunities they assert.

a)   <u>Immunities</u>

Federal law recognizes several varieties of absolute immunity in § 1983 cases. Here, the individual Yuba County defendants raise three. First, they argue the Eleventh Amendment protects them from liability because they are state actors and not "persons" within the meaning of section § 1983. Second, they argue they are entitled to absolute immunity as prosecutors. And third, they argue they are entitled to absolute immunity as witnesses.

23

1                        (1)      Eleventh Amendment

2              "Claims under § 1983 are limited by the scope of the Eleventh Amendment." *Doe*

3  *v. Lawrence Livermore Nat. Lab.*, 131 F.3d 836, 839 (9th Cir. 1997).  Actions against states and

4  state officials in their official capacities can proceed in three circumstances: when the state gives

5  its consent; when Congress abrogates the state's Eleventh Amendment immunity in a valid

6  exercise of power; and when a plaintiff seeks prospective relief from a government official.  *See*

7  *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 73 (1996); *Green v. Mansour*, 474 U.S. 64, 68

8  (1985).  Here, California has not consented to this action, the plaintiffs do not seek prospective

9  relief, and Congress did not abrogate California's immunity by passing § 1983.  *Quern v. Jordan*,

10  440 U.S. 332, 341 (1979).  The plaintiffs do not dispute these conclusions; moreover, as noted

11  above, the claims against the Yuba County defendants in their official capacities are redundant of

12  the claims against the County in this case.

13              But "state officials, sued in their individual capacities, are 'persons' within the

14  meaning of § 1983," and "[t]he Eleventh Amendment does not bar such suits."  *Hafer v. Melo*,

15  502 U.S. 21, 31 (1991).  "Personal-capacity suits seek to impose personal liability upon a

16  government official for actions he takes under color of state law."  *Kentucky v. Graham*, 473 U.S.

17  159, 165 (1985); *accord Monell v. N.Y. City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978)).

18  The individual-capacity claims may proceed if otherwise adequately alleged and if not barred by

19  another immunity.

20                        (2)      Prosecutorial Immunity

21              State prosecuting attorneys are absolutely immune in actions for damages under

22  § 1983 when they act within the scope of their duties by initiating and pursuing criminal

23  prosecutions, *Imbler v. Pachtman*, 424 U.S. 409, 410 (1976), carrying out "the traditional

24  functions of an advocate," *Kalina v. Fletcher*, 522 U.S. 118, 131 (1997).  Absolute immunity

25  protects even against claims of malicious prosecution, use of perjured testimony, and suppression

26  of material evidence.  *See Imbler*, 424 U.S. at 430.  It is meant to avoid "deflection of the

27  prosecutor's energies from his public duties, and the possibility he would shade his decisions

28  instead of exercising the independence of judgment required by the public trust."  *Id.* at 423.  This

24

1   rule represents a painful sacrifice, to be sure: absolute prosecutorial immunity may well leave

2   "the genuinely wronged defendant without civil redress against a prosecutor whose malicious or

3   dishonest action deprives him of liberty." *Id.* at 427.  It should come as no surprise then that

4   immunity is not automatic and that the Supreme Court recognizes absolute immunity sparingly.

5   *Genzler v. Longanbach*, 410 F.3d 630, 636–37 (9th Cir. 2005) (citing *Burns v. Reed*, 500 U.S.

6   478, 486–87 (1991)).  The prosecutor who asserts absolute immunity bears the burden to show

7   the protection is justified.  *Genzler*, 410 F.3d at 636.

8           Absolute prosecutorial immunity applies only to conduct "intimately associated

9   with the judicial phase of the criminal process." *Burns*, 500 U.S. at 486 (quoting *Imbler*, 424

10  U.S. at 430).  For this reason, when a prosecutor argues she is absolutely immune under this rule,

11  the court must determine whether she performed a "quasi-judicial function." *Broam v. Bogan*,

12  320 F.3d 1023, 1029 (9th Cir. 2003).  If so, she is immune, even if she violated the plaintiff's

13  constitutional rights.  *Id.*  In making this determination, the court looks not to the prosecutor's

14  motivation, but to the "ultimate acts" themselves.  *See Ashelman v. Pope*, 793 F.2d 1072, 1078

15  (9th Cir. 1986) (en banc).

16          Many activities that take place before a prosecution is officially instituted may be

17  protected by absolute prosecutorial immunity.  *Imbler*, 424 U.S. at 431 n.33.  For example,

18  appearing in court in support of an application for a search warrant, presenting evidence at a

19  hearing, evaluating evidence, interviewing witnesses, and preparing charging documents are all

20  acts subject to the protection of absolute immunity.  *Kalina*, 522 U.S. at 130; *Buckley v.*

21  *Fitzsimmons*, 509 U.S. 259, 273 (1993); *Burns*, 500 U.S. at 492.  But giving legal advice to the

22  police is not.  *Burns*, 500 U.S. at 496.  And a prosecutor enjoys only qualified immunity, not

23  absolute immunity, for investigatory, administrative, or investigative functions such as "gathering

24  physical evidence and conducting interrogations to determine whether a crime has been

25  committed and whether probable cause exists to arrest a suspect." *Broam*, 320 F.3d at 1028,

26  1031.  Similarly, absolute immunity does not protect a prosecutor who fabricates evidence during

27  the early stages of an investigation, or who holds defamatory press conferences.  *See Buckley*, 509

28  U.S. at 275–77.

1       Here, McGrath, Bendorf, and Vacek are absolutely immune to claims regarding

2 their actions "preparing for the initiation of judicial proceedings or for trial"; this includes "the

3 professional evaluation of the evidence assembled by the police and appropriate preparation for

4 its presentation at trial or before a grand jury." *Buckley*, 509 U.S. at 273.  These tasks are part of

5 their duties as "advocate[s] for the State."  *Imbler*, 424 U.S. at 431 n.33.  The plaintiffs therefore

6 may not maintain this action on the basis of their allegation that McGrath, Bendorf, and Vacek

7 "fabricated and pursued criminal charges, improperly empaneled a grand jury, knowingly

8 presented incompetent and irrelevant evidence, withheld exonerating evidence, and maliciously

9 prosecuted" Santana and Vasquez.  Compl. ¶ 88.  Even if unconstitutional, these were the acts of

10 advocates preparing for trial and are protected by absolute immunity.  *See Genzler*, 410 F.3d

11 at 637–38.

12       Santana and Vasquez also allege McGrath, Bendorf, and Vacek planned and

13 participated in an investigation that began long before evidence was gathered, victims were

14 interviewed, search warrants were obtained, or charges were prepared.  *See, e.g.*, Compl. ¶¶ 85–

15 87 (secret plans to investigate and charge Santana); *id.* ¶ 92 (participation in the collection of

16 evidence).  Prosecutors act like the police when they "search[ ] for clues and corroboration that

17 might give [them] probable cause to recommend that a suspect be arrested," and accordingly they

18 bear only qualified immunity for these acts.  *Buckley*, 509 U.S. at 273.  Like the hypothetical

19 prosecutor the Supreme Court described in *Buckley*, who "plans and executes a raid on a

20 suspected weapons cache," McGrath , Bendorf, and Vacek may assert only qualified immunity in

21 defense to the plaintiffs' claims that they helped collect and manufacture the evidence against

22 Santana and Vasquez.

23       (3)    <u>Testimonial Immunity</u>

24       The defendants' immunity as prosecutors does not extend to their testimony at the

25 criminal trial, which certainly is not provided as part of an advocate's traditional role.  *See*

26 *Kalina*, 522 U.S. at 130.  But another immunity protects the testimony of trial witnesses: "a trial

27 witness has absolute immunity with respect to *any* claim based on the witness' testimony."

28 *Rehberg v. Paulk*, __ U.S. __, 132 S. Ct. 1497, 1505 (2012) (emphasis in original); *see also*

1    *Briscoe v. LaHue*, 460 U.S. 325, 345–46 (1983).  Even perjury on the witness stand does not

2    destroy this immunity.  *Rehberg*, 132 S. Ct. at 1505.[12]  A trial witness's absolute immunity shares

3    a common heritage with a prosecutor's absolute immunity.  *See, e.g.*, *Briscoe*, 460 U.S. at 335.

4    Testimonial absolute immunity protects not only private, uninterested witnesses; police officers

5    as well are immune to claims arising from their testimony at trial.  *Rehberg*, 132 S. Ct. at 1505–

6    08; *Biscoe*, 460 U.S. at 335.

7                Here, despite this immunity, Santana and Vasquez argue McGrath, Bendorf, and

8    Vacek are liable for their testimony in the criminal trial because they participated in the criminal

9    case as both witnesses and prosecutors.  Compl. ¶ 112; Opp'n Yuba Dismiss at 8 (citing *Kalina*,

10   522 U.S. 118).  In *Kalina*, the Supreme Court held that although a state deputy district attorney

11   was absolutely immune for actions undertaken "in connection with the preparation and filing of

12   . . . the information and the motion for an arrest warrant," she could be held liable under § 1983

13   for certifying "under penalty of perjury" that the facts underlying the information and motion

14   were true.[13]  522 U.S. at 129–31.  The *Kalina* Court reasoned that by attesting to the accuracy of

15   those facts, the prosecutor had "performed an act that any competent witness might have

16   performed."  *Id.* at 129–30.  And because another person who had done that same act would be

17   protected by only qualified immunity, so would the prosecutor.  *Id.* at 130–31; *see also Malley v.*

18   *Briggs*, 475 U.S. 335, 341–43 (1986) (a police officer applying for a warrant is protected by only

19   qualified immunity).  The Court noted that "tradition, as well as the ethics of our profession,

20   generally instruct counsel to avoid the risks associated with participating as both advocate and

21   witness in the same proceeding."  *Kalina*, 522 U.S. at 130.

22

23

_____

24        [12] "In *Briscoe*, the Court concluded that the possibility of civil liability was not needed to
25   deter false testimony at trial because other sanctions—chiefly prosecution for perjury—provided
     a sufficient deterrent."  *Rehberg*, 132 S. Ct. at 1505 (citing 460 U.S. at 342).

26        [13] Justice Scalia, writing separately to concur, explained that "[a] conscientious prosecutor
27   reading our cases should now conclude that there is absolute immunity for the decision to seek an
     arrest warrant after filing an information, but only qualified immunity for testimony as a witness
     in support of that warrant."  522 U.S. at 131–32 (Scalia, J., concurring).

