UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JESSE I. SANTANA, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>THE COUNTY OF YUBA, et al.,<br><br>    Defendants. | No. 2:15-cv-00794-KJM-EFB<br><br>ORDER |

1    Attorneys Jesse Santana and David Vasquez allege they were tried for
2 crimes they did not commit because local prosecutors, a judge, another attorney,
3 and Yuba County itself wanted to prevent Santana's appointment to the Sutter
4 County Superior Court. Santana and Vasquez are Hispanic, and they attribute
5 the prosecution to racial discrimination. The defendants move to dismiss Santa-
6 na's and Vasquez's first amended complaint.

7    The court held a hearing on June 17, 2016. Jaime Leaños appeared for
8 Santana and Vasquez. Jeffrey Norlander appeared for Yuba County, Patrick
9 McGrath, John Vacek, Mary Barr, and Gene Stober. John Whitesides appeared
10 for Randall Elliot. Michael Fox appeared for Judge Julia Scrogin. Wendy Green
11 appeared for Timothy Evans.

12    The motions are granted in part.

13  **I.  ALLEGATIONS**

14    The defendants move to dismiss the first amended complaint under Fed-
15 eral Rule of Civil Procedure 12(b)(6). When considering a motion to dismiss un-
16 der that rule, the court assumes the events alleged actually occurred. *See, e.g.,*
17 *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Santana and Vasquez allege as follows.

**A. Santana's Judicial Candidacy**

In 2007, Jesse Santana, who is Hispanic, was a prominent attorney whose law practice primarily entailed the representation of criminal defendants. First Am. Compl. ¶ 44, ECF No. 40. A vacancy opened on the Sutter County Superior Court bench, and Santana submitted his application to the Governor's Office for a judicial appointment to the vacant seat. *Id.* He had strong support among the local Hispanic community, which made up about a quarter of both Sutter County and the neighboring Yuba County. *Id.* ¶¶ 44–45. David Vasquez, another local attorney, was among his supporters. *Id.* ¶ 44.

Despite the substantial Hispanic population in Sutter and Yuba counties, the membership of neither the Yuba nor Sutter County Superior Court bench had included a Hispanic judge. *Id.* ¶ 45. This disparity is, Santana and Vasquez allege, the result of a racist custom and practice within the Yuba and Sutter County administrations. *Id.* ¶ 46. This custom and practice extends to the Yuba County District Attorney's Office, whose attorneys and investigators have a policy to resist the judicial appointment of any ethnic minority group, including Hispanic judges. *Id.* ¶ 46.

In 2007, only one other application had been filed for the vacancy on the Sutter County Superior Court, by Sutter County Deputy District Attorney Susan Green, who is Caucasian and not Hispanic. *Id.* Green had the support of several friends in the Yuba County District Attorney's Office. *Id.* Their support was attributable to a policy of keeping the local judiciary entirely White Caucasian, and they feared that the Governor's office would appoint Santana in an effort to add diversity to the local judiciary. *Id.* ¶ 47. They knew the Governor would make a decision in June 2008, so in late 2007, they agreed on a plan to thwart Santana's appointment by filing false criminal charges against him. *See id*. ¶ 48. They knew that if Santana became the object of a criminal investigation, he would be disqualified. *Id.* ¶ 49.

**B. Santana and Vasquez Negotiate a Civil Release for Socorro Acevedo**

In November 2007, Socorro Acevedo met with Marysville Police Detective Randall Elliott to report that her boss, Joseph Griesa, had sexually assaulted and physically abused her. *Id.* ¶ 30. Acevedo was a minor at the time. *Id.* She showed Elliott text messages and bruises to corroborate her allegations, but Elliott thought the case would be difficult to prosecute and recommended she pursue a civil claim against Griesa instead. *Id.* ¶¶ 31–32.

Acevedo sought out an attorney: Jesse Santana. *Id.* ¶ 33. He confirmed that she could file a civil case against Griesa. *Id.* ¶ 34. Acevedo wanted to take care of the matter privately because she wanted to avoid testifying in court, she didn't want her father and brother to find out about it, and she wanted to put the events behind her and move away to college. *Id.* ¶ 33. Santana confirmed the matter could probably be resolved privately with the approval of a judge and agreed to represent Acevedo without charge. *Id.* ¶¶ 34–35.

Meanwhile, Detective Elliott phoned Griesa to tell him about Acevedo's allegations and advised him to hire a lawyer. *Id.* ¶ 36. Griesa hired David Vasquez. *Id.* Vasquez and Griesa discussed the possibility of a criminal or civil case against Griesa. *Id.* ¶ 38. Vasquez explained that the District Attorney may be less likely to prosecute him criminally if he reached a prompt civil settlement agreement with Acevedo. *Id.* Griesa authorized Vasquez to pursue a civil settlement and deposited $50,000 into Vasquez's client trust account so Vasquez could use the money to make a good-faith settlement offer. *Id.*

In November and December 2007, Santana and Vasquez negotiated a civil settlement agreement. *Id.* ¶ 40. A tentative agreement to settle the case for $100,000 was solidified, and draft releases were prepared. *Id.* Eventually, the final version of the release included the following language:

> In consideration of the sum of one hundred thousand dollars ($100,000.00), Socorro Acevedo will request that criminal charges not be filed against Joe Griesa, and will exercise any privilege she may have pursuant to law, not to testify in any proceedings, and she will not file any civil action, arising out of the underlying facts, against Joe Griesa. Joe Griesa will pay $50,000.00 now and the remaining $50,000.00 within 60 days. In exchange, Socorro Acevedo forever releases and discharges Joe Griesa from all claims, demands, actions, and causes of action of every kind and nature in any way related to Joe Griesa's interactions with Socorro Acevedo.

*Id.* Everyone understood a judge would have to approve this agreement in light of Acevedo's youth. *Id.*

Vasquez told Detective Elliott about the proposed agreement, and Elliott generally approved of this resolution. *Id.* ¶ 41. Vasquez also told Yuba County Deputy District Attorney Melanie Bendorf about the proposal. *Id.* Santana likewise contacted Elliott. *Id.* He explained Acevedo's motivations, including her desire to keep the matter out of public view and put the case behind her, and he asked to be present if Elliott interviewed Acevedo. *Id.* Griesa and Elliott also spoke about the proposed release and $100,000 payment, and Elliott suggested Griesa get a second opinion from another attorney, Timothy Evans. *Id.*

### C.  The Criminal Investigation and Prosecution of Santana and Vasquez

In December 2007, Susan Green (Santana's competitor for judicial appointment), Patrick McGrath (Yuba County District Attorney), Melanie Bendorf (the Yuba County Deputy District Attorney mentioned above), Julia Scrogin (a Judge on the Yuba County Superior Court), and Timothy Evans (the attorney recommended by Elliott) met over lunch. *Id.* ¶ 48. McGrath proposed a plan to investigate and prosecute bribery charges against Santana. *See id.* ¶¶ 48–50. The group agreed they would falsely characterize the settlement negotiations between Acevedo, Griesa, and their attorneys as clandestine attempts at persuading Acevedo to withhold information from investigators, prosecutors, and the courts in return for money. *Id.* ¶ 50. Green, McGrath, Bendorf, and Scrogin ignored their understanding and evidence showing

- Acevedo had not agreed to withhold information; rather, she agreed not to file a civil case, to ask that the criminal prosecution end, and to exercise any privilege she had against testifying;
- Santana had informed Elliott that Acevedo would agree to an interview with the detective and asked only that her attorney be present;
- The settlement negotiations were not secret, considering that Vasquez had informed Elliott and Bendorf about a potential civil settlement agreement; and
- The negotiations between Acevedo, Griesa, and their attorneys were consistent with a longstanding practice among police, prosecutors, and private attorneys, who had in the past facilitated similar agreements between the victims and perpetrators of sexual assault at a victim's request.

To ensure this investigation and prosecution appeared bona fide, the group agreed Vasquez would also be charged. *Id.* ¶ 50. Soon after this meeting, Green, McGrath, Bendorf, and Scrogin sought out the assistance of John Vacek, another Deputy District Attorney, and of Mary Barr and Gene Stober, investigators, who all agreed to join in the plan. *Id.* ¶ 48.

Elliott filed a report of his investigation, but made no recommendation on whether criminal charges should be filed against Griesa. *Id.* ¶ 42. He noted his understanding that Griesa and Acevedo had negotiated a settlement agreement with Santana's and Vasquez's help, and he recommended that the District Attorney's Office consider bribery charges against the two attorneys. *Id.* His report

included the false assertion that Santana had instructed Acevedo not to speak to him. *Id*. Santana and Vasquez believe the other defendants pressured him into including this false assertion, or at least encouraged the misstatement. *Id*. The District Attorney's Office began investigating possible bribery charges against Santana and Vasquez. *Id*.

In the meantime, Acevedo and her mother had signed the civil release, but Griesa did not sign it because he had no guarantee against a criminal prosecution. *Id*. ¶ 43. Acevedo had also reconsidered her decision after her father learned about the alleged abuse and told her he wanted a criminal prosecution. *Id*. Santana informed Detective Elliott and Vasquez of these developments, and Vasquez returned the $50,000 to Griesa. *Id*. Acevedo also hired a new lawyer, Michael Trezza. *Id*.

A search warrant was obtained for Santana's and Vasquez's law offices, and a search was completed in May 2008, the month before the Governor was expected to make his decision on Santana's application. *Id*. ¶ 51(b). Santana first learned of the charges when the search warrant was executed, and reported them immediately to the commission considering his application, as he was obligated to do. *Id*. ¶ 52. As a result, he was disqualified as a candidate for the judgeship, and Green was appointed. *Id*.