28

1     Unlike in *Kalina*, the testimony at issue in this case would have been protected by

2 absolute immunity had another witness given it.  That is, this case is more like *Briscoe*, where the

3 Supreme Court found that a police officer enjoyed absolute immunity for trial testimony.

4 460 U.S. at 335–36.  At the time they testified in the criminal trial, McGrath, Bendorf, and Vacek

5 had turned control of the prosecution over to the Attorney General's office, so the conflicts that

6 would normally have tainted their testimony had dissipated.  The court recognizes that although

7 they were no longer assigned to the case, they nonetheless remained prosecutors.  And not only

8 were they prosecutors; they were the very prosecutors who had decided to prosecute Santana and

9 Vasquez.  Nevertheless, the court concludes that if a police officer enjoys absolute immunity for

10 testimony at trial about a case he investigated, *see Briscoe*, 460 U.S. at 326–27, it is hard to see

11 why a prosecutor formerly assigned to the case should not enjoy the same immunity.  Moreover,

12 "[t]he central focus" in determining absolute immunity is "the nature of the judicial proceeding

13 itself," not the identity of the witness.  *Briscoe*, 460 U.S. at 334; *see also Kalina*, 522 U.S. at 127.

14     Moreover, the reasons that motivated the Supreme Court to grant lay witnesses and

15 police-officer witnesses testimonial immunity apply equally to a witness who was formerly a

16 prosecutor in the case.  A trial witness's immunity from damages under § 1983 is part of the same

17 common-law "cluster of immunities protecting the various participants in judge-supervised

18 trials." *Butz v. Economou*, 438 U.S. 478, 512 (1978).  Ironclad immunity is necessary "to assure

19 that judges, advocates, and witnesses can perform their respective functions without harassment

20 or intimidation." *Id.*  The Supreme Court has recognized, "again and again," the alternative

21 "would disserve the broader public interest." *Briscoe*, 460 U.S. at 345.

22                              (4)     Summary

23     First, the official-capacity claims against the individual Yuba County defendants

24 are dismissed with prejudice as either redundant or barred by the Eleventh Amendment, but the

25 individual-capacity claims against the same defendants may proceed if otherwise adequately

26 alleged.  Second, the district attorney defendants are immune from liability for actions undertaken

27 in their personal capacities inasmuch as those actions were prosecutorial and not investigative.

28 And third, the Yuba County defendants are also immune to any claims arising from their

1    testimony at the criminal trial.  The complaint is dismissed with prejudice and without leave to

2    amend to the extent these immunities apply.  The court now turns to the substantive adequacy of

3    the complaint's federal claims against the Yuba County defendants.

b)    <u>Pleading Adequacy</u>

5    As noted above, Santana and Vasquez allege violations of their Fourteenth

6    Amendment rights to substantive due process and equal protection of the law, their Fourth

7    Amendment right to be free of unlawful searches and seizures, and malicious prosecution to

8    deprive them of each of the same rights.  The court addresses first the Fourteenth Amendment

9    claims.

(1)    Fourteenth Amendment

11    Santana and Vasquez allege violations of their Fourteenth Amendment right to

12    substantive due process, and clarify this claim "stems from the malicious prosecution."  Opp'n

13    Yuba Dismiss at 11.

14    "[N]o substantive due process right exists under the Fourteenth Amendment to be

15    free from prosecution without probable cause."  *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1069

16    (9th Cir. 2004) (citing *Albright v. Oliver*, 510 U.S. 266 (1994)); *accord Lacey v. Maricopa Cnty.*,

17    693 F.3d 896, 919 (9th Cir. 2012) (en banc) (a claim for malicious prosecution under § 1983 must

18    be based on a specific constitutional right).  The motion is therefore granted with prejudice and

19    without leave to amend as to this claim.

20    The Fourteenth Amendment's equal protection clause, on the other hand, provides

21    an adequate basis for a § 1983 claim of malicious prosecution.  *See, e.g.*, *Awabdy*, 368 F.3d

22    at 1070.  The equal protection clause protects every person within a State's jurisdiction from

23    intentional or arbitrary discrimination, including by a State's agents.  *Village of Willowbrook v.*

24    *Olech*, 528 U.S. 562, 564 (2000) (per curiam) (citing *Sioux City Bridge Co. v. Dakota Cnty.*, 260

25    U.S. 441, 445 (1923)).  When considering a claim for violation of the Fourteenth Amendment's

26    equal protection clause, the court's first step is to identify the classification that gave rise to the

27    alleged discrimination; the type of classification dictates how closely the court scrutinizes its

28    justification.  *See, e.g.*, *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 589 (9th Cir. 2008);

1    *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1277 (9th Cir. 2004).  One of three specific levels of

2    scrutiny normally applies: strict scrutiny, intermediate scrutiny, or the default test, rational basis

3    review.  *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 543 (9th Cir. 2004).  Strict scrutiny and

4    intermediate scrutiny are applicable to claims of discrimination on the basis of a suspect

5    classification or when a plaintiff alleges deprivation of fundamental rights.  *See, e.g.*,

6    *Kahawaiolaa*, 386 F.3d at 1277.  Otherwise the court considers whether the classification in

7    question is rationally related to a legitimate state interest.  *See, e.g.*, *Dallas v. Stanglin*, 490 U.S.

8    19, 23 (1989).  "Under this standard, a 'State may not rely on a classification whose relationship

9    to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.'" *Lazy Y*

10   *Ranch*, 546 F.3d at 589 (quoting *City of Cleburne v. Cleburne Living Cntr.*, 473 U.S. 432, 446

11   (1985)).

12          Here, the complaint does not clearly allege the basis of any classification.  Its

13   Fourteenth Amendment claim invokes only due process, not equal protection.  *See* Compl. at 25.

14   The motion must therefore be granted.  Nevertheless, the complaint's allegations are generally

15   consistent with both a theory of classification on the basis of political association, *see, e.g.*,

16   Compl. ¶¶ 83–85 (the defendants, all associated with the District Attorney's office, discriminated

17   against Santana because he was not part of their circle), and a theory of racial discrimination, *see,*

18   *e.g.*, *id.* ¶ 82 (Santana was a "prominent Hispanic lawyer").  The motion is therefore granted with

19   leave to amend.

20          The defendants correctly note that political association is not a suspect

21   classification.  *See, e.g.*, *Pagan v. Calderon*, 448 F.3d 16, 36 (lst Cir. 2006) (citing *Vieth v.*

22   *Jubelirer*, 541 U.S. 267, 293 (2004) (plurality opinion)); *R.A.V. v. City of St. Paul, Minn.*, 505

23   U.S. 377, 406 (1992) (White, J., concurring in the judgment) ("A defamation statute that drew

24   distinctions on the basis of political affiliation . . . would unquestionably fail rational-basis

25   review.").  But the fact that a plaintiff lacks membership in a suspect class calls for rational basis

26   review, not dismissal.  Rational basis review is "the most relaxed and tolerant form of judicial

27   scrutiny," *Dallas*, 490 U.S. at 26, but it is a meaningful standard nonetheless.  The Ninth Circuit

28   has held that when a defendant provides the court with no rational basis for the classification, a

1   motion to dismiss must be denied, even if the defendant articulates reasons for the decision itself.

2   *See Lazy Y Ranch*, 546 F.3d at 590.  In any event, the viability of an as-yet-unpleaded claim is

3   better tested in a later motion to dismiss.  *See, e.g.*, *SAES Getters S.p.A. v. Aeronex, Inc.*, 219 F.

4   Supp. 2d 1081, 1086 (S.D. Cal. 2002).

5          The Fourteenth Amendment claims are dismissed with leave to amend as

6   described above.

7                          (2)      Fourth Amendment—Seizure

8          "The Fourth Amendment safeguards '[t]he right of the people to be secure in their

9   persons, houses, papers, and effects, against unreasonable searches and seizures.'"  *Atwater v.*

10  *City of Lago Vista*, 532 U.S. 318, 326 (2001) (quoting U.S. Const. am. IV).  It goes without

11  saying that an unreasonable search or seizure is an element of any § 1983 claim for violation of

12  the right to be free from unreasonable searches and seizures.  *See Karam v. City of Burbank*,

13  352 F.3d 1188, 1193 (9th Cir. 2003).

14         A prosecution intended to deny a person of his right to be free from unreasonable

15  searches and seizures may also serve as the basis for a claim under § 1983.  *See, e.g.*, *Awabdy*,

16  368 F.3d at 1069.  The plaintiff must allege the defendants prosecuted him with malice, without

17  probable cause, and for the purpose of denying him of his Fourth Amendment right, *see id.* at

18  1066, and that a Fourth Amendment seizure occurred, *Yousefian v. City of Glendale*, 779 F.3d

19  1010, 1015 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 135 (2015).  Malicious prosecution actions

20  are not limited to prosecutors; others who wrongly cause charges to be filed may also be liable.

21  *Awabdy*, 368 F.3d at 1066.

22         Here, it is unclear whether Santana and Vasquez allege a search or seizure ever

23  occurred.[14]  Santana and Vasquez do not allege they were ever held in custody, arrested,

24  incarcerated, or even restrained.  To shed light on this omission, the defendants request the court

25

26  ─────────────

27         [14] The complaint might also be read to assert a claim founded on an allegedly unlawful
    search, but the plaintiffs provide no argument to support this theory.  The court therefore
    expresses no view on the viability of such a claim.

28

1   take notice of the Yuba County Superior Court's records in the underlying criminal case.  *See*

2   Elliott Req. J. Not., Ex. B, ECF No. 11-2.  The court grants the unopposed request for judicial

3   notice of these records.  *See* Fed. R. Evid. 201(b); *United States v. S. Cal. Edison Co.*, 300 F.

4   Supp. 2d 964, 973 (E.D. Cal. 2004) ("Federal courts may 'take notice of proceedings in other

5   courts, both within and without the federal judicial system, if those proceedings have a direct

6   relation to the matters at issue.'" (quoting *U.S. ex rel Robinson Rancheria Citizens Council v.*

7   *Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992)).  But judicial notice does not establish the truth

8   of these records' content.  *See, e.g.*, *M/V Am. Queen v. San Diego Marine Const. Corp.*, 708 F.2d

9   1483, 1491 (9th Cir. 1983); *Cactus Corner, LLC v. U.S. Dep't of Agric.*, 346 F. Supp. 2d 1075,

10   1100 (E.D. Cal. 2004), *aff'd*, 450 F.3d 428 (9th Cir. 2006).

11          The Yuba County Superior Court's records suggest Santana and Vasquez

12   remained at liberty on their own recognizance throughout the prosecution.  *See* Elliott Req. J.