In October 2008, Judge Scrogin presided over a grand jury, which returned an indictment against Santana and Vasquez the next month. *Id*. ¶ 53. Santana and Vasquez were booked, fingerprinted, photographed, arraigned, ordered to make further court appearances, ordered to surrender their passports, and ordered not to leave the state. *Id*. They appealed the indictment, arguing Judge Scrogin was biased, and the Court of Appeal agreed Judge Scrogin had acted without fundamental jurisdiction, rendering the indictment void. *Id*. ¶ 54. The California Attorney General's Office then took over the prosecution, and the case proceeded on a criminal complaint. *Id*. ¶ 55. A jury trial was conducted in March and April 2014. *Id*. After deliberating for less than an hour, the jury acquitted Santana and Vasquez of all charges. *Id*.

### D.  Procedural Matters

Following their acquittal, Santana and Vasquez filed a complaint in this court against Yuba County, the City of Marysville, the Marysville Police Department, McGrath, Bendorf, Vacek, Barr, Stober, Elliott, Scrogin, and Evans. *See generally* Compl. ECF No. 1. The defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). Some defendants also moved to strike the complaint under California Code of Civil Procedure 425.16, which allows motions

against "strategic lawsuits against public participation" or SLAPPs, and which applies in federal court. The court granted the motions to dismiss, partially with prejudice and partially with leave to amend, and granted the special motions to strike to the extent those motions challenged the complaint's legal sufficiency. Order Mar. 31, 2016 (Prev. Order), ECF No. 37.

Santana and Vasquez filed an amended complaint on April 22, 2016. ECF No. 40. They assert eleven claims against the remaining defendants—Yuba County, McGrath, Bendorf, Vacek, Barr, Stober, Elliott, Scrogin, and Evans:

(1) Violation of their Fourth Amendment rights against unreasonable searches and seizures, against all the defendants under 42 U.S.C. § 1983, *id.* ¶¶ 56–61;

(2) Violation of their Fourteenth Amendment rights to equal protection from racial discrimination, against all the defendants under 42 U.S.C. § 1983, *id.* ¶¶ 62–66;

(3) Violation of their Fourteenth Amendment rights to due process as a procedural matter, against all the defendants under 42 U.S.C. § 1983, *id.* ¶¶ 67–71;

(4) Violation of their Fourteenth Amendment rights to due process as a substantive matter, against all the defendants under 42 U.S.C. § 1983, *id.* ¶¶ 72–76;

(5) Violation of their Fourteenth Amendment right to be free from malicious prosecution, against all the defendants under 42 U.S.C. § 1983, *id.* ¶¶ 77–83;

(6) Conspiracy to deprive them of Fourteenth Amendment rights, against all the defendants under 42 U.S.C. §§ 1983 and 1985, *id.* ¶¶ 84–88;

(7) A claim against Yuba County under 42 U.S.C. § 1983 for the actions of McGrath, its official policymaker, *id.* ¶¶ 89–95;

(8) A claim against Yuba County under 42 U.S.C. § 1983 for maintaining an official policy of racial discrimination, *id.* ¶¶ 96–102;

(9) Malicious prosecution under California law, against Evans, *id.* ¶¶ 103–07;

(10) Intentional infliction of emotional distress under California law, against Evans, *id.* ¶¶ 108–11; and

(11) Negligence under California law, against Evans, *id.* ¶¶ 112–14.

Santana and Vasquez request damages, attorneys' fees, costs, and any other appropriate relief. *Id.* at 25–26.

The defendants move to dismiss all of these claims. Yuba Mot., ECF No. 44; Elliott Mot., ECF No. 41; Scrogin Mot., ECF No. 43; Evans Mot., ECF No. 42. Santana and Vasquez oppose these motions. Opp'n Yuba Mot., ECF No. 46; Opp'n Elliott Mot., ECF No. 48; Opp'n Scrogin Mot., ECF No. 50; Opp'n Evans Mot., ECF No. 49. The defendants replied. Yuba Reply, ECF No. 53; Elliott Reply, ECF No. 51; Scrogin Reply, ECF No. 52; Evans Reply, ECF No. 55.

## II. LEGAL STANDARD

The court's previous order summarized the applicable legal standard:

> A party may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The motion may be granted only if the complaint lacks a "cognizable legal theory" or if its factual allegations do not support a cognizable legal theory. *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013). The court assumes these factual allegations are true and draws reasonable inferences from them. *Iqbal*, 556 U.S. at 678.
>
> A complaint need contain only a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), not "detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). But this rule demands more than unadorned accusations; "sufficient factual matter" must make the claim at least plausible. *Iqbal*, 556 U.S. at 678. In the same vein, conclusory or formulaic recitations of elements do not alone suffice. *Id.* (quoting *Twombly*, 550 U.S. at 555). Evaluation under Rule 12(b)(6) is a context-specific task drawing on "judicial experience and common sense." *Id.* at 679. And aside from the complaint, district courts have discretion to examine documents incorporated by reference, *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1159–60 (9th Cir. 2012); affirmative defenses based on the complaint's allegations, *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013); and proper subjects of judicial notice, [*W. Radio Servs. Co. v. Qwest Corp.*, 678 F.3d 970, 976 (9th Cir. 2012)].
>
> Should a motion to dismiss be granted, district courts ordinarily allow the plaintiff leave to amend "when a viable case may be presented." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1039 (9th Cir. 2002). However, "liberality in granting leave to amend is subject to several limitations." *Cafasso, U.S.* ex rel. *v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1058 (9th Cir. 2011) (citation and quotation marks omitted). Leave need not be granted where the amendment of the complaint would cause the opposing party undue prejudice, is sought in

1    bad faith, constitutes an exercise in futility, or creates undue delay.
2    *Id.* The court's decision is one of discretion. *Id.*

3  Prev. Order at 21–22.

4  **III.    YUBA COUNTY DEFENDANTS**

5      The court addresses first the claims against the Yuba County defendants:
6  the County, McGrath, Bendorf, Vacek, Barr, and Stober. Santana and Vasquez
7  assert only federal claims against these defendants, all under 42 U.S.C. § 1983.
8  The Yuba County defendants argue first that the complaint must be dismissed
9  because they are absolutely immune.

10     **A.  Absolute Prosecutorial Immunity**

11     As discussed in the court's previous order, state prosecuting attorneys are
12 absolutely immune from damages under § 1983 when the case concerns acts
13 within the scope of their duties as prosecutors, *Imbler v. Pachtman*, 424 U.S. 409,
14 410 (1976), carrying out "the traditional functions of an advocate," *Kalina v.*
15 *Fletcher*, 522 U.S. 118, 131 (1997). Absolute immunity protects even against
16 claims of malicious prosecution, use of perjured testimony, and suppression of
17 material evidence. *See Imbler*, 424 U.S. at 430. It is meant to avoid "deflection of
18 the prosecutor's energies from his public duties, and the possibility he would
19 shade his decisions instead of exercising the independence of judgment required
20 by the public trust." *Id.* at 423.

21     Absolute prosecutorial immunity applies only to conduct "intimately as-
22 sociated with the judicial phase of the criminal process." *Burns v. Reed*, 500 U.S.
23 478, 486 (1991) (quoting *Imbler*, 424 U.S. at 430). For this reason, when a prose-
24 cutor argues she is absolutely immune under this rule, the court must determine
25 whether she performed a "quasi-judicial function." *Broam v. Bogan*, 320 F.3d
26 1023, 1029 (9th Cir. 2003). If so, she is immune, even if she violated the plain-
27 tiff's constitutional rights. *Id.* In making this determination, the court looks not to
28 the prosecutor's motivation, but to the "ultimate acts" themselves. *See Ashelman*
29 *v. Pope*, 793 F.2d 1072, 1078 (9th Cir. 1986) (en banc).

30     When it comes to what a prosecutor says and does while presenting the
31 State's case at trial, the rule is clear: absolute immunity bars the claim. *Imbler*,
32 424 U.S. at 431. In addition, the Supreme Court has found that some activities
33 are protected by prosecutorial immunity even if they occur before the trial begins.
34 *Id.* at 431 n.33. For example, appearing in court in support of an application for a
35 search warrant, presenting evidence at a hearing, evaluating evidence, interview-
36 ing witnesses, and preparing charging documents may all be subject to the pro-

1 tection of absolute immunity. *Kalina*, 522 U.S. at 130; *Buckley v. Fitzsimmons*, 509

2 U.S. 259, 273 (1993); *Burns*, 500 U.S. at 492. But other tasks—administrative or

3 investigative tasks, for example—are non-prosecutorial and are not protected by

4 absolute immunity. *Van de Kamp v. Goldstein*, 555 U.S. 335, 342–43 (2009).

5      Santana and Vasquez argue the defendants' alleged misdeeds fall in the

6 unprotected, non-prosecutorial category. They allege the defendants acted as in-

7 vestigators or administrators, gave legal advice to the police, and conducted de-

8 famatory press conferences, First Am. Compl. ¶ 51, none of which is a task pro-

9 tected by prosecutorial immunity, *see Burns*, 500 U.S. at 496; *Buckley*, 509 U.S. at

10 273–74 & n.5, 277.

11      Three of these categories present no difficult questions. First, Santana

12 and Vasquez allege without detail that the defendants are liable for their actions

13 as administrators. As clarified at hearing, the only administrative act Santana

14 and Vasquez identify is McGrath's direction and supervision of the prosecution.