13   Not., Ex. B, ECF No. 11-2.  The Ninth Circuit recently declined to decide whether a defendant

14   who faces felony charges in California has been subjected to a "seizure" under the Fourth

15   Amendment if he remains always at liberty on his own recognizance.  *Yousefian*, 779 F.3d at

16   1015 n.6 (citing *Karam*, 352 F.3d at 1193–94).  Several years ago, however, in *Karam*, the circuit

17   court found that a defendant who faced misdemeanor charges and who remained at liberty on her

18   own recognizance could not succeed in a Fourth Amendment case because she had not been

19   "seized."  352 F.3d at 1193–94.  In reaching this decision, the court considered several facts: the

20   defendant had not been charged with a felony, she was not required to report to anyone, and she

21   was required only to make court appearances and obtain the court's permission if she wanted to

22   leave the state.  *Id.* at 1194.  Any seizure was therefore "de minimis," and she could not state a

23   Fourth Amendment claim.  *Id.*  A clear majority of federal circuit courts have similarly concluded

24   that "a pre-arraignment, non-felony summons requiring no more than a later court appearance

25   does not constitute a Fourth Amendment seizure."  *Burg v. Gosselin*, 591 F.3d 95, 99–101 (2d

26   Cir. 2010) (collecting authority on this point from the First, Third, Sixth, Seventh, Eighth, Ninth,

27   Tenth, and Eleventh Circuits).

28   /////

1           This case mirrors *Karam* but for one important detail: Santana and Vasquez faced

2    felony charges, not misdemeanor charges.  "The contours of the holding in *Karam* are not entirely

3    defined as to the significance, by itself, of the felony charge."  *McCabe v. Hart*, 357 F. App'x

4    151, 153 (9th Cir. 2009).  The provenance of the distinction between those who face

5    misdemeanor charges and felony charges is likely Justice Ginsburg's concurrence in *Albright v.*

6    *Oliver*, 510 U.S. 266 (1994); several circuit opinions cite that concurrence as persuasive

7    authority.  *See e.g.*, *Burg*, 591 F.3d at 97–98; *Karam*, 352 F.3d at 1194; *see also DePiero v. City*

8    *of Macedonia*, 180 F.3d 770, 789 (6th Cir. 1999).  In *Albright*, Justice Ginsburg wrote as follows:

9    
10        A person facing serious criminal charges is hardly freed from the
     state's control upon his release from a police officer's physical grip.
     He is required to appear in court at the state's command.  He is
11   often subject, as in this case, to the condition that he seek formal
     permission from the court (at significant expense) before exercising
     what would otherwise be his unquestioned right to travel outside
12   the jurisdiction.  Pending prosecution, his employment prospects
     may be diminished severely, he may suffer reputational harm, and
13   he will experience the financial and emotional strain of preparing a
     defense.
14   
15        A defendant incarcerated until trial no doubt suffers greater
     burdens.   That difference, however, should not lead to the
     conclusion that a defendant released pretrial is not still "seized" in
16   the constitutionally relevant sense.  Such a defendant is scarcely at
     liberty; he remains apprehended, arrested in his movements, indeed
17   "seized" for trial, so long as he is bound to appear in court and
     answer the state's charges.  He is equally bound to appear, and is
18   hence "seized" for trial, when the state employs the less strong-arm
     means of a summons in lieu of arrest to secure his presence in
19   court.

20   510 U.S. at 278–79 (Ginsburg, J., concurring).  No other justice joined Justice Ginsburg in this

21   reasoning, however, and several federal circuit courts disagree.  *See, e.g.*, *Bielanski v. Cnty. of*

22   *Kane*, 550 F.3d 632, 638 (7th Cir. 2008); *Riley v. Dorton*, 115 F.3d 1159, 1162 (4th Cir. 1997),

23   *abrogated on other grounds*, *Wilkins v. Gaddy*, 559 U.S. 34 (2010); *Kingsland v. City of Miami*,

24   382 F.3d 1220, 1236 (11th Cir. 2004); *see also Mata v. Anderson*, 685 F. Supp. 2d 1223, 1251

25   (D.N.M. 2010) (collecting authority), *aff'd*, 635 F.3d 1250 (10th Cir. 2011); *cf. United States v.*

26   *Scott*, 450 F.3d 863, 872 (9th Cir. 2006) ("People released pending trial . . . have suffered no

27   judicial abridgment of their constitutional rights.").

28   /////

1           For example, despite considering Justice Ginsberg's arguments in *Albright*, the

2   First Circuit determined that categorizing "standard conditions of pretrial release" as a Fourth

3   Amendment seizure would be "much too ambitious a view of the law." *Nieves v. McSweeney*,

4   241 F.3d 46, 55–56 (1st Cir. 2001). The court based its decision on the Supreme Court's holding

5   in *Brower v. County of Inyo,* 489 U.S. 593 (1989), which emphasized the concepts of "physical

6   control" and "termination of freedom of movement" as requirements for a Fourth Amendment

7   seizure. *Id.* at 56 (internal citations omitted). The First Circuit refused to find a seizure absent

8   any arrest, detention, restriction of travel, or other "deprivation of . . . liberty." *Id.*

9           Another judge of this district has concluded that "[t]he fact of a felony charge, of

10  itself, is not determinative of a seizure in violation of the Fourth Amendment. It is the fact of the

11  felony charge with other restrictions that is important." *Fenters v. Chevron*, No. 05-1630, 2010

12  WL 5477710, at *23 (E.D. Cal. Dec. 30, 2010). In *Fenters*, the plaintiff was charged with felony

13  embezzlement. *Id.* at *19. She was booked, fingerprinted, and released on her own recognizance,

14  although she was required to appear at all times and places the court ordered, and she could not

15  leave the state without the court's permission. *Id.* at *19, 21. The district court found this was

16  not a seizure, so the defendants were granted summary judgment. *Id.* at *21.

17          This court agrees a felony charge cannot alone remove Santana and Vasquez from

18  the logical bounds of *Karam*. But neither does the fact that Santana and Vasquez faced felony

19  charges alone establish their seizure. Whether they were seized depends not on the charges filed

20  against them, but on the restrictions they faced as a result. *See, e.g.*, *Karam*, 352 F.3d at 1193–94

21  (pretrial release conditions were not a seizure because the plaintiff had been required only to

22  make court appearances and obtain the court's permission if she wanted to leave the state); *Evans*

23  *v. Ball*, 168 F.3d 856, 860–61 (5th Cir. 1999) (pretrial release conditions amounted to a seizure

24  because the plaintiff was required to appear in court, obtain permission before leaving the state,

25  report regularly to pretrial services, sign a personal recognizance bond, and give financial and

26  other identifying information to officers), *abrogated on other grounds*, *Castellano v. Fragozo*,

27  352 F.3d 939 (5th Cir. 2003); *Gallo v. City of Philadelphia*, 161 F.3d 217, 222–23 (3d Cir. 1998)

28  (although it was a "close question," a seizure occurred when the plaintiff was required to pay a

1    bond, attend court hearings, contact pretrial services weekly, and was prohibited from traveling

2    outside New Jersey and Pennsylvania); *Murphy v. Lynn*, 118 F.3d 938, 946 (2d Cir. 1997)

3    (pretrial release conditions subjected the plaintiff to a seizure because he could not leave the state

4    and was required to appear in court many times); *Nieves,* 241 F.3d at 56 (no seizure occurred

5    when plaintiffs were charged with multiple felonies and required to appear in court, but released

6    on their own recognizance, not required to post a monetary bond, not restricted in their travel, or

7    "otherwise exposed to any significant deprivation of liberty").

8            As these examples show, the inquiry is a factual one wherein the court looks to

9    what particular restrictions Santana and Vasquez faced.  Because the complaint includes no

10   allegation that an unreasonable search or seizure occurred, the motion must be granted.  As the

11   deficiency could be cured by sufficient additional factual allegations, the motion will be granted

12   with leave to amend unless amendment would be futile for some other reason.

13                   (3)    Fourth Amendment—Probable Cause

14           The defendants argue any amendment would be futile because the charges and

15   prosecution were founded on probable cause.  "[P]robable cause is an absolute defense to

16   malicious prosecution."  *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1054–55 (9th Cir. 2009).

17   The Yuba County defendants do not argue directly they had probable cause to believe Santana

18   and Vasquez had committed a crime.  Rather, they cite previous state court decisions to that effect

19   and argue Santana and Vasquez are collaterally estopped or precluded from relitigating the issue.

20   If this were true, then amending the Fourth Amendment claim would be futile.

21           "In determining the collateral estoppel effect of a state court judgment, federal

22   courts must, as a matter of full faith and credit, apply that state's law of collateral estoppel."  *In re*

23   *Bugna*, 33 F.3d 1054, 1057 (9th Cir. 1994).  In California, collateral estoppel bars relitigation of

24   issues argued and decided in prior proceedings.  *Lucido v. Super. Ct.*, 51 Cal. 3d 335, 341 (1990).

25   A state court's finding of probable cause may preclude later litigation of the same question in

26   federal court, including when raised in a malicious prosecution claim under § 1983.  *Wige v. City*

27   *of L.A.*, 713 F.3d 1183, 1184–85 (9th Cir. 2013) (citing *McCutchen v. City of Montclair*, 73 Cal.

28   /////

App. 4th 1138 (1999)); *Awabdy*, 368 F.3d at 1068.  A court looks to five "threshold requirements":

> First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding.  Second, this issue must have been actually litigated in the former proceeding.  Third, it must have been necessarily decided in the former proceeding.  Fourth, the decision in the former proceeding must be final and on the merits.  Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.

*Lucido*, 51 Cal. 3d at 341.  In a case like this one, a common rejoinder is that the evidence the defendants had when they decided to arrest or prosecute was different from the evidence presented to the state court that found probable cause.  *See, e.g.*, *Wige*, 713 F.3d at 1186; *Awabdy*, 368 F.3d at 1068; *McCutchen*, 73 Cal. App. 4th at 1147.  For example, if the evidence presented at the preliminary hearing was discovered only after an arrest was made, if the evidence presented to the state court was fabricated, or if the prosecutors lied or their conduct was otherwise "wrongful," collateral estoppel does not apply.  *Awabdy*, 368 F.3d at 1068; *see also Wige*, 731 F.3d at 1186.