15 This is not the type of administrative action excepted from absolute immunity.

16 *See Van de Kamp*, 555 U.S. at 343–45 (the direction and supervision of prosecuto-

17 rial actions is likewise prosecutorial); *Genzler*, 410 F.3d at 643–44 (same).

18      Second, the legal advice allegedly offered here was not actually legal ad-

19 vice. Santana and Vasquez allege an unnamed member of the Yuba County Dis-

20 trict Attorney's Office pressured Detective Elliott into making false statements

21 and unfounded charges in his police report. First Am. Compl. ¶ 42. An attorney

22 can hardly be said to offer legal advice by telling a detective to invent facts. *Cf.*

23 *Burns*, 500 U.S. at 482, 492–93 (a prosecutor offered legal advice to the police

24 about whether hypnosis was an acceptable investigative technique). Even assum-

25 ing "advice" is the right designation for this instruction, it was certainly not "le-

26 gal advice." This same reasoning shows it was not an act protected by prosecuto-

27 rial immunity—it was nothing the defendants did as part of their role as advo-

28 cates. This allegation may therefore support the plaintiffs' claims that the defend-

29 ants acted outside their role as advocates, but it cannot support a claim for un-

30 constitutional legal advice unprotected by prosecutorial immunity.

31      Third, McGrath did not act as a prosecutor when he told a newspaper af-

32 ter the trial that his office stood by its investigation and prosecution. First Am.

33 Compl. ¶ 55. "Comments to the media have no functional tie to the judicial pro-

34 cess just because they are made by a prosecutor." *Buckley*, 509 U.S. at 277. At

35 most, this statement is protected by qualified immunity. *Id*. at 278. But it is un-

36 clear how this statement would support the § 1983 claims against McGrath, aside

from, perhaps, the substantive due process claim, which is dismissed, as dis-
cussed below. Any immunity attached to this statement is moot.

This leaves the fourth category, investigative actions akin to those per-
formed by a detective or police officer, which makes for a closer call. The distinc-
tion between prosecutor and investigator can be a murky one, *see Genzler*, 410
F.3d at 637–38; *Broam*, 320 F.3d at 1029, and its application is an "inexact sci-
ence," *Lacey v. Maricopa Cty.*, 693 F.3d 896, 912 (9th Cir. 2012) (en banc). The
complaint includes the following relevant allegations:

(1)   Santana and Vasquez allege McGrath and Bendorf participated in
      the December 2007 lunch meeting where it was first agreed that the
      District Attorney's Office would investigate and prosecute bribery
      charges. First Am. Compl. ¶ 48. Soon after the meeting, McGrath
      secured Vacek's participation in the plan. *Id.* At this time, Detective
      Elliott's investigation was ongoing and no charges had been filed.
      *See id.* ¶ 42.

(2)   In May 2008, Yuba County Investigator Mary Barr, with help from
      the District Attorney's office, prepared and filed an application for a
      search warrant authorizing the search of Santana's, Vasquez's, and
      Trezza's law offices. *Id.* ¶ 51(b). The warrant application falsely de-
      scribed the proposed civil settlement as a bribe and ignored that
      Acevedo had never wanted to testify, regardless of the settlement. *Id.*
      The warrant application also omitted an important detail: Acevedo
      had alleged that Griesa raped her and sodomized her while she was
      unconscious. *Id.* This allegation could have allowed her to invoke
      California Code of Civil Procedure section 1219(b), which provides
      that "a court shall not imprison or otherwise confine or place in cus-
      tody the victim of a sexual assault or domestic violence crime for
      contempt if the contempt consists of refusing to testify concerning
      that sexual assault or domestic violence crime." *Id.*; *see also id.* §
      1219(d)(1) (defining sexual assault to include rape under California
      Penal Code section 261 and sodomy under section 286). This infor-
      mation undermines a description of the settlement agreement as a
      bribe or an attempt to obstruct justice.

(3)   In July 2008, Bendorf, Vacek, and Stober "interrogated" Acevedo.
      *Id.* ¶ 51(d). At this time, criminal charges not had been filed against
      Santana and Vasquez, but search warrants had been obtained for
      their law offices, and the warrants had been executed. *See id.* ¶¶

51(b), 52. Santana and Vasquez had not been indicted, *see id.* ¶ 53, and they had not been arraigned, *see id.* ¶ 58. The interrogation concerned a suspected bribe, and Acevedo was the supposed recipient of the bribe. *Id.* ¶ 51(d). She was therefore theoretically at risk for prosecution. *Id.* But the defendants refused her request that her attorney be present. *Id.* During the interrogation, Acevedo explained that she had never intended to testify against Griesa, regardless of any settlement agreement. *Id.* She explained their negotiations had concerned only the compensation she would receive from Griesa for her personal injuries. *Id.* Bendorf and Vacek ignored and suppressed this testimony, which tended to exonerate Santana and Vasquez. *Id.* Acevedo also told the defendants that Griesa had sedated her, that she had lost consciousness, and that he then raped her and sodomized her. *Id.* Bendorf and Vacek covered up the alleged rape in an attempt to induce Griesa's cooperation in their investigation and prosecution of Santana and Vasquez. *Id.* Griesa was never charged in connection with these allegations. *Id.*; *see also id.* ¶ 51(c) (the District Attorney's office at large knew about these events and decided not to prosecute in an effort to obtain Griesa's cooperation).

(4)   The complaint alleges generally that McGrath, Bendorf, and Vacek suppressed evidence that showed (a) Elliott had initially discouraged Acevedo from seeking criminal prosecution; (b) Elliott had expressed his approval of the proposed civil settlement to Vasquez; and (c) Vasquez told Bendorf that Griesa would not sign the proposed settlement agreement if criminal charges were filed against him. *Id.* ¶ 51(e). This evidence tended to exonerate Santana and Vasquez. *Id.* The complaint does not allege when or at what stage of the criminal case this suppression occurred.

The defendants are absolutely immune if these allegations do not allow a reasonable inference that they were acting as investigators. "A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Buckley*, 509 U.S. at 274. But "a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards." *Id.* at 274 n.5. Neither does an investigation necessarily become a prosecution when a grand jury is empaneled. *See id.* at 275. And a prosecutor must not be allowed the unfair benefit of hindsight:

A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually ar-

rested, indicted, and tried, that work may be retrospectively de-
scribed as "preparation" for a possible trial; every prosecutor might
then shield himself from liability for any constitutional wrong
against innocent citizens by ensuring that they go to trial.

*Id.* In other words, absolute immunity does not protect "every litigation-inducing conduct." *Burns*, 500 U.S. at 494.

Similarly, the Ninth Circuit has explained that, on the one hand, "[p]rosecutors are absolutely immune from liability for gathering additional evidence after probable cause is established or criminal proceedings have begun when they are performing a quasi-judicial function." *Broam*, 320 F.3d at 1030. But on the other hand, "even after the initiation of criminal proceedings, a prosecutor may receive only qualified immunity when acting in a capacity that is exclusively investigatory . . . ." *Id.* at 1031. "Witness interviews may serve either an investigative or an advocacy-related function, as may other methods of gathering or manufacturing evidence prior to trial." *Genzler*, 410 F.3d at 638. Thus in *Broam v. Bogan*, where the plaintiffs' complaint did not explain whether the prosecutors' alleged unconstitutional conduct occurred before or after they determined probable cause existed to support an arrest, the Ninth Circuit remanded and ordered the district court to allow an amendment. 320 F.3d at 1033-34. And in *Genzler*, after explaining that timing is "relevant, but not necessarily determinative," the Ninth Circuit found that the prosecutor-defendant was not protected by absolute immunity during witness interviews because investigations were ongoing and a criminal complaint had not been filed. 410 F.3d at 639–43.

The defendants also offer a citation to *Hampton v. City of Chicago*, 349 F. Supp. 2d 1075, 1081 (N.D. Ill. 2004). In *Hampton*, the district court found that the defendant prosecutor was entitled to absolute immunity for claims related to "interviewing witnesses, deciding what information was necessary for trial, preparing a felony review card, interviewing plaintiff, reading plaintiff his *Miranda* rights and approving charges against plaintiff." *Id.* at 1081 (citing *Miranda v. Arizona*, 384 U.S. 436 (1966)). These duties were "all part of initiating a judicial proceeding and part of [the defendant's] job as a felony review prosecutor," and were "not typically performed by police officers." *Id.* The timing of these events is not entirely clear from the district court's decision, but it is clear that the plaintiff in Hampton had been arrested before the prosecutor interviewed him. *Id.* at 1077.

These authorities demonstrate the Yuba County defendants are entitled to only qualified immunity with respect to the alleged December 2007 lunch meeting, the May 2008 warrant application, and the July 2008 interrogation. At

those times, Santana and Vasquez had not been arrested, they had not been in-
dicted, and they had not been arraigned. The investigation was ongoing, and the
defendants were gathering evidence. The court may reasonably infer they were
not acting as advocates. The same may be true of the complaint's general allega-
tions that the defendants suppressed exonerating evidence if this suppression oc-
curred within the same time period.

　　　In summary, the claims against the Yuba County defendants are not
barred by absolute prosecutorial immunity because Santana and Vasquez allege
adequately that these defendants were acting as investigators, not advocates.