Awabdy illustrates these rules well.  In that case, the plaintiff, Mr. Awabdy, was a former member of the city council.  368 F.3d at 1065.  While he was on the city council he butted heads with other municipal officials.  *Id.*  He alleged that a cabal of two other city councilmembers, a police officer, and the city manager was formed to falsely claim he embezzled public funds so as to torpedo his reelection campaign.  *Id.*  The group also allegedly made it known they intended to "get" Awabdy because he was of "Arabic extraction."  *Id.*  Charges were brought two weeks before the election, and Awabdy was defeated, while the other incumbents were reelected.  *Id.* at 1065–66.  The next month he was held to answer on embezzlement charges, although the district attorney later dismissed the charges in the interests of justice.  *Id.* at 1066.  Awabdy then brought an action in federal court, alleging claims under § 1983 for malicious prosecution to deprive him of his rights under the First, Thirteenth, and Fourteenth Amendments.  *Id.* at 1065.  The district court granted the defendants' motion to dismiss.  *Id.*  On appeal, the Ninth Circuit reversed.  *See id.* at 1068.  It held that collateral estoppel did not bar

1   litigation of probable cause because Awabdy had alleged the charges against him were based on

2   fraud, false accusations, and wrongful conduct.  *Id.*  In other words, relitigation of probable cause

3   was not precluded because the plaintiff alleged the earlier probable cause determination was

4   wrongfully obtained.

5          Here, Santana and Vasquez cite *Awabdy* to argue any state court decision on

6   probable cause has no preclusive effect.  In reply, the defendants protest only the complaint's lack

7   of detail.  *See, e.g.*, Yuba Reply Dismiss at 6 ("Plaintiffs continuously fail to be specific about

8   what exactly was fraudulent, corrupt or fabricated.  Further, they fail to allege or explain that

9   absent the unidentified fabricated evidence or false statement, the remaining information would

10  not have been sufficient to support probable cause."); Marysville Reply at 6 ("Plaintiffs do not

11  contend that either of their appeals was tainted by fabricated evidence or other prosecutorial

12  misconduct.").

13         The complaint's allegations go beyond conclusory statements of wrongful

14  conduct:  Green was a friend of the defendants and a former district attorney.  The defendants

15  intended to prevent Santana from becoming a judge.  They met and spoke about Santana's

16  candidacy, Green's candidacy, and a possible criminal case against Santana.  The defendants

17  agreed not to prosecute Griesa so they could pursue the case against Santana and Vasquez, and

18  Judge Scrogin empaneled the grand jury in Santana's case despite recusing herself from several

19  earlier cases in which Santana appeared as counsel.  This is not to say the complaint plausibly

20  alleges the defendants lacked probable cause, *cf. infra* pages 56–57; rather, the allegations of

21  wrongful conduct simply remove the complaint from the preclusive shadow of previous state

22  court decisions.  Moreover, the court considers here only whether amendment would be futile.

23         A careful reading of *Awabdy* also confirms this is the correct result.  The relevant

24  passage is phrased in the conjunctive: "[C]ollateral estoppel does not apply when the decision to

25  hold a defendant to answer was made [1] on the basis of fabricated evidence presented at the

26  preliminary hearing or [2] as the result of other wrongful conduct by state or local officials."

27  368 F.3d at 1068.  In other words, collateral estoppel does not apply if the previous decision was

28  allegedly the result of "wrongful conduct by state or local officials," even if the plaintiff does not

1  point out specific fabrications.  *Id.*  The circuit court's statement of Mr. Awabdy's allegations

2  also supports this reading: it listed no specific statements other than to note the embezzlement

3  charge was, generally, false.  *See id.* at 1065–66.  In fact, the record on appeal contained no

4  details about the embezzlement charge at all, and the court listed them only in the margin,

5  apparently for context.  *See id.* at 1065 n.1.

6            Finally, no information on the record here shows the California state courts'

7  previous decisions weighed the possibility of the defendants' false accusations or wrongful

8  conduct.  *See generally*, Marysville & Elliott Req. J. Not. Ex. C, ECF No. 11-2.[15]  The court

9  therefore concludes that amendment would not be futile, and leave to amend is granted on the

10  claims premised on the Fourth Amendment right to be free from unreasonable searches and

11  seizures.

12                    (4)    Municipal Liability

13            Municipalities may be held liable as "persons" under 42 U.S.C. § 1983.  *Monell v.*

14  *Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978).  A plaintiff who seeks to impose liability on a

15  municipality under § 1983 must "identify a municipal 'policy' or 'custom' that caused the

16  plaintiff's injury."  *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997).  "Locating a

17  'policy' ensures that a municipality is held liable only for those deprivations resulting from the

18  decisions of its duly constituted legislative body or of those officials whose acts may fairly be

19  said to be those of the municipality."  *Id.* at 403–04.

20            In general, no heightened pleading standard applies to § 1983 claims, *Leatherman*

21  *v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993), but to

22  plead a *Monell* claim and withstand a Rule 12(b)(6) motion to dismiss, allegations in a complaint

23  "may not simply recite the elements of a cause of action, but must contain sufficient allegations of

24  underlying facts to give fair notice and to enable the opposing party to defend itself effectively."

25  /////

26  

27            [15] The court grants the unopposed request for judicial notice of this document.  *See supra*
    note 1.

28

1   *AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012) (quoting *Starr v.*

2   *Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).

3            Here, the complaint includes no allegation of the County's policy or practice and

4   gives the defendants no notice of how the plaintiffs intend to prove the County's liability.

5   Santana and Vasquez cite *Karim-Panahi v. Los Angeles Police Department* for the proposition

6   that "a claim of municipal liability under § 1983 is sufficient to withstand a motion to dismiss

7   when the claim is nothing more than a bare allegation that conduct conformed to official policy,

8   custom, or practice." Opp'n Yuba Dismiss at 4 (citing 839 F.2d 621, 624 (9th Cir. 1988)). But

9   this rule no longer reflects federal law, which now requires sufficient factual allegations to

10  "plausibly suggest an entitlement to relief" for all aspects of a plaintiff's claim under *Monell* and

11  § 1983. *See, e.g.*, *Hernandez*, 666 F.3d at 637; *Starr*, 652 F.3d at 1216.

12           In their opposition brief, Santana and Vasquez also argue the County had a policy

13  of keeping the judicial bench racially homogenous. Opp'n Yuba Mot. Dismiss 14. They did not

14  allege these facts in their complaint. The motion is granted on this claim, but with leave to

15  amend.

16                    2.      State Law Claims

17           The court now turns to the complaint's state law claims against the Yuba County

18  Defendants. They argue several state-law immunities protect them from liability.

19           In California, "[a] public employee is not liable for injury caused by his instituting

20  or prosecuting any judicial or administrative proceeding within the scope of his employment,

21  even if he acts maliciously and without probable cause." Cal. Gov't Code § 821.6. This section's

22  "principal function" is to defuse claims of malicious prosecution. *Blankenhorn v. City of Orange*,

23  485 F.3d 463, 487–88 (9th Cir. 2007) (citing *Kayfetz v. California*, 156 Cal. App. 3d 491 (1984)),

24  but courts must construe it broadly, *see, e.g.*, *Gillan v. City of San Marino*, 147 Cal. App. 4th

25  1033, 1048 (2007). The immunity associated with section 821.6 protects "all employees of a

26  public entity," even non-attorneys and those without legal training. *Asgari v. City of L.A.*, 15 Cal.

27  4th 744, 756–57 (1997) (citation and quotation marks omitted). It applies equally "to actions

28  taken in preparation for formal proceedings," including investigations, which are "an essential

                                                      39

1   step toward the institution of formal proceedings." *Catsouras v. Dep't of Cal. Hwy. Patrol*, 181

2   Cal. App. 4th 856, 889 (2010) (citations and quotation marks omitted).  And it encompasses

3   claims for negligence and emotional distress.  *See, e.g.*, *Amylou R. v. Cnty. of Riverside*, 28 Cal.

4   App. 4th 1205, 1211 (1994); *Johnson v. City of Pacifica*, 4 Cal. App. 3d 82, 86–87 (1970).  The

5   section includes no exception for claims of a conspiracy.  *Citizens Capital Corp. v. Spohn*, 133

6   Cal. App. 3d 887, 889 (1982).

7            California law also protects a "privileged publication or broadcast . . . [i]n any

8   (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized

9   by law, or (4) in the initiation or course of any other proceeding authorized by law . . . ."  Cal.

10   Civ. Code § 47(b).  This protection does not apply to claims of malicious prosecution, but it

11   extends to any communication, whether or not a "publication," as long as the communication is

12   "required or permitted by law in the course of a judicial proceeding to achieve the objects of the

13   litigation, even though the publication is made outside the courtroom and no function of the court

14   or its officers is involved."  *Silberg v. Anderson*, 50 Cal. 3d 205, 212 (1990).  "The usual

15   formulation is that the privilege applies to any communication (1) made in judicial or quasi-

16   judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the

17   objects of the litigation; and (4) that have some connection or logical relation to the action."  *Id.*

18   Like section 821.6, section 47(b) is construed broadly.  *See, e.g.*, *Thornton v. Cal. Unemp't. Ins.*

19   *Appeals Bd.*, 204 Cal. App. 4th 1403, 1418 (2012).

20            Here, these sections combine to immunize the Yuba County defendants from the

21   state law claims.  First, the Yuba County defendants' actions were all undertaken in connection

22   with the criminal case, including their investigation.  As section 821.6 provides, it is irrelevant

23   whether the defendants' actions were undertaken maliciously or without probable cause, and as

24   noted above, section 821.6 guards against claims of negligence and for emotional distress.

25   Second, the defendants' testimony in the criminal trial falls squarely within the confines of

26   section 47(b).  *See Silberg*, 50 Cal. 3d at 213 ("The principal purpose of section [47(b)] is to

27   afford litigants and witnesses the utmost freedom of access to the courts without fear of being

28   harassed subsequently by derivative tort actions." (citations and internal quotation marks

1    omitted)).  The plaintiffs' only response is that the Yuba County defendants did not act as

2    prosecutors.  Opp'n Yuba Dismiss at 17.  As noted above, section 821.6 applies equally to non-

3    lawyers.

4           The motion is granted as to the state law claims against the Yuba County

5    defendants.  Because the motion is granted as to each claim against the individual defendants, the

6    claims against the County must also be dismissed.  The plaintiffs are granted leave to amend if

7    possible within the confines of Federal Rule of Civil Procedure 11.

8                    3.      Motion for a More Definite Statement

9           Finally, the Yuba County defendants move for a more definite statement under

10   Federal Rule of Civil Procedure 12(e).  Rule 12(e) allows such a motion if the complaint "is so

11   vague or ambiguous that the party cannot reasonably prepare a response."  Fed. R. Civ. P. 12(e).

12   Whether to grant a motion under Rule 12(e) is a matter of discretion.  *Griffin v. Cedar Fair, L.P.*,

13   817 F. Supp. 2d 1152, 1154 (N.D. Cal. 2011).