### B. Qualified Immunity

　　　A prosecutor or investigator who is not entitled to absolute prosecutorial
immunity may nonetheless enjoy qualified immunity against a § 1983 claim. *See,
e.g., Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982). Likewise Barr and Stober,
who are not prosecutors, but state officers, enjoy qualified immunity. *See id.*
Qualified immunity is evaluated using a two-part test. *Tolan v. Cotton*, ___ U.S.
___, 134 S. Ct. 1861, 1865 (2014) (per curiam). The court has discretion to begin
with either part, *Pearson v. Callahan*, 555 U.S. 223, 242 (2009), but typically de-
termines first whether the facts, viewed in the light most favorable to the party
asserting an injury, show that each defendant violated one or more of the plain-
tiffs' federally protected rights. *Tolan*, 134 S. Ct. at 1865; *Johnson v. Bay Area Rap-
id Transit Dist.*, 724 F.3d 1159, 1168 (9th Cir. 2013). If the answer to this question
is "no," nothing further is necessary—the absence of any violation means no
claim can proceed. *Johnson*, 724 F.3d at 1168.

　　　The second part of the inquiry tests whether the federal right asserted was
"clearly established" at the time of the alleged violation. *Tolan*, 134 S. Ct. at
1866. This determination hinges on whether the law as it was gave the defend-
ants fair warning that their conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S.
730, 741 (2002). "A clearly established right is one that is 'sufficiently clear that
every reasonable official would have understood that what he is doing violates
that right.'" *Mullenix v. Luna*, ___ U.S. ___, 136 S. Ct. 305, 308 (2015) (per curi-
am) (quoting *Reichle v. Howards*, 566 U.S. ___, 132 S. Ct. 2088, 2093 (2012)).
"Put simply, qualified immunity protects 'all but the plainly incompetent or those
who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341
(1986)). The court must take care not to define "clearly established law" too gen-
erally. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). The correct definition ac-
counts for the "specific context of the case." *Saucier v. Katz*, 533 U.S. 194, 201
(2001), *overruled in part on other grounds*, *Pearson*, 555 U.S. 223.

The Yuba County defendants challenge the complaint's first, second, third, fourth, and fifth claims. The court considers whether the defendants' qualified immunity precludes each of these claims.

### 1. Unconstitutional Search or Seizure (First Claim)

"The Fourth Amendment safeguards '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Atwater v. City of Lago Vista*, 532 U.S. 318, 326 (2001) (quoting U.S. Const. amend. IV) (alteration in *Atwater*). This right applies against states and state agencies. *Elkins v. United States*, 364 U.S. 206, 223–24 (1960). It goes without saying that an unreasonable search or seizure is an element of any § 1983 claim for violation of the right to be free from unreasonable searches and seizures. *See Karam v. City of Burbank*, 352 F.3d 1188, 1193 (9th Cir. 2003).

Here, Santana and Vasquez do not allege they were detained before their trial, and they do not allege they were released on bail. In fact, judicially noticeable state court records suggest they were always at liberty on their own recognizance. Prev. Order at 31–32. As summarized in the court's previous order, federal law does not clearly establish whether a person who is charged with a felony and released on her own recognizance is "seized" within the meaning of the Fourth Amendment. *See id.* at 32–34. This absence of authority contrasts with the clear majority of federal circuit courts, including the Ninth Circuit, which have held that "a pre-arraignment, non-felony summons requiring no more than a later court appearance does not constitute a Fourth Amendment seizure." *Burg v. Gosselin*, 591 F.3d 95, 99–101 (2d Cir. 2010) (collecting authority); *see also Karam*, 352 F.3d at 1193–94. In 2010, another judge of this district concluded that "[t]he fact of a felony charge, of itself, is not determinative of a seizure in violation of the Fourth Amendment. It is the fact of the felony charge with other restrictions that is important." *Fenters v. Chevron*, No. 05-1630, 2010 WL 5477710, at *23 (E.D. Cal. Dec. 30, 2010). And in 2015, the Ninth Circuit expressly declined to address whether a felony charge makes a difference. *Yousefian v. City of Glendale*, 779 F.3d 1010, 1015 n.6 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 135 (2015); *see also McCabe v. Hart*, 357 F. App'x 151, 153 (9th Cir. 2009) (unpublished).

After considering these authorities, the court concluded in its previous order that whether a seizure occurred depends on the restrictions the person faces, not on the charges against her. Prev. Order at 34. Santana and Vasquez allege they were seized when they were booked, fingerprinted, photographed, arraigned, ordered to make further court appearances, ordered to surrender their passports, and ordered not to leave the state without the court's permission. It is

certainly arguable that restrictions like these could amount to a Fourth Amend-
ment seizure. In *Evans v. Ball*, for example, the Fifth Circuit held that pretrial re-
lease conditions amounted to a "seizure" because the person was required to ap-
pear in court, obtain permission before leaving the state, report regularly to pre-
trial services, sign a personal recognizance bond, and give financial and other
identifying information to officers. 168 F.3d 856, 860–61 (5th Cir. 1999), *abrogat-
ed on other grounds*, *Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003) (en banc).
Similarly, in 1997, the Second Circuit held that a person had been "seized" be-
cause he was forbidden from leaving the state and was required to appear in
court many times. *See Murphy v. Lynn*, 118 F.3d 938, 946 (2d Cir. 1997). And in
1975, the Supreme Court held that "pretrial release may be accompanied by bur-
densome conditions that effect a significant restraint of liberty," referring to a
now-recodified section of the U.S. Code that allowed restrictions on travel. *Ger-
stein v. Pugh*, 420 U.S. 103, 114 (1975) (citing 18 U.S.C. § 3416(a)(2), *revised and
recodified*, 18 U.S.C. § 3142(c)(1)(B)(iv)).

Santana and Vasquez argue persuasively that the restrictions they faced
were meaningfully harsher than the "de minimis" restrictions the Ninth Circuit
shrugged off in *Karam*. Opp'n Yuba Mot. at 9 (citing 352 F.3d at 1193–94). Be-
tween the time Santana and Vasquez were charged and the time they were ac-
quitted, seven years passed. Serious felony charges loomed over them. Their rep-
utations and careers suffered. They were compelled to make court appearances.
Nevertheless, as highlighted above, no clearly established law put the defendants
on notice that these conditions amounted to a Fourth Amendment seizure. Last
year, the Ninth Circuit held that the law was uncertain on this point and declined
to address the uncertainty. *Yousefian*, 779 F.3d at 1015 n.6. The Yuba County
defendants are therefore entitled to qualified immunity, and the first claim
against them is dismissed.

### 2. Equal Protection of the Law (Second Claim)

Qualified immunity first depends on whether a constitutional violation
occurred. The defendants argue the court cannot infer that a constitutional viola-
tion occurred because Santana and Vasquez do not allege any similarly situated,
non-Hispanic person was treated differently than they were. Yuba Mot. at 10–11;
Elliott Mot. at 10–11.[1] Santana and Vasquez respond by citing *Awabdy v. City of*

---

[1] In the interest of clarity, the court addresses here arguments presented by
both the Yuba County defendants and Detective Elliott.

*Adelanto*, 368 F.3d 1062 (9th Cir. 2004). *See* Opp'n Yuba Mot. at 10–12. In *Awabdy*, the Ninth Circuit held that a plaintiff may pursue an equal protection claim under § 1983 by alleging a defendant "purposefully caused the state to institute proceedings against him because of his race or ethnicity," regardless of whether any similarly situated person was treated differently. 368 F.3d at 1071.

> a. *Selective Prosecution or Express Discrimination?*

These competing arguments set up two possible interpretations of the complaint. The defendants interpret the complaint to allege selective prosecution, and emphasize that plaintiffs who allege selective prosecution claims must allege similarly situated persons were treated differently. *See* Yuba Mot. at 10–11; Elliott Mot. at 10–11. Santana and Vasquez disagree and explain that they do not allege selective prosecution, but direct, intentional, and express discrimination. *See* Opp'n Yuba Mot. at 10–12. Express discrimination claims need not be supported by comparative allegation. *See Awabdy*, 368 F.3d at 1071.

As a preliminary matter, the plaintiffs' arguments support Santana's claims, but not Vasquez's. The court cannot infer the defendants pursued Vasquez because he is Hispanic; rather, he was allegedly charged in an effort to lend legitimacy to Santana's prosecution. *See* First. Am. Compl. ¶¶ 50, 63; *but cf. id.* ¶¶ 3, 16, 45. If this was in fact the defendants' motivation, Vasquez would have suffered the same fate if he belonged to any other racial or ethnic group, majority or minority. Vasquez's equal protection claim is dismissed. Santana, by contrast, alleges straightforwardly that the defendants pursued charges against him because he was Hispanic. This leaves the question of whether the complaint is best understood as alleging selective prosecution or intentional, express discrimination. A bit more detail about *Awabdy*, similar cases, and selective prosecution claims is necessary to explain the court's reasoning.

A selective prosecution claim consists of the allegation that a prosecutor or another officer enforced facially neutral laws with discriminatory effect and purpose, regardless of probable cause. *See United States v. Armstrong*, 517 U.S. 456, 465 (1996). A plaintiff must allege other similarly situated persons were not prosecuted. *Id.* This pleading requirement is born of respect for federalism or the separation of powers and the differing competencies of prosecutors and judges. *See id.* at 464–65. Prosecutors have broad discretion to enforce criminal laws and look to a variety of circumstances when deciding when and how to charge a crime. *Id.* at 465. Undue judicial interference may cause delay and uncertainty or even reveal the government's strategy. *Id.* The Supreme Court therefore requires plaintiffs to allege and prove disparate treatment "to dispel the presumption that

1  a prosecutor has not violated equal protection" by providing "clear evidence to
2  the contrary." *Id.* (citation omitted).