14          Here, the complaint tells a long and complicated story, and could very likely have

15   been drafted more elegantly, but it is not so confusing as to call for a wholesale reworking.

16   Should Santana and Vasquez file an amended complaint, however, the court admonishes them to

17   carefully distinguish which claims they advance against each defendant, in which capacity, and

18   on what grounds.  The motion for a more definite statement is denied.

19          D.      City of Marysville and Randall Elliott

20          As a preliminary matter, the Marysville defendants have informed the court that

21   the parties had stipulated to the dismissal of the federal claims against the City of Marysville.

22   Notice of Mot. at 3, ECF No. 11.  The parties also reached a stipulation that should the court

23   dismiss the state claims against the City, the plaintiffs would not seek leave to amend.  *Id.*  The

24   parties confirmed this stipulation at hearing.  The federal claims against the City are therefore

25   dismissed with prejudice.  Similarly, the City of Marysville and its Police Department are sued

26   duplicatively.  *See, e.g.*, *Brouwer v. City of Manteca*, No. 07-1362, 2008 WL 2825099, at *3

27   (E.D. Cal. July 21, 2008).  The Marysville Police Department is therefore dismissed with

28   prejudice.

41

1            With respect to the federal claims, Elliott advances many of the same arguments as

2    the Yuba County defendants.  For the reasons described above,

3        •    The motion is granted with prejudice as to any malicious prosecution claim under

4              the Fourteenth Amendment substantive due process clause, but Santana and

5              Vasquez are granted leave to amend to allege claims under the Fourteenth

6              Amendment's equal protection clause, *see supra* page 24;

7        •    The motion is granted with leave to amend to allow Santana and Vasquez to allege

8              facts to support their broad allegations of unreasonable search or seizure, *see supra*

9              pages 31–35; and

10       •    Amendment of the Fourth Amendment claims would not be futile, despite

11             previous state court decisions finding the defendants had probable cause, *see supra*

12             pages 35–38.

13           This leaves the applicability of state law immunities to the Marysville

14   Defendants.[16]  As noted above, California Government Code section 821.6 provides, "A public

15   employee is not liable for injury caused by his instituting or prosecuting any judicial or

16   administrative proceeding within the scope of his employment, even if he acts maliciously and

17   without probable cause."  This immunity protects "all employees of a public entity," even non-

18   attorneys and those without legal training, such as Elliott.  *Asgari*, 15 Cal. 4th at 757 (citation and

19   quotation marks omitted).  It applies to investigations.  *Catsouras*, 181 Cal. App. 4th at 889.  And

20   it encompasses claims for negligence and emotional distress.  *See, e.g.*, *Amylou R.*, 28 Cal. App.

21   4th at 1211; *Johnson*, 4 Cal. App. 3d at 86–87.  And it includes no exception for claims of a

22   conspiracy.  *Citizens Capital Corp.*, 133 Cal. App. 3d at 889.

23           To review, the complaint alleges Elliott met with Acevedo and her family and

24   heard Acevedo relate her claims of physical and sexual abuse by Griesa.  Compl. ¶¶ 34, 49–50.

25   _____

26        [16] Because the federal claims are dismissed with leave to amend in part, the court does not
     reach the question of federal qualified immunity, a context-specific doctrine not subject to general
27   propositions.  *See, e.g.*, *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other
     grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

28

1    He saw sexual text messages from Griesa on Acevedo's phone, but nonetheless expressed his

2    belief her claims would lead to no prosecution because the case would devolve into a credibility

3    contest. *Id.* ¶¶ 35–36, 51.  Elliott then called Griesa to tell him about Acevedo's allegations, gave

4    Griesa citations to relevant Penal Code sections, and advised him to make no statement. *Id.* ¶ 52.

5    Elliott also told Vasquez, Griesa's lawyer, about the charges he was investigating. *Id.* ¶ 53.  After

6    one of Acevedo's sisters called to alert him that Griesa had begun removing files from his office,

7    Elliott refused to obtain a search warrant. *Id.* ¶ 56.  The complaint alleges Elliott did this despite

8    his belief that he had sufficient information to send the case to the district attorney's office. *Id.*

9    ¶ 59.

10          Before Elliott filed any report, he heard about the civil settlement from Vasquez.

11   *Id.* ¶ 60.  Elliott told Vasquez this "might be a good resolution." *Id.* ¶ 61.  Elliott also heard from

12   Santana that Acevedo preferred a civil resolution and wanted to put the matter behind her. *Id.*

13   ¶ 63.  This was unsurprising to him because he understood victims of sexual assault prefer not to

14   face their accusers or testify in court. *Id.* ¶ 64.  At some point, Elliott also heard directly from

15   Griesa that Griesa had agreed to pay $100,000, and Elliott told Griesa to seek a second opinion.

16   *Id.* ¶ 76.

17          Santana and Vasquez allege Elliott supported Green's candidacy and did not want

18   Santana to become a judge. *Id.* ¶¶ 83–85.  The complaint alleges generally that Elliott was a part

19   of a conspiracy against Santana, *see id.* ¶¶ 83–85, 88, but does not allege his presence at a

20   meeting at which the alleged co-conspirators discussed their plan, *see id.* ¶ 87.  The complaint

21   alleges generally that Elliott fabricated evidence and withheld exonerating evidence, but does not

22   specify Elliott's role in the part of the conspiracy that actually brought about the trial. *See id.*

23   ¶ 105.

24          The complaint alleges conduct within the protections of section 821.6: actions

25   undertaken by a public employee in the scope of his employment in preparation for a criminal

26   prosecution.  That section also applies to all the complaint's state law claims: malicious

27   prosecution, negligence, and intentional infliction of emotional distress. *See, e.g.*, *Blankenhorn v.*

28

1    *City of Orange*, 485 F.3d at 487–88; *Amylou R.*, 28 Cal. App. 4th at 1211; *Johnson*, 4 Cal. App.

2    3d at 86–87.

3          Santana and Vasquez's only argument to the contrary is that Marysville may be

4    liable under California Government Code section 815.2(a).  Marysville Opp'n at 18.  That section

5    provides, "A public entity is liable for injury proximately caused by an act or omission of an

6    employee of the public entity within the scope of his employment if the act or omission would,

7    apart from this section, have given rise to a cause of action against that employee or his personal

8    representative."  Cal. Gov't Code § 815.2(a).  But under the same section, "a public entity is not

9    liable for an injury resulting from an act or omission of an employee of the public entity where

10    the employee is immune from liability."  *Id.* § 815.2(b).

11          As to the City, based on the parties' stipulation, the state law claims are dismissed

12    without leave to amend.  As to Elliott, the same claims are dismissed with leave to amend if

13    possible consonant with Federal Rule of Civil Procedure 11.

14        E.      Judge Scrogin

15          Judge Scrogin's motion is founded on three arguments.  She challenges the court's

16    subject matter jurisdiction over the claims against her, contends she is immune under the doctrine

17    of judicial absolute immunity, and argues that even if the court were to reach the merits of the

18    claims against her, the complaint states no claim upon which relief can be granted.

19          1.      Subject Matter Jurisdiction

20          A federal court cannot adjudicate the merits of any claim over which it lacks

21    subject matter jurisdiction.  *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868).  Judge

22    Scrogin argues both that the plaintiffs lack standing to bring claims against her and that this

23    action is barred by the Eleventh Amendment.

24          a)      Standing

25          "Standing is the threshold issue of any federal action," *Employers-Teamsters*

26    *Local Nos. 175 & 505 Pension Trust Fund v. Anchor Capital Advisors*, 498 F.3d 920, 923 (9th

27    Cir. 2007), and functions as a limitation on the court's judicial power, *see Valley Forge Christian*

28    *College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982).

1   The requirement of Article III standing imposes three specific constraints: (1) the plaintiff must

2   suffer a concrete and particularized "injury in fact;" (2) the injury and conduct complained of

3   must be causally connected, and the injury must be traceable to the defendant's challenged

4   actions; and (3) the injury must be "likely" to be resolved by resolution favorable to the plaintiff.

5   *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "The party invoking federal

6   jurisdiction bears the burden of establishing these elements." *Id.* at 561.  At this early stage, it is

7   enough for the plaintiffs to allege these three elements are satisfied.  *See id.*

8            Here, the complaint's allegations make out a case or controversy between and

9   among Santana, Vasquez, and Scrogin.  They allege she and the other defendants conspired to

10  prosecute them and allege their reputations have been ruined.  They allege Judge Scrogin

11  participated in this conspiracy by, among other things, seating a grand jury to indict them.  And

12  they allege Judge Scrogin is civilly liable and must compensate them by paying money damages.

13  Cases like *Grant v. Johnson*, 15 F.3d 146 (9th Cir. 1994), or *In re Justices of Supreme Court of*

14  *Puerto Rico*, 695 F.2d 17 (1st Cir. 1982), are distinguishable.  In those cases, the plaintiffs lacked

15  standing because they challenged laws the defendant judges had no role in passing and no ability

16  to repeal.  Here, in contrast, no statute's constitutionality is at issue and no judge is "adjudicating

17  cases pursuant to state law." *Grant*, 15 F.3d at 147.  The plaintiffs have standing.

18                b)      Eleventh Amendment

19           Under the Eleventh Amendment, federal courts have no jurisdiction over claims

20  against states, state agents, and state instrumentalities.  *See Regents of the Univ. of Cal. v. Doe*,

21  519 U.S. 425, 429 (1997).  Several years ago, the Ninth Circuit held,

22            [S]tate case law and constitutional provisions make clear that the
              Court is a State agency.  The official name of the court is the
23            Superior Court of the State of California; its geographical location
              within any particular county cannot change the fact that the court
24            derives its power from the State and is ultimately regulated by the
              State.  Judges are appointed by California's governor, and their
25            salaries are established and paid by the State.  We conclude that a
              suit against the Superior Court is a suit against the State, barred by
26            the eleventh amendment.

27  *Greater L.A. Council on Deafness, Inc. v. Zolin*, 812 F.2d 1103, 1110 (9th Cir. 1987).  In

28  addition, the Supreme Court has held that "an official-capacity suit is, in all respects other than

                                        45

1  name, to be treated as a suit against the entity." *Graham*, 473 U.S. at 166.  The court therefore

2  concludes that to the extent the complaint alleges claims against Judge Scrogin in her official

3  capacity, the court lacks subject matter jurisdiction to address them.  *See, e.g.*, *Holland v.*

4  *Andrews*, No. 11-01733, 2011 WL 6838642, at *3 (C.D. Cal. Sept. 7, 2011) (dismissing official-

5  capacity claims against a Los Angeles Superior Court judge for lack of subject matter

6  jurisdiction), *report and recommendation adopted*, 2011 WL 6838640 (C.D. Cal. Dec. 22, 2011).