3       In *Awabdy*, the Ninth Circuit saw no need to require the plaintiff to allege
4  similarly situated persons were treated differently. The plaintiff there targeted
5  neither the prosecutors nor the prosecution itself, but the local administrators
6  who had allegedly trumped up false charges against him. *See* 368 F.3d at 1071.
7  "Accordingly," the Circuit held, given "the particular defendants involved," the
8  plaintiff could prevail despite the absence of any similarly situated person. *Id.*

9       The *Awabdy* panel explained its reasoning by citing *Pyke v. Cuomo*, 258
10  F.3d 107 (2d Cir. 2001), and *Farm Labor Organizing Committee v. Ohio State High-*
11  *way Patrol*, 308 F.3d 523 (6th Cir. 2002). In *Pyke*, the plaintiffs alleged New York
12  state officials had purposefully withheld police protection from an Indian reserva-
13  tion. 258 F.3d at 108. The plaintiffs did not allege any similarly situated, non-
14  Native-Americans were treated differently, but the Second Circuit found this
15  shortcoming immaterial. For one, like the *Awabdy* court, the *Pyke* court distin-
16  guished the claim before it from a selective prosecution claim. *Id.* at 108–09. Sec-
17  ond, the court explained, if the *Pyke* plaintiffs were required to prove a similarly
18  situated non-Indian group was treated differently, they could never succeed.
19  There is no group situated similarly to a sovereign Indian Tribe, exercising signif-
20  icant self-governance within its community in New York State. *Id.* at 109.

21       In *Farm Labor Organizing Committee*, the Sixth Circuit reviewed a claim
22  that the Ohio State Highway Patrol had unconstitutionally singled the plaintiffs
23  out during a traffic stop because they were Hispanic. 308 F.3d at 533. The court
24  required the plaintiffs to show the stop had both a discriminatory effect and mo-
25  tivation. *Id.* at 533–34. To prove discriminatory intent, the plaintiff would be re-
26  quired to identify a similarly situated person who was not stopped. *Id.* at 534. In
27  the margin the court then explained what the case was not: an alleged instance of
28  systemic, intentional racial discrimination. *See id.* at 533 n.4 ("We note that the
29  record contains no indication that the [Highway Patrol] employs explicit racial
30  criteria or admits to racially-motivated decision making."). It cited authority ex-
31  plaining that "[i]t is not necessary to plead the existence of a similarly situated
32  non-minority group when challenging a law or policy that contains an express,
33  racial classification." *Id.* (quoting *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d
34  Cir. 2000)). The *Pyke* court relied on the same authority. *See* 258 F.3d at 109–10
35  (citing *Brown*, 221 F.3d at 337).

36       These decisions are at first glance difficult to reconcile with a later Ninth
37  Circuit opinion, *Rosenbaum v. City and County of San Francisco*, 484 F.3d 1142 (9th

Cir. 2007). In *Rosenbaum*, a group of Christian evangelists had used amplified sound to proselytize their message in San Francisco streets and parks. *Id.* at 1147–50. They challenged the city's enforcement of a noise ordinance. *See id.* They alleged the city had denied their applications for permits and had shut down their outreach programs because it disagreed with their message. *Id.* at 1152. Relying on the Supreme Court's opinions in *Wayte v. United States*, 470 U.S. 598 (1985), and *United States v. Armstrong*, *supra*, 517 U.S. 456, the Ninth Circuit began its discussion this way:

> A government entity has discretion in prosecuting its criminal laws, but enforcement is subject to constitutional constraints. To prevail on its claim under the equal protection clause of the Fourteenth Amendment, a plaintiff must demonstrate that enforcement had a discriminatory effect and the police were motivated by a discrimina-tory purpose. To establish a discriminatory effect, the claimant must show that similarly situated individuals were not prosecuted. To show discriminatory purpose, a plaintiff must establish that the deci-sion-maker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects up-on an identifiable group.

*Id.* at 1152–53 (citations, quotation marks, footnotes, and alterations omitted). A few years later, in *Lacey v. Maricopa County*, the en banc Ninth Circuit quoted these sentences to explain the applicable legal standard. *See* 693 F.3d at 920. In neither *Rosenbaum* nor *Lacey* did the Circuit acknowledge or distinguish its deci-sion in *Awabdy*.

At a general level, the standard articulated in *Rosenbaum* conflicts with the rule of *Awabdy*. Despite factual similarities between the two cases, the *Rosen-baum* court required an allegation of similarly situated persons, but the *Awabdy* court did not: In neither *Awabdy* nor *Rosenbaum* were the plaintiffs prosecuted, in neither case did the plaintiffs sue a prosecutor, and in both cases the plaintiffs alleged the defendants had purposefully caused the state to take a discriminatory enforcement action. *Compare Awabdy*, 368 F.3d at 1071, *with Rosenbaum*, 484 F.3d at 1152–53.

But *Awabdy* does not conflict with *Rosenbaum* and *Lacey* when one acknowledges the *Awabdy* panel's meticulous description of the claims before it:

> [The plaintiff, Mr. Awabdy,] is not claiming that the defendants prosecuted him under a facially neutral law in a discriminatory manner. Indeed, the defendants did not prosecute him at all. They simply provided information, false or fraudulent as it may have been, to those charged with that responsibility.

368 F.3d at 1071 (citations omitted). In other words, Mr. Awabdy's focus, like that of Santana and Vasquez, was with neither a selection nor a prosecution, but with the lies, rooted in racial animus, that eventually launched the prosecution.

The *Awabdy* court continued by explaining the plaintiff was not asking the court "to exercise judicial power over the special province of the Executive, because he [was] not challenging the prosecutor's decision to initiate criminal proceedings." *Id.* (citation omitted). In both *Rosenbaum* and *Lacey*, by contrast, the Circuit called on the consideration afforded to prosecutions and prosecutors by the Supreme Court. *See Wayte*, 470 U.S. at 607–09; *Armstrong*, 517 U.S. at 465. The *Awabdy* court acknowledged this rationale and explained why it did not fit the case before it, as quoted above. 368 F.3d at 1071. The Second Circuit reasoned similarly in *Pyke*. 258 F.3d at 108–09. The same difference separates the complaint here from a selective prosecution complaint. Santana does not allege the defendants exercised their prosecutorial discretion unconstitutionally. He claims the defendants stepped outside their role as the State's attorneys and invented a case.

The defendants' position also essentially invites the conclusion that the Ninth Circuit overruled *Awabdy* in *Rosenbaum* and *Lacey*. The court declines to find binding authority has been overruled by silent implication. *Cf. Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (although a second decision need not rest on the very same foundation as a previous decision before the second may overrule the first, the second must be "clearly irreconcilable" or "directly at odds" with the first).

In summary, the complaint's allegations allow the court to infer the Yuba County defendants violated Santana's constitutional right to equal protection of the laws, but not Vasquez's. The defendants can therefore enjoy qualified immunity only if they demonstrate their alleged actions fell within the bounds of clearly established law.

### b.   Clearly Established Law

If it appears here that there is any absence of clearly established law, the uncertainty is attributable to the legal tangles wrought by the parties' briefing. A reasonable officer in the defendants' situation would not have made the decisions the Yuba County defendants are alleged to have made. Regardless of any uncertainty about what a plaintiff must plead to reach discovery in a federal lawsuit, no reasonable officer could conclude that the Constitution permits her to manipulate evidence to support an unsupportable felony charge, particularly when her goal is to prevent the appointment of a judge whose race or ethnicity the officer

finds objectionable. Explicitly discriminatory laws and policies "fall within the core" of the Equal Protection Clause's prohibition. *Miller v. Johnson*, 515 U.S. 900, 905 (1995) (quoting *Shaw v. Reno*, 509 U.S. 630, 642 (1993)); *accord, e.g.*, *Pyke*, 258 F.3d at 108–09 ("A plaintiff alleging an equal protection claim under a theory of discriminatory application of the law, or under a theory of discriminatory motivation underlying a facially neutral policy or statute, generally need not plead or show the disparate treatment of other similarly situated individuals.").

### c. Timeliness of Filing

The defendants raise a further argument for dismissal, and though it is not a feature of qualified immunity, it is best addressed here: Santana's second claim must be dismissed because it is untimely. Santana's constitutional claims are brought under 42 U.S.C. § 1983. That section does not specify its limitations period. *Wallace v. Kato*, 549 U.S. 384, 387 (2007). The court therefore applies the limitations period imposed by California law in personal injury claims. *See id.* In California, a two-year limitations period applies to personal injury claims that were less than one year old as of January 1, 2003. *See Canatella v. Van De Kamp*, 486 F.3d 1128, 1132 (9th Cir. 2007).

The limitations period begins to run on the date a claim accrues. *Lukovsky v. City & Cty. of S.F.*, 535 F.3d 1044, 1048 (9th Cir. 2008). Federal law determines when a claim accrues. *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999). "[U]nder federal law, a claim accrues 'when the plaintiff knows or has reason to know of the injury which is the basis of the action.'" *Lukovsky*, 535 F.3d at 1048 (quoting *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 926 (9th Cir. 2004)). Here, Santana was injured when the defendants "purposefully caused the state to institute proceedings against him because of his race or ethnicity." *Awabdy*, 368 F.3d at 1071; *accord Yasin v. Coulter*, 449 F. App'x 687, 690 (9th Cir. 2011) (unpublished) (holding that a claim under *Awabdy* accrues at the inception of the prosecution and distinguishing *Heck v. Humphrey*, 512 U.S. 477, 484 (1994)). This occurred at the latest in 2008, when he was arraigned. *See* Req. J. Not. Ex. B, at 1, ECF No. 11-2.[2] Santana's and Vasquez's original complaint was filed in this

---

[2] The court takes judicial notice of this record. *See* Fed. R. Evid. 201 (governing judicial notice); *W. Radio*, 678 F.3d at 976 (a court may consider proper subject of judicial notice on a motion to dismiss); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (a court may take judicial notice of public filings in other, related cases).

court in April 2015. ECF No. 1. This claim is therefore untimely and is dis-
missed.