7  The Eleventh Amendment does not bar claims against state officials in their personal capacity,

8  however.  *See, e.g.*, *Hafer*, 502 U.S. at 31; *Graham*, 473 U.S. at 166.  The court therefore turns to

9  those claims.

10                  2.      Judicial Absolute Immunity

11          "It is well settled that judges are generally immune from civil liability under

12  section 1983." *Meek v. Cnty. of Riverside*, 183 F.3d 962, 965 (9th Cir. 1999) (citing *Mireles v.*

13  *Waco*, 502 U.S. 9, 9–10 (1991) (per curiam)).  The Supreme Court has carefully guarded judicial

14  immunity, reasoning that "a judicial officer, in exercising the authority vested in him, shall be

15  free to act upon his own convictions, without apprehension of personal consequences to himself."

16  *Bradley v. Fisher*, 80 U.S. 335, 347 (1871).  A judge's errors should be corrected on appeal, not

17  by subsequent civil litigation.  *In re Thomas*, 508 F.3d 1225, 1227 (9th Cir. 2007) (per curiam).

18  Civil liability, if imposed, "would contribute not to principled and fearless decisionmaking but to

19  intimidation." *Pierson v. Ray*, 386 U.S. 547, 554 (1967).

20          Judicial immunity is not withdrawn for actions undertaken in bad faith or with

21  malice.  *Mireles*, 502 U.S. at 11.  Neither does "grave procedural error[ ]" defeat judicial

22  immunity.  *Stump v. Sparkman*, 435 U.S. 349, 359 (1978).  This immunity remains intact despite

23  unfair, controversial, and callous decisions, *see id.* at 363–64, and applies even in the face of

24  allegations the judge acted corruptly, *Pierson*, 386 U.S. at 554; *see also Ashelman v. Pope*, 793

25  F.2d 1072, 1078 (9th Cir. 1986) (en banc) ("[A] conspiracy between judge and prosecutor to

26  predetermine the outcome of a judicial proceeding, while clearly improper, nevertheless does not

27  pierce the immunity extended to judges and prosecutors.").

28  /////

46

1    Judicial immunity may be overcome in only two circumstances: first, when the

2    plaintiff alleges damages arising from "actions not taken in the judge's judicial capacity," and

3    second, if the judge acted "in the complete absence of all jurisdiction." *Mireles*, 502 U.S.

4    at 11–12.[17]

5    Here, Santana and Vasquez argue Judge Scrogin acted in clear absence of all

6    jurisdiction. Opp'n Scrogin at 4. They cite the California Court of Appeal's decision in

7    Santana's appeal, which set aside his indictment because it found the trial court had acted without

8    "fundamental jurisdiction." *See id.*; *Santana*, 2012 WL 1777801, at *10. They argue the Court of

9    Appeal's phrase, "without fundamental jurisdiction," is a synonym of "in clear absence of all

10    jurisdiction," and therefore Judge Scrogin is not protected by judicial absolute immunity. Opp'n

11    Scrogin Mot. at 4.

12    The phrase "without fundamental jurisdiction" has a specific meaning: "A court

13    lacks jurisdiction in a fundamental sense when it has no authority at all over the subject matter or

14    the parties, or when it lacks any power to hear or determine the case." *People v. Ford*, 61 Cal. 4th

15    282, 286 (2015) (citations and quotation marks omitted). The absence of fundamental jurisdiction

16    is distinct from a second type of jurisdictional flaw: "When a trial court has fundamental

17    jurisdiction but fails to act in the manner prescribed, it is said to have acted 'in excess of its

18    jurisdiction.'" *Id.* at 287. One difference between these jurisdictional faults is their effect on the

19    resulting order or ruling. If a court lacks fundamental jurisdiction, its ruling is void, whereas a

20    ruling in excess of jurisdiction is "valid until set aside." *Id.* at 286–87.

21    In *Christie v. City of El Centro*, the state court of appeal considered whether the

22    disqualification of a judge deprived him of fundamental jurisdiction, such that any ruling by that

23    judge is void. *See* 135 Cal. App. 4th 767, 776–80 (2006). Although the court noted some

24    uncertainty in the case law, it concluded that "the orders of disqualified judges are void and must

_____

26    [17] The Supreme Court appears to use the phrases "complete absence of all jurisdiction" and "clear absence of all jurisdiction" interchangeably. *Compare, e.g.*, *Mireles*, 502 U.S. at 12

27    ("complete absence"), *with, e.g.*, *Stump*, 435 U.S. at 356–57 ("clear absence" (quoting *Bradley*, 80 U.S. at 336)).

1     be vacated." *Id.* at 779 (citing, *inter alia*, *Giometti v. Etienne*, 219 Cal. 687, 688–89 (1934) (per

2     curiam)).  It was for this holding that the *Santana* court cited *Christie* and quoted the phrase

3     "without fundamental jurisdiction."  *See* 2012 WL 1777801, at *10 & nn. 17–18.

4            This leaves the question of the relationship between an "absence of fundamental

5     jurisdiction" under California law and a "clear" or "complete absence of all jurisdiction" under

6     federal law.  At first glance, the California Supreme Court's distinction between judicial actions

7     undertaken without "fundamental jurisdiction" and actions taken "in excess of jurisdiction," *see*

8     *Ford*, 61 Cal. 4th at 286–87, seems to parallel the difference the United States Supreme Court

9     identifies between actions in "clear absence of all jurisdiction" and "in excess of [the judge's]

10    authority," *see Sparkman*, 435 U.S. at 356–57 & n.7.  For example, as noted above, the *Ford*

11    court describes actions in excess of jurisdiction by explaining that although a judge may have

12    fundamental jurisdiction, she may act outside her authority by ignoring limitations imposed by

13    "the Constitution, a statute, or relevant case law." 61 Cal. 4th at 286–87.  And the *Bradley* and

14    *Sparkman* Courts drew a distinction between a probate judge who tries a criminal case and a

15    judge of the criminal court who convicts a defendant of a nonexistent crime.  *See* 435 U.S. at 357

16    n.7 (citing 80 U.S. at 352).  If this analogy were to hold, then by acting without fundamental

17    jurisdiction, Judge Scrogin would have acted in clear absence of all jurisdiction, and would not be

18    protected by absolute judicial immunity.

19           Although the relationship between the "absence of fundamental jurisdiction" and

20    the "clear absence of all jurisdiction" is facially plausible, on closer examination, the federal test

21    proves more demanding.  Two Ninth Circuit decisions show why.  First, in *Rosenthal v. Justices*

22    *of the Supreme Court of California*, the court considered whether a disbarred lawyer could bring

23    claims against a justice of the California Supreme Court.  910 F.2d 561, 563–64 (9th Cir. 1990).

24    The plaintiff argued the defendant justice was not protected by judicial absolute immunity

25    because the justice had signed his name to an order after recusing himself earlier in the case.  *Id.*

26    at 565.  The Ninth Circuit was unpersuaded, and reasoned that to the extent the justice erred by

27    signing the later order, the error was harmless.  *Id.* at 565–66.  The Ninth Circuit recognized the

28    order was void if the justice in fact should have recused himself, citing *Giometti v. Etienne,*

1  *supra*. *Id.* at 565 (citing 219 Cal. at 688–89).  As noted above, *Giometti* is the decision the

2  *Christie* court relied on to hold, in 2006, that because a disqualified judge acts without

3  fundamental jurisdiction, "the orders of disqualified judges are void and must be vacated."

4  135 Cal. App. 4th at 779.  Yet in *Rosenthal*, the Ninth Circuit concluded, "A judge is immune

5  from suit under 42 U.S.C. § 1983 for acts in excess of his jurisdiction, so long as the acts

6  themselves were judicial."  910 F.2d at 565–66 (citing *Sparkman*, 435 U.S. at 355–57, and

7  *Bradley*, 80 U.S. at 351).  This reasoning suggests the lack of fundamental jurisdiction is not

8  dispositive.

9        Second, in *Sadoski v. Mosley*, a former criminal defendant sued the state court

10  judge who had sentenced her.  435 F.3d 1076, 1078–79 (9th Cir. 2006).  She argued the defendant

11  judge had acted in clear absence of all jurisdiction because the state supreme court held on appeal

12  that the defendant judge "did not have jurisdiction."  *Id.*  Again the Ninth Circuit was

13  unpersuaded.  It quoted *Sparkman*: "[a] judge will not be deprived of immunity because the

14  action he took was in error, was done maliciously, or was in excess of his authority . . . ."  *Id.* at

15  1079 (quoting 435 U.S. at 356).  Therefore the defendant judge was entitled to absolute

16  immunity, and again, the lack of jurisdiction was not dispositive.

17        Very rarely are judges found to have acted in clear absence of all jurisdiction.

18  This case does not fit any exception.  For example, in *Maestri v. Jutkofsky*, a town justice

19  exercised jurisdiction over a non-adjoining town in clear violation of state law.  860 F.2d 50, 51–

20  52 (2d Cir. 1988).  It was undisputed that the judge knew he lacked territorial jurisdiction.  *Id.*

21  at 53.  The Second Circuit summarized, "For a judge to assume authority outside the geographic

22  bounds of his office is the kind of clear judicial usurpation which cannot be condoned by any

23  grant of immunity.  No public policy would be served by granting immunity for such arrogant

24  excesses of authority."  *Id.*

25        Moreover, the core of Santana's and Vasquez's complaint concerns Judge

26  Scrogin's alleged bias against Santana.  *See* Compl. ¶¶ 98–107; Opp'n Scrogin Mot. at 4–7.  In a

27  /////

28  /////

49

1   virtual phalanx, federal courts have concluded that allegations of bias or a conflict of interest do

2   not deprive a judge of absolute immunity.[18]  Perhaps most starkly, in *Lopez v. Vanderwater*, the

3   Seventh Circuit held the defendant judge had not acted in clear absence of all jurisdiction even

4   though he allegedly "had an interest in the case," "prejudged the case," and "proceeded to

5   judgment despite his knowledge of fundamental constitutional infirmities in the procedure that

6   was followed."  620 F.2d at 1234.  The defendant judge did, however, act in excess of all

7   jurisdiction by acting as a de facto prosecutor, not to mention that his actions were, more

8   importantly, nonjudicial.  *See id.* at 1235–36 & n.13.