### 3.   Malicious Prosecution (Fifth Claim)

A prosecution intended to deprive a person of his right to be free from
unreasonable searches and seizures may serve as the basis for a claim under
§ 1983. *See, e.g.*, *Awabdy*, 368 F.3d at 1069. A plaintiff must allege the defendants
prosecuted him with malice, without probable cause, and for the purpose of de-
priving him of his Fourth Amendment right, *see id.* at 1066, and he must allege a
Fourth Amendment seizure occurred, *Yousefian*, 779 F.3d at 1015. Here, because
no clearly established law showed the defendants seized Santana and Vasquez, as
discussed above, their malicious prosecution claim cannot proceed on the basis
of an alleged Fourth Amendment violation.

A claim for malicious prosecution can also rest on an alleged violation of
the plaintiff's Fourteenth Amendment rights to equal protection, "or the viola-
tion of another such 'explicit textual source of constitutional protection.'" *Id.* at
1015 (quoting *Albright v. Oliver*, 510 U.S. 266, 271–75 (1994)). Here, the com-
plaint states a cognizable claim that Santana, but not Vasquez,[3] was deprived of
his right to equal protection in violation of clearly established law, as discussed
above. In this circuit, a plaintiff may pursue independent claims of direct consti-
tutional violations and malicious prosecution to deprive him of the same consti-
tutional rights. *Awabdy*, 368 F.3d at 1072.

Unlike Santana's direct claim for violation of his right to equal protec-
tion, his malicious prosecution claim is not time-barred. A plaintiff can state no
claim for malicious prosecution until the alleged maliciously prosecuted case
terminates in his favor. *See Heck*, 512 U.S. at 484; *RK Ventures, Inc. v. City of Seat-
tle*, 307 F.3d 1045, 1060 n.11 (9th Cir. 2002). The jury reached a verdict in San-
tana's and Vasquez's criminal case in 2014. The same two-year limitations peri-
od for personal injury claims applies again here. Se*e Lopes v. Fremont Freewheelers*,
No. 07-6213, 2008 WL 3304944, at *3 (N.D. Cal. Aug. 7, 2008), *aff'd*, 362 F.

---

[3] However, the complaint could be read to imply Vasquez was targeted spe-
cifically because he was Hispanic. *Cf.* First Am. Compl. ¶¶ 3, 16, 45. He is granted
leave to amend to clarify whether he indeed advances this theory, as specified in the
conclusion of this order. He is not granted leave to allege a direct claim of discrimi-
nation, however, as that claim would prove untimely, as discussed above.

App'x 874 (9th Cir. 2010). Santana's April 2015 complaint in this respect is therefore timely, as are his amended claims. *See* Fed. R. Civ. P. 15(c)(1)(B).

In addition, however, as noted above, to assert a claim for malicious prosecution, Santana must allege the defendants lacked probable cause. *Yousefian*, 779 F.3d at 1014. He alleges generally that the defendants lacked probable cause, First Am. Compl. ¶ 78, but the defendants contend it is clear on the face of the complaint that their actions were supported by probable cause. *See* Yuba Mot. at 14. Specifically, they cite the alleged terms of the proposed settlement agreement between Griesa and Acevedo:

> In consideration of the sum of one hundred thousand dollars ($100,000.00), Socorro Acevedo will request that criminal charges not be filed against Joe Griesa, and will exercise any privilege she may have pursuant to law, not to testify in any proceedings, and shall not file any civil action, arising out of the underlying facts, against Joe Griesa. . . .

First Am. Compl. ¶ 40.

Santana and Vasquez were eventually indicted and prosecuted for bribery, obstruction of justice, and dissuading a witness under the following Penal Code sections:[4]

> [E]very person who attempts to prevent or dissuade another person who has been the victim of a crime . . . from doing any of the following is guilty of a public offense . . . : . . . [c]ausing a complaint, indictment, information, probation or parole violation to be sought and prosecuted, and assisting in the prosecution thereof.

Cal. Penal Code § 136.1(b)(2).

> Every person doing any of the acts described in subdivision (a) or (b) knowingly and maliciously under any one or more of the following circumstances, is guilty of a felony . . . : . . . [w]here the act is committed by any person for pecuniary gain or for any other consideration acting upon the request of any other person.

*Id.* § 136.1(c)(4).

---

[4] The court grants the Yuba County defendants' unopposed request for judicial notice of the grand jury indictment and criminal complaint. *See* Req. J. Not., Ex. B, ECF No. 44-2 (indictment); *id.* Ex. E (criminal complaint). These documents are public records whose existence is subject to no reasonable dispute. *See supra* note 2.

> If two or more persons conspire . . . to pervert or obstruct justice . . .
> they shall be punishable in the same manner and to the same extent
> as is provided for the punishment of that felony.

*Id.* § 182(a)(5).

Probable cause is an objective standard that considers what reasonable conclusions a defendant may draw from the facts she knew at the time. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). A defendant has probable cause to believe an offense has occurred when her knowledge could lead a prudent person to that conclusion. *Yousifian*, 779 F.3d at 1014. Her state of mind or intentions are irrelevant. *Devenpeck*, 543 U.S. at 154.

Although the terms of the proposed settlement agreement suggest Acevedo had agreed to avoid participating in a criminal process in exchange for $100,000, Santana and Vasquez allege that everyone knew she intended to keep the matter private regardless of the money and accepted the money only as compensation for personal injury. Moreover, Santana and Vasquez allege the defendants withheld and ignored exonerating evidence, which is a relevant consideration in matters of probable cause. *See, e.g.*, *Awabdy*, 368 F.3d at 1067 (collecting authority to show that a civil rights plaintiff may rebut a presumption of probable cause "by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith"). The more specific allegations of the amended complaint also suffice to overcome the vagueness that proved fatal to the original complaint. *See* Prev. Order at 56–57; *cf.* First Am. Compl. ¶¶ 48–52. The court declines to declare at this early stage that the "totality of the circumstances" gave the defendants probable cause. *See Illinois v. Gates*, 462 U.S. 213, 230–31 (1983).

The defendants identify no law that would support an assertion of qualified immunity, and the court finds that the authorities cited above would not have allowed a reasonable officer in the defendants' position to act as they did.

Vasquez's malicious prosecution claim is dismissed in total. Santana's malicious prosecution claim is dismissed only to the extent it is based on an unconstitutional seizure.

### 4. Due Process Clause—"Right to Fair Notice" (Third Claim)

The Due Process Clause prohibits the government from depriving a person of life, liberty, and property rights without first undertaking an adequate process. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). A person can therefore succeed in a § 1983 lawsuit against a government actor by showing

(1) that she had a liberty or property interest protected by the Constitution,
(2) that the defendant deprived her of that interest, and (3) that the process the
defendant undertook, if any, was lacking. *See, e.g.*, *Shanks v. Dressel*, 540 F.3d
1082, 1090 (9th Cir. 2008). What "process" is "due" varies from one situation to
the next. *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). But, generally speaking,
"[t]he fundamental requirement of due process is the opportunity to be heard at a
meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319,
333 (1976) (citation and quotation marks omitted).

Here, Santana and Vasquez allege the defendants prosecuted them even
though the settlement agreement they negotiated fit the established practice of
police, prosecutors, and private attorneys. First Am. Compl. ¶ 68. They cite no
clearly established law to support this theory of the defendants' liability on this
claim, and the court is aware of none. This claim is dismissed.

### 5. Due Process Clause—Injury to Professional Reputation (Fourth Claim)

The Due Process Clause also prohibits government officials from arbitrar-
ily depriving a person of certain constitutionally protected fundamental property
or liberty interests. *See, e.g.*, *Action Apartment Ass'n, Inc. v. Santa Monica Rent Con-
trol Bd.*, 509 F.3d 1020, 1026 (9th Cir. 2007). These interests include the right to
pursue a given profession. *Greene v. McElroy*, 360 U.S. 474, 492 (1959); *Meyer v.
Nebraska*, 262 U.S. 390, 399 (1923). But "only 'egregious official conduct can be
said to be arbitrary in the constitutional sense': it must amount to an 'abuse of
power' lacking any 'reasonable justification in the service of a legitimate gov-
ernmental objective.'" *Shanks*, 540 F.3d at 1088 (quoting *Cty. of Sacramento v.
Lewis*, 523 U.S. 833, 846 (1998)). In other words, only conduct that "shocks the
conscience" violates the Due Process Clause. *See, e.g.*, *United States v. Salerno*, 481
U.S. 739, 746 (1987).