9          Here, the motion is granted as to the federal claims against Judge Scrogin.

10  However, because the complaint alleges in conclusory manner that Judge Scrogin also acted as

11  investigator or prosecutor, *see, e.g.*, Compl. ¶¶ 84–86, the motion is granted with leave to add

12  factual allegations showing Judge Scrogin's actions were nonjudicial, if possible under Rule 11.[19]

13               3.    State Law Claims and Immunities

14         The California Government Claims Act regulates claims against public entities.

15  *DiCampli-Mintz v. Cnty. of Santa Clara*, 55 Cal. 4th 983, 989 (2012).  If a person does not

16  present a claim at the time and manner prescribed by that Act, he or she may not file a lawsuit

17  against a California public entity.  *Id.* at 989–90 (citing Cal. Gov't Code §§ 905, 911.2, and

18  945.4).  "Even if the public entity has actual knowledge of facts that might support a claim, the

19

20         _____

21         [18] *See, e.g.*, *Prater v. City of Philadelphia Family Ct.*, 569 F. App'x 76, 79 (3d Cir. 2014), *cert. denied*, 135 S. Ct. 1157, *reh'g denied*, 135 S. Ct. 1587 (2015); *Guttman v. Khalsa*, 446 F.3d 1027, 1033 (10th Cir. 2006); *Lopez v. Vanderwater*, 620 F.2d 1229, 1234 (7th Cir. 1980); *Pett v. Crandall*, No. 14-682, 2014 WL 3105821, at *3 (N.D.N.Y. July 7, 2014); *Muhammad v. Bethel-Muhammad*, No. 11-0690, 2013 WL 5531395, at *4 (S.D. Ala. Oct. 7, 2013); *Zahl v. Kosovsky*, No. 08 8308, 2011 WL 779784, at *9 (S.D.N.Y. Mar. 3, 2011) *aff'd*, 471 F. App'x 34 (2d Cir. 2012); *Langella v. Cercone*, No. 09-312E, 2010 WL 2402940, at *7 (W.D. Pa. June 10, 2010); *Wall v. Wall*, No. 09-527, 2009 WL 3110208, at *4 (M.D. Ala. Sept. 24, 2009); *Sylvester v. Sorrell*, No. 08-88, 2009 WL 819383, at *3 (D. Vt. Mar. 25, 2009); *Retzler v. Bristol Twp.*, No. 08-3269, 2009 WL 632934, at *3 (E.D. Pa. Mar. 9, 2009); *Scott v. Cent. Maine Power Co.*, 709 F. Supp. 1176, 1188 (D. Me. 1989); *Schuler v. City of Chambersburg, Pa.*, 641 F. Supp. 657, 659 (M.D. Pa. 1986).

22

23

24

25

26

27         [19] Because the court concludes the complaint does not establish any exception to the bar of judicial absolute immunity, it does not reach the substantive adequacy of any federal claims against Judge Scrogin.  Neither does the court address the effect of any statute of limitations.

28

1   claims statutes still must be satisfied." *Id.* at 990. The rule applies equally to actions litigated in

2   federal court. *Young v. City of Visalia*, 687 F. Supp. 2d 1141, 1152 (E.D. Cal. 2009). A federal

3   court complaint must therefore include allegations that either demonstrate or excuse compliance

4   with the Act, otherwise the complaint must be dismissed. *Id.*

5          California Government Code section 915(c) applies to claims against a "judicial

6   branch entity." Cal. Gov't Code § 915(c); *see also J. Council of Cal. v. Super. Ct.*, 229 Cal. App.

7   4th 1083, 1095 (2014). That section provides that claims "against a superior court or a judge"

8   must be delivered or mailed to "the court executive officer." Cal. Gov't Code § 915(c)(1). Under

9   section 915(e), a claim is "deemed to have been presented in compliance with [section 915] even

10  though it is not mailed or provided as in [that] section," if the claim is "actually received by the

11  court executive officer, court clerk/administrator, court clerk, or secretariat of the judicial branch

12  entity." *Id.* § 915(e)(4).

13         Here, Santana and Vasquez allege they "presented a written claim for damages

14  with the State of California defendant, Yuba County Superior Court Judge Julia Scrogin, pursuant

15  to California Government Code Section 910 et seq." Compl. ¶ 11. They do not allege

16  compliance with section 915(c), *i.e.*, presentation of a claim to the court executive officer. When

17  Judge Scrogin identified this omission in her motion to dismiss, Santana and Vasquez responded,

18  that "On October 22, 2014, plaintiffs presented their Notice of Claim to Scrogin by filing it with

19  the Victims Compensation and Government Claims Board." Opp'n Scrogin at 19 (citing Compl.

20  ¶ 11). They argue this was sufficient under Government Code section 915(e)(2). This fact does

21  not appear in the complaint, and the court construes it as a request for leave to amend; however,

22  amendment on this ground would be futile. The California Court of Appeal recently rejected an

23  identical argument after a careful construction of section 915(e)(2), concluding that the legislature

24  intended notice to be provided as described in section 915(e)(4). *See J. Council*, 229 Cal. App.

25  4th at 1096–97, 1100–01. Because amendment would not cure the presentation defect, the

26  motion is granted with prejudice and without leave to amend as to the state-law claims.

27  /////

28  /////

51

1      F.      Timothy Evans

2              Evans first challenges this court's subject matter jurisdiction, and second moves to

3      dismiss for failure to state a claim upon which relief can be granted.

4              1.      Subject Matter Jurisdiction

5              Federal district courts have subject matter jurisdiction over all "civil actions

6      arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  District

7      courts also have subject matter jurisdiction over any civil action "authorized by law to be

8      commenced by any person . . . [t]o recover damages or to secure equitable or other relief under

9      any Act of Congress providing for the protection of civil rights . . . ."  28 U.S.C. § 1343.  Here,

10     because the complaint alleges claims under § 1983 for violations of federal constitutional rights,

11     the court has subject matter jurisdiction over those federal claims.

12             The complaint also alleges claims under state law, and the court must have subject

13     matter jurisdiction over each.  *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008);

14     *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 66 n.1 (1996).  Evans argues that because he and the

15     plaintiffs are all residents of California and because the complaint includes no federal claims

16     against him, the court cannot exercise subject matter jurisdiction over the claims against him.

17     Evans Mot. Dismiss at 7–8.  This argument overlooks the effect of 28 U.S.C. § 1367, which

18     provides that if this court has original jurisdiction over a particular civil action, it also has

19     jurisdiction "over all other claims that are so related to claims in the action . . . that they form part

20     of the same case or controversy under Article III of the United States Constitution."  28 U.S.C.

21     § 1367(a).  A state law claim is part of the same case or controversy if it and the federal claim

22     together "derive from a common nucleus of operative fact, such that the relationship between the

23     federal claim and the state claim permits the conclusion that the entire action before the court

24     comprises but one constitutional case."  *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156,

25     165 (1997) (citations, alterations, and quotation marks omitted).

26             The state law claims against Evans are part of the same case or controversy as the

27     federal claims against the other defendants.  As summarized above, the complaint alleges Evans

28     participated in the same conspiracy to prosecute Santana.  He, like the other defendants, allegedly

1    supported Green for the judicial appointment, disfavored Santana, and believed a criminal

2    prosecution would undermine Santana's application.  Santana and Vasquez allege he helped to

3    plan the prosecution, fabricated evidence, and withheld exonerating evidence.  The court

4    therefore has supplemental jurisdiction over the state law claims against Evans under

5    28 U.S.C. § 1367(a).

6              A district court may nevertheless decline to exercise supplemental jurisdiction

7    over a claim in four instances: "(1) the claim raises a novel or complex issue of State law, (2) the

8    claim substantially predominates over the claim or claims over which the district court has

9    original jurisdiction, (3) the district court has dismissed all claims over which it has original

10   jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining

11   jurisdiction."  *Id.* § 1367(c).  These four circumstances are the exclusive means by which a

12   district court may decline supplemental jurisdiction.  *Executive Software N. Am., Inc. v. U.S. Dist.*

13   *Court for Cent. Dist. of Cal.*, 24 F.3d 1545, 1556 (9th Cir. 1994), *overruled on other grounds by*

14   *Cal. Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087 (9th Cir. 2008).

15             None of the exceptions listed in § 1367(c) applies to this case.  The parties have

16   identified no novel or complex questions of California law, the claims against Evans do not

17   predominate, and the court has allowed the plaintiffs leave to amend.  Finally, the court is aware

18   of no compelling reason to decline jurisdiction, and the efficient resolution of this action will

19   more likely be accomplished in this forum, as a whole.  *See also Colo. River Water Conservation*

20   *Dist. v. United States*, 424 U.S. 800, 817 (1976) (federal courts have a "virtually unflagging

21   obligation . . . to exercise the jurisdiction given them").

22             2.    State Law Claims

23             Evans argues the complaint lacks sufficient factual allegations to support each of

24   the claims against him, especially because the complaint alleges his involvement began only after

25   the investigation was underway.  *See* Evans Mot. at 9–11.  Santana and Vasquez respond that

26   (1) additional facts obtained after the complaint was filed show Evans was involved in this case

27   before the investigation began; and (2) Evans is liable because he was part of a conspiracy to

28   investigate and prosecute them.  *See* Opp'n Evans at 12–14.

1          As to the first argument, on a motion to dismiss, the court does not consider

2   evidence outside the complaint unless it is subject to judicial notice or can be incorporated by

3   reference.  These rules do not allow the court to consider the additional factual information

4   Santana and Vasquez identify in their briefing in opposition to Evans's motion.

5          The second argument calls for closer inspection.  A conspiracy indeed "renders

6   each participant in the wrongful act responsible as a joint tortfeasor for all damages ensuing from

7   the wrong[,] regardless of the degree of his activity."  *Berg & Berg Enterprises, LLC v. Sherwood*

8   *Partners, Inc.*, 131 Cal. App. 4th 802, 823 (2005) (citation and quotation marks omitted).  The

9   elements of a claim for civil conspiracy under California law are (1) "the defendant had

10   knowledge of and agreed to both the objective and the course of action that resulted in the

11   injury"; (2) "there was a wrongful act committed pursuant to that agreement"; and (3) the

12   plaintiffs sustained damages as a result.  *Berg & Berg Enterprises, LLC v. Sherwood Partners,*

13   *Inc.*, 131 Cal. App. 4th 802, 823 (2005).

14          Evans argues conspiracy claims are uniformly subject to a "heightened pleading

15   standard" in federal court.  Reply at 2 (citing *Harris v. Roderick*, 126 F.3d 1189, 1195 (9th Cir.