Here, Santana and Vasquez allege the prosecution prevented both of
them from practicing law. First Am. Compl. ¶ 73.5. The Supreme Court has de-

---

[5] The complaint could also be read to allege Santana was deprived of a judi-
cial appointment, but he agreed at hearing that if he was deprived of this appoint-
ment, he would have been deprived of no constitutionally protected right. He is cor-
rect. Prospective employment is not a right to which an applicant may assert a "legit-
imate claim of entitlement." *See, e.g.*, *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d
62, 79 (4th Cir. May 24, 2016); *Jones v. City Sch. Dist. of New Rochelle*, 695 F. Supp. 2d

fined the general boundaries of the right to pursue a profession. *Engquist v. Or.*
*Dep't of Agric.*, 478 F.3d 985, 997 (9th Cir. 2007), *aff'd*, 553 U.S. 591 (2008). A
state may not arbitrarily and totally prohibit a person from practicing his chosen
profession. *See, e.g.*, *Conn v. Gabbert*, 526 U.S. 286, 292 (1999) (citing *Schware v.*
*Bd. of Bar Exam'rs of N.M.*, 353 U.S. 232, 238–39 (1957)). The Court has also sug-
gested the state must not impose a stigma or some other disability on a person
that completely forecloses her future employment. *See Bd. of Regents of State Colls.*
*v. Roth*, 408 U.S. 564, 573 (1972). Similarly, the Ninth Circuit has held that a
person may pursue a constitutional claim in "extreme cases, such as a 'govern-
ment blacklist, which when circulated or otherwise publicized to prospective em-
ployers effectively excludes the blacklisted individual from his occupation, much
as if the government had yanked the license of an individual in an occupation
that requires licensure.'" *Engquist*, 478 F.3d at 997–98 (quoting *Olivieri v. Rodri-*
*guez*, 122 F.3d 406, 408 (7th Cir. 1997)).

Santana and Vasquez do not allege the criminal prosecution completely
prevented them from practicing law or imposed a functional "government black-
list" on them during the time the prosecution was pending. The court also takes
judicial notice that Santana has appeared a number of times before the under-
signed to represent defendants in criminal cases; Santana conceded as much at
hearing. Because clearly established law forbids only total eclipses of a person's
right to practice his profession, the plaintiffs' claims cannot survive on this allega-
tion. Nevertheless, as also discussed at hearing, an alternative due-process formu-
lation of this claim may be possible. *See Crowe v. Cty. of San Diego*, 608 F.3d 406,
444 (9th Cir. 2010); *Herb Hallman Chevrolet, Inc. v. Nash-Holmes*, 169 F.3d 636, 645
(9th Cir. 1999); *Buckey v. Cty. of L.A.*, 968 F.2d 791, 795 (9th Cir. 1992). Because
complaints must be dismissed with leave to amend "when a viable case may be
presented," *Lipton*, 284 F.3d at 1039, this claim is dismissed with leave to amend,
as specified in the conclusion of this order.

**C. Summary**

The Yuba County defendants are not entitled to absolute prosecutorial
immunity with respect to Santana's and Vasquez's claims that they acted outside
their role as advocates, as described above. Nevertheless, the defendants' quali-
fied immunity and the applicable limitations period bar several claims. As for the

---

136, 146 (S.D.N.Y. 2010); *Parsons v. Pond*, 126 F. Supp. 2d 205, 217 (D. Conn.
2000), *aff'd*, 25 F. App'x 77 (2d Cir. 2002).

Yuba County defendants, (1) the search and seizure claim is dismissed, (2) the equal protection claim is dismissed, (3) the due process claims (procedural and substantive) are dismissed, (4) Vasquez's malicious prosecution claim is dismissed with leave to amend, *see supra* note 3, and (5) Santana's malicious prosecution claim is dismissed to the extent that claim rests on his allegations of unconstitutional searches and seizures. Santana and Vasquez are granted leave to amend to allege claims based on a due-process injury to their professional reputations.

## IV.   RANDALL ELLIOTT

Many of the claims against Detective Elliott must be dismissed for the same reasons described above, *see supra* note 1:

- The search and seizure claim is dismissed because no clearly established law allows the conclusion that a person is seized if he is released on his own recognizance;
- The equal protection claim is dismissed because it is untimely;
- The "fair notice" claim is dismissed because it is supported by no clearly established law;[6]
- The substantive due process claim is dismissed because no allegations show Santana and Vasquez were unable to practice law; and
- The malicious prosecution claim is dismissed to the extent it is based on an unreasonable seizure, and it is dismissed to the extent it is based on racial discrimination against Vasquez, because the complaint does not allow the court reasonably to infer those underlying constitutional violations occurred.

This leaves Santana's claim of malicious prosecution, a potential amended malicious prosecution claim by Vasquez, and the possibility of an amended, reputation-related claim.

Only one factual allegation ties Elliott to the Yuba County defendants' alleged scheme: that he was pressured to submit an inaccurate investigation report, which recommended charges against Santana and Vasquez. First Am. Compl. ¶ 42. The remaining allegations are only general statements and conclu-

---

[6] The plaintiffs do not oppose Elliott's motion with respect to this claim. Opp'n Elliott Mot. at 1.

sions. *See, e.g.*, *id.* ¶ 48 ("Soon after [the December 2007 lunch meeting], McGrath and the other meeting participants enlisted the remaining Defendants to join in the Derailment Plan."); *id.* ¶ 85 ("Defendants entered into a conspiracy for the purpose of derailing Santana's candidacy for judicial appointment . . . ."). As alleged here, as in the original complaint, Elliott's investigation was largely complete long before any plan coalesced in December 2007. The court cannot draw a reasonable inference of Elliott's liability for the investigation and prosecution. No allegations show he was motivated by race.

Elliott also moves to dismiss the sixth claim, conspiracy under §§ 1983 and 1985. A conspiracy claim under § 1983 has two elements: (1) an express or implied agreement to deprive the plaintiffs of constitutional rights and (2) a resulting deprivation of rights. *Avalos v. Baca*, 596 F.3d 583, 592 (9th Cir. 2010). The agreement need not be overt, but the complaint must include some factual basis to support an inference that the agreement propelled the defendant's actions. *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1301 (9th Cir. 1999). "[T]he plaintiff must state specific facts to support the existence of the claimed conspiracy." *Burns v. Cty. of King*, 883 F.2d 819, 821 (9th Cir. 1989). Vague claims that a defendant was involved in a conspiracy do not suffice. *See Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989); *see also Lacey*, 693 F.3d at 937 (noting conclusory conspiracy allegations do not provide notice to a defendant).

A claim under § 1985(3) has four elements:

> "(1) [A] conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of this conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States."

*Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992) (quoting *United Bhd. of Carpenters and Joiners of Am. v. Scott*, 463 U.S. 825, 828–29 (1983)). The second element requires more specifically that the plaintiff demonstrate the defendants were motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Id.* (quoting *Griffith v. Breckenridge*, 403 U.S. 88, 102 (1971)).

Here, the complaint includes no factual allegations that allow the court to infer Elliott was part of a conspiracy to violate Santana's constitutional rights. The allegations do not tie him to the "derailment plan" by any more than general statements. It is no more than possible that he was motivated by racial animus. A complaint cannot survive on possibilities and general statements. *Iqbal*, 556 U.S.

at 681 (conclusory allegations of racial animus and conspiracy cannot survive a
motion to dismiss under Rule 12(b)(6)). The claims against Elliott are dismissed.

## V. JUDGE JULIA SCROGIN

The court dismissed Santana's and Vasquez's original claims against
Judge Scrogin because their complaint did not allege she acted "in the complete
absence of all jurisdiction." *Mireles v. Waco*, 502 U.S. 9, 11–12 (1991) (per curi-
am). They were allowed to amend their complaint to allege Judge Scrogin is lia-
ble for non-judicial actions. Prev. Order at 50; *see also Mireles*, 502 U.S. at 11
("[A] judge is not immune from liability for nonjudicial actions, i.e., actions not
taken in the judge's judicial capacity."). The amended complaint includes no al-
legations showing Judge Scrogin's actions were non-judicial. She allegedly con-
vened a grand jury, excused jurors for cause, and compelled Acevedo to testify
under threat of contempt. First Am. Compl. ¶¶ 53–54. These were judicial ac-
tions.

The case against her cannot proceed alone on the allegation that she at-
tended the December 2007 lunch meeting. *See also Ashelman*, 793 F.2d at 1078
("[A] conspiracy between judge and prosecutor to predetermine the outcome of a
judicial proceeding, while clearly improper, nevertheless does not pierce the im-
munity extended to judges and prosecutors."). Aside from the judicial actions
described above, no factual allegations tie her to the alleged "derailment plan."
The claims against Judge Scrogin are dismissed.

## VI. TIMOTHY EVANS

### A. Federal Claims under §§ 1983 and 1985

Any claim under § 1983 must concern the defendants' actions under col-
or of state law. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 946 (1982). Evans is a
private attorney. "[P]rivate parties are not generally acting under color of state
law," *Price v. State of Hawaii*, 939 F.2d 702, 707–08 (9th Cir. 1991), "no matter
how discriminatory or wrongful" their actions may be, *Am. Mfrs. Mut. Ins. Co. v.
Sullivan*, 526 U.S. 40, 50 (1999) (citation and quotation marks omitted). But
"[u]nder familiar principals, even a private entity can, in certain circumstances,
be subject to liability under section 1983." *Villegas v. Gilroy Garlic Festival Ass'n*,
541 F.3d 950, 954 (9th Cir. 2008) (en banc). The basic question a court must an-
swer is whether the private person's conduct "may be fairly characterized as
'state action'" or is "fairly attributable to the State." *Lugar*, 457 U.S. at 924, 937.

"Something more" is necessary before a private individual may be said to
have acted as the government. *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d

826, 835 (9th Cir. 1999). This "something more" is not susceptible to any particular litmus test, and the Supreme Court has suggested a "host of facts" that may influence a court's decision:

> [A] challenged activity may be state action when it results from the State's exercise of coercive power, when the State provides significant encouragement, either overt or covert, or when a private actor operates as a willful participant in joint activity with the State or its agents. We have treated a nominally private entity as a state actor when it is controlled by an agency of the State, when it has been delegated a public function by the State, when it is entwined with governmental policies, or when government is entwined in its management or control.