16   1997); *Burns v. Cnty. of King*, 883 F.2d 819, 821 (9th Cir. 1989); and *Woodrum v. Woodward*

17   *Cnty.*, 866 F.2d 1121, 1126 (9th Cir. 1989)).  This is incorrect.  First, the cases cited do not

18   support Evans's statement.  *Harris* addressed the pleading standard in *Bivens*[20] actions.  126 F.3d

19   at 1195.  *Burns* and *Woodrum* addressed alleged violations of federal civil rights statutes, *see*

20   *Burns*, 883 F.2d at 821; *Woodrum*, 866 F.2d at 1126; here, however, the complaint alleges no

21   federal claims against Evans.  Second, in holding that a heightened pleading standard applies to

22   *Bivens* actions, *Harris* relied on *Branch v. Tunnell*, 937 F.2d 1382 (9th Cir. 1991), which decision

23   was expressly overruled in 2002, *see Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1121 (9th

24   Cir. 2002).  The *Harris* court also relied on *Buckey v. County of Los Angeles*, 968 F.2d 791, 794

25   /////

26

27   _____

28          [20] *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

1   (9th Cir. 1992), which like *Burns* and *Woodrum* concerned conspiracy to violate 42 U.S.C.

2   § 1983.

3          Rather, in federal court, when a plaintiff alleges a defendant was party to a state-

4   law civil conspiracy, Rule 9(b) raises the pleading standard when "the object of the alleged

5   conspiracy is fraudulent." *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 991 (9th

6   Cir. 2006); *accord Mintel Learning Tech., Inc. v. Beijing Kaidi Educ.*, No. 06-7541, 2007 WL

7   2288329, at *4 (N.D. Cal. Aug. 9, 2007) ("[I]t is true that courts have applied a heightened

8   pleading standard to claims of civil conspiracy—but generally only with respect to claims of civil

9   conspiracy to commit fraud."). Here, other than formulaic allegations the defendants "acted with

10  fraud, oppression, and/or malice" unsupported by any factual allegation, *see* Compl. ¶¶ 33, 147,

11  the complaint alleges no fraud or misrepresentation. Elsewhere the complaint makes clear the

12  object of this alleged conspiracy was not to defraud Santana or Vasquez, but to smear Santana

13  and to prevent his appointment. Rule 8, not Rule 9(b), therefore governs the complaint's

14  allegations.

15         The complaint's factual allegations support a plausible claim of civil conspiracy.

16  The complaint alleges Evans, a friend of the other defendants and supporter of Green's judicial

17  appointment, met with the other defendants to "discuss[ ] the filing of unfounded criminal charges

18  against Jesse Santana to scuttle his judicial appointment." Compl. ¶¶ 87, 91. He knew about the

19  defendants' plan to fabricate charges against Santana and Vasquez and agreed with their goal. *Id.*

20  ¶¶ 91–92. He took part in this plan by arranging for Griesa, his client, to waive his attorney-client

21  privilege so that the conspirators could obtain Vasquez's files. *Id.* ¶ 95. It also appears beyond

22  any reasonable dispute Evans testified as an expert before the grand jury that indicted Santana.

23  *See Santana v. Superior Court*, 2012 WL 1777801 at *7. Evans's interpretation of these

24  allegations as innocuous may be equally plausible, but the Ninth Circuit has held, "If there are

25  two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both

26  of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)."

27  *Starr*, 652 F.3d at 1216. Only if the "defendant's plausible alternative explanation is so

28

1   convincing that plaintiff's explanation is *implausible*" will the complaint be dismissed.  *Id.*

2   (emphasis in original).

3          The complaint's allegations are sufficient at this stage to state a claim of civil

4   conspiracy.  This leaves the substantive viability of each state-law claim.

5                              a)    <u>Malicious Prosecution</u>

6          "To establish a cause of action for malicious prosecution, a plaintiff must

7   demonstrate that the prior action (1) was initiated by or at the direction of the defendant and

8   legally terminated in the plaintiff's favor, (2) was brought without probable cause, and (3) was

9   initiated with malice."  *Siebel v. Mittlesteadt*, 41 Cal. 4th 735, 740 (2007).  As noted above,

10  because the complaint alleges the prosecution was part of a civil conspiracy, "[e]ach member of

11  the conspiracy becomes liable for all acts done by others pursuant to the conspiracy, and for all

12  damages caused thereby."  *Berg & Berg*, 131 Cal. App. 4th at 823.  Here, the first and third

13  elements present no difficult questions: Santana's prosecution was the conspiracy's main event,

14  the co-conspirators were the prosecutors and investigators, Santana and Vasquez were acquitted,

15  and the prosecution's goal was to prevent Santana's judicial appointment.

16          Whether the defendants had probable cause is another matter.[21]  Probable cause is

17  an objective standard.  *Paiva v. Nichols*, 168 Cal. App. 4th 1007, 1018 (2008).  It is applied to the

18  facts available to the defendant at the time he or she decided to prosecute the earlier case.  *Id.*

19  "[P]robable cause to bring an action does not depend upon it being meritorious, as such, but upon

20  it being arguably tenable, *i.e.*, not so completely lacking in apparent merit that no reasonable

21  attorney would have thought the claim tenable."  *Wilson v. Parker, Covert & Chidester*, 28 Cal.

22  4th 811, 824 (2002) (emphasis omitted).

23          Here, Santana and Vasquez allege the prosecution lacked probable cause because

24  it was based on fabricated evidence wrongfully obtained.  *See, e.g.*, Compl. ¶ 88.  The complaint

25  does not specify which evidence was fabricated or wrongfully obtained.  In light of the

26  _____

27          [21] As above, the court concludes previous state court decisions do not preclude litigation
    of this issue here.  *See supra* pages 35–38.

28
                                        56

1    complaint's other allegations, for example that the defendants knew Griesa had paid $50,000 and

2    Acevedo had agreed not to testify against him, a conclusory allegation of fabricated evidence is

3    insufficient to state a plausible claim.  The motion is granted as to this claim.

4                                    b)        Negligence

5           The well-known elements of a negligence action are the defendant's duty, breach

6    of that duty, proximate cause, and damages.  *See, e.g.*, *Merrill v. Navegar, Inc.*, 26 Cal. 4th 465,

7    477 (2001).  For reasons similar to those described immediately above, the complaint does not

8    plausibly allege the defendants breached any duty because an "obvious alternative explanation"

9    for their alleged misconduct makes the complaint's theory implausible, *see Twombly*, 550 U.S.

10   at 567: the defendants had probable cause to believe Santana and Vasquez had committed bribery

11   and had obstructed justice.  They could not have breached any duty by prosecuting Santana and

12   Vasquez for crimes supported by probable cause, even if the prosecution would also effectively

13   lock in Green's judicial appointment.  The motion is granted as to this claim.

14                                   c)        Intentional Infliction of Emotional Distress

15          A complaint states a claim for intentional infliction of emotional distress when it

16   alleges (1) the defendant's conduct was outrageous; (2) the defendant either intended to cause

17   emotional distress or acted with reckless disregard to the probability of causing emotional

18   distress; (3) the plaintiff suffered severe emotional distress; and (4) the defendant's conduct

19   actually and proximately caused that emotional distress.  *Nally v. Grace Cmty. Church*, 47 Cal. 3d

20   278, 300 (1988).  The defendant's conduct is sufficiently "outrageous" when it is "so extreme as

21   to exceed all bounds of that usually tolerated in a civilized community."  *Davidson v. City of*

22   *Westminster*, 32 Cal. 3d 197, 209 (1982).  Here, again, the complaint's allegations do not

23   plausibly allege the defendants lacked probable cause to prosecute.  The defendants did not act

24   outside the bounds of all decency by advancing a cause they believed was supported by probable

25   cause.  The motion is granted as to this claim.

26                        3.        Leave to Amend

27          Each of the deficiencies noted in this section may be cured in an amended

28   complaint; the motion is granted with leave to amend, if possible within the confines of Rule 11.

1  *But cf.* Cal. Civ. Code § 47(b); *Healy v. Tuscany Hills Landscape & Recreation Corp.*, 137

2  Cal.App.4th 1, 5 (2006) (Code of Civil Procedure section 425.16 and Civil Code section 47(b) are

3  construed similarly and broadly).  Because the claims against Evans are dismissed with leave to

4  amend, the court does not reach the viability of any hypothetical federal claims.  These claims, if

5  alleged in an amended pleading, are more properly tested in a later motion to dismiss.  *See, e.g.*,

6  *SAES Getters*, 219 F. Supp. 2d at 1086.

7  IV.  <u>CONCLUSION</u>

8  1.  The complaint is DISMISSED.  Leave to amend is granted as follows:

9      a.  Leave to amend is granted to allege claims under 42 U.S.C. § 1983 against

10  McGrath, Bendorf, Vacek, Barr, Stober, and Elliott arising from non-prosecutorial and

11  non-testimonial actions undertaken in their personal capacities and based on alleged

12  deprivations of the plaintiffs' rights under the Fourth Amendment and the Fourteenth

13  Amendment equal protection clause, including as founded on claims of malicious

14  prosecution;

15      b.  Leave to amend is granted to allege claims under 42 U.S.C. § 1981 to the extent

16  these claims are not barred by the immunities discussed in this order;

17      c.  Leave to amend is granted to allege claims against Yuba County under 42 U.S.C.

18  § 1983 arising from an alleged policy of keeping the judicial bench racially homogenous;

19      d.  Leave to amend is granted to allege state law claims against Yuba County,

20  McGrath, Bendorf, Vacek, Barr, Stober, and Elliott for which they are not immune under

21  California Government Code section 821.6 and California Civil Code section 47(b);

22      e.  Leave to amend is granted as to claims under 42 U.S.C. § 1983 against Judge

23  Scrogin, to allow the addition of any factual allegations showing her actions were

24  nonjudicial;

25      f.  Leave to amend is granted as to all claims against Evans, state or federal; and

26      g.  In all other respects the complaint is dismissed with prejudice and without leave to

27  amend.

28  /////

2.      The special motions to strike are GRANTED IN PART to the extent they are based on the

legal deficiencies described in this order.  To the extent the special motions to strike are based on

factual deficiencies, however, the motions are DENIED IN PART WITHOUT PREJUDICE.

3.      The Yuba County defendants' motion for a more definite statement is DENIED.

4.      This order resolves ECF Nos. 8, 11, 15, 16, 19, and 20.

        IT IS SO ORDERED.

DATED:  March 31, 2016.

_____
UNITED STATES DISTRICT JUDGE