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (citations, quotation marks, and alterations omitted).

Here, Santana and Vasquez argue Evans is liable under § 1983 because the Yuba County defendants secured his participation in their plan to prevent Santana's appointment on account of his race. "A plaintiff may demonstrate joint action by proving the existence of a conspiracy or by showing that the private party was 'a willful participant in joint action with the State or its agents.'" *Franklin v. Fox*, 312 F.3d 423, 445 (9th Cir. 2002) (quoting *Collins v. Womancare*, 878 F.2d 1145, 1154 (9th Cir. 1989)). "To be liable as co-conspirators, each participant in a conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *Id*. A "substantial degree of cooperation" is required between the state actors and the private person. *Id*.

Evans was allegedly part of the December 2007 lunch meeting, and he preferred Green to Santana because she was not Hispanic. He helped forward privileged attorney-client material to the Yuba County defendants, and helped secure Griesa's cooperation in the prosecution of Santana and Vasquez. The court concluded in its previous order that Santana and Vasquez had plausibly alleged Evans was part of a civil conspiracy against them under California law. *See* Prev. Order at 54–56. These allegations allow the court to infer Evans was a "willful participant in joint activity with the State." *Brentwood*, 531 U.S. at 296; *accord Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 151–52 (1970) (allowing a § 1983 claim to proceed on the theory that a private person and a policeman reached an agreement to discriminate on the basis of race).

These allegations also suffice to state the first three elements of a claim against Evans under § 1985(3): "(1) a conspiracy; (2) for the purpose of depriv-

ing, either directly or indirectly, any person or class of persons of the equal pro-
tection of the laws, or of equal privileges and immunities under the laws; and
(3) an act in furtherance of this conspiracy." *Sever*, 978 F.2d at 1536. The ques-
tion remains, then, for purposes of both § 1983 and § 1985, whether Evans's ac-
tions deprived Santana or Vasquez of a constitutional right. *See id.* Evans is no
more liable than the Yuba County defendants. The court also concludes Evans is
protected by qualified immunity to the same extent as the other defendants. *See*
*Filarsky v. Delia*, ___ U.S. ___, 132 S. Ct. 1657, 1664–65 (2012). The discussion of
the claims against those defendants therefore applies to Evans just as well: (1) the
search and seizure claim is dismissed, (2) the equal protection claim is dismissed,
(3) the due process claims are dismissed, (4) Vasquez's malicious prosecution
claim is dismissed with leave to amend; and (5) Santana's malicious prosecution
claim is dismissed to the extent it is based on an allegedly unconstitutional sei-
zure. Santana and Vasquez may also amend their complaint to allege a reputa-
tion-related claim against Evans under § 1983.

Finally, the court disagrees that Evans may avoid liability because he did
nothing to further the prosecution after May 2008, when Santana disclosed the
criminal charges to the state judicial appointment commission. The allegations
here allow the court reasonably to infer Evans's participation in a conspiracy of
malicious prosecution that began in December 2007, and the prosecution did not
terminate until 2014.

**B. State Law Claims**

Santana and Vasquez also allege three state-law claims against Evans:
malicious prosecution, negligence, and intentional infliction of emotional dis-
tress. As a preliminary matter, Evans argues he is protected by California's litiga-
tion privilege.

**1. Litigation Privilege**

As summarized in the court's previous order, California law protects any
"privileged publication or broadcast . . . [i]n any (1) legislative proceeding,
(2) judicial proceeding, (3) in any other official proceeding authorized by law, or
(4) in the initiation or course of any other proceeding authorized by law . . . ."
Cal. Civ. Code § 47(b). This protection does not apply to claims of malicious
prosecution, but it extends to any communication, whether or not a "publica-
tion," as long as the communication is "required or permitted by law in the
course of a judicial proceeding to achieve the objects of the litigation, even
though the publication is made outside the courtroom and no function of the

court or its officers is involved." *Silberg v. Anderson*, 50 Cal. 3d 205, 212 (1990). "The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Id.* Section 47(b) is construed broadly. *See, e.g.*, *Thornton v. Cal. Unemp't. Ins. Appeals Bd.*, 204 Cal. App. 4th 1403, 1418 (2012). "Any doubt as to whether the privilege applies is resolved in favor of applying it." *Adams v. Superior Court*, 2 Cal. App. 4th 521, 529 (1992).

Here, Santana and Vasquez allege Evans was part of a conspiracy of malicious prosecution. Evans allegedly met with the other defendants in December 2007 to formulate a plan. First Am. Compl. ¶ 48. His role was eventually to forward information from Vasquez's client files and to secure Griesa's cooperation. *See id.* ¶¶ 51(a), (c). Aside from participation in the lunch meeting, these actions fall within the litigation privilege: they were communications from an attorney who, during the representation of a client, forwarded information to prosecutors in an attempt to secure a favorable result for his client. *See, e.g.*, *Home Ins. Co. v. Zurich Ins. Co.*, 96 Cal. App. 4th 17, 24 (2002) (the litigation privilege "applies to statements made by counsel during settlement negotiations"); *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman*, 47 Cal. App. 4th 777, 782–83 (1996) (statements to the Attorney General in preparation for an investigation or charge are privileged). Although no previous case appears to be directly on point, doubts are resolved in favor of applying the privilege. *Adams*, 2 Cal. App. 4th at 529. Section 47 therefore protects Evans against the claims for intentional infliction of emotional distress and negligence.

### 2. Malicious Prosecution

As noted above, the litigation privilege does not apply to claims of malicious prosecution. *Silberg*, 50 Cal. 3d at 212. "To establish a cause of action for malicious prosecution, a plaintiff must demonstrate that the prior action (1) was initiated by or at the direction of the defendant and legally terminated in the plaintiff's favor, (2) was brought without probable cause, and (3) was initiated with malice." *Siebel v. Mittlesteadt*, 41 Cal. 4th 735, 740 (2007). As before, the court concludes the first and third elements resolve in Santana's and Vasquez's favor: Santana's prosecution was the conspiracy's main event; the co-conspirators were the prosecutors and investigators; Santana and Vasquez were acquitted; and the prosecution's goal was to prevent Santana's judicial appointment on account of his race and ethnicity. Prev. Order at 56.

Evans's previous motion to dismiss was granted because the complaint did not specify which evidence was allegedly fabricated or wrongfully obtained. Santana's and Vasquez's amended complaint alleges more specifically now (1) the defendants knew Acevedo never intended to testify, regardless of the settlement agreement; (2) her agreement was always intended as a settlement of possible civil claims against Griesa, and the defendants knew this; (3) the defendants suppressed evidence that suggested state law may have prevented Acevedo from being held in contempt; (4) the defendants suppressed evidence of a rape in an attempt to secure Santana's and Vasquez's indictment; and (5) the defendants did all this because they wanted to prevent the judicial appointment of an Hispanic man to an all-White bench. As before, Santana and Vasquez state a plausible claim of civil conspiracy, so "[e]ach member of the conspiracy becomes liable for all acts done by others pursuant to the conspiracy, and for all damages caused thereby." *Berg & Berg Enters., LLC v. Sherwood Partners, Inc.*, 131 Cal. App. 4th 802, 823 (2005). These allegations paint a plausible picture of malicious prosecution. The motion in this respect is denied.

## VII.   CONCLUSION AND LEAVE TO AMEND

The court's previous order thoroughly discussed the law applicable to this case and the plaintiffs' claims. Plaintiffs were allowed an amendment with the benefit of that order, but their amended complaint again falls short of the standards the court identified. Except as specifically noted below, the motions to dismiss are granted without leave to amend. *See, e.g.*, *Cafasso*, 637 F.3d at 1058 (leave to amend may be denied when amendment would prove an exercise in futility); *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989) ("The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint.").

(1)   The Yuba County defendants' motion, ECF No. 44, is **granted in part**. The first, second, third, and fourth claims are dismissed. The fifth claim, for malicious prosecution, is dismissed except as asserted by Santana on an equal-protection basis. The plaintiffs are granted leave to amend to allege a reputation-related claim against the Yuba County defendants under 42 U.S.C. § 1983, and Vasquez is granted leave to amend to allege a claim of malicious prosecution to deprive him of equal protection.

(2)   Elliott's motion, ECF No. 41, is **granted**.

(3)   Judge Scrogin's motion, ECF No. 43, is **granted**.

(4)   Evans's motion, ECF No. 42, is **granted in part**. The first, second, third, fourth, tenth, and eleventh claims are dismissed. The fifth claim, for malicious prosecution, is dismissed except as asserted by Santana on an equal-protection basis. The plaintiffs are granted leave to amend to allege a reputation-related claim against Evans under 42 U.S.C. § 1983, and Vasquez is granted leave to amend to allege a claim of malicious prosecution to deprive him of equal protection.

(5)   Any amended complaint is due **within twenty-one (21) days**.

(6)   A status (pretrial scheduling) conference is set for **October 13, 2016 at 2:30 p.m. in Courtroom No. 3**. The parties shall submit, at least seven (7) days prior to the Status Conference, a Joint Status Report that includes the Rule 26(f) discovery plan, with all named parties participating in the preparation and completion of the report.

IT IS SO ORDERED.

DATED:  August 18, 2016.

_____
UNITED STATES DISTRICT JUDGE