1

2

3

4

5

6

7               UNITED STATES DISTRICT COURT

8           FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10    JESSE I. SANTANA, et al.,              Case No. 2:15-cv-00794-KJM-EFB

11              Plaintiffs,
                                             <u>ORDER</u>
12         v.

13    THE COUNTY OF YUBA, et al.,

14              Defendants.

15

16              Attorneys Jesse Santana and David Vasquez allege they were tried for crimes they

17    did not commit because Yuba County prosecutors and another attorney conspired to prevent

18    Santana's appointment to the Sutter County Superior Court to keep the bench white, in a racial

19    sense.  The Yuba County defendants,[1] defendant Timothy J. Evans and plaintiffs all move for

20    summary judgment.  As explained below, the court GRANTS in part and DENIES in part the

21    motions.

22    I.     <u>BACKGROUND</u>

23              Unless otherwise indicated, the following facts are undisputed.  *See* County

24    Undisputed Material Fact ("UMF"), ECF No. 102-2 & Pls. Resp., ECF No. 112; Evans UMF, ECF

25    /////

26

27    _____

      [1] The Yuba County defendants are the County of Yuba, Yuba County District Attorney Patrick
      McGrath, Yuba County Deputy District Attorneys Melanie Bendorf and John Vacek, and Yuba
28    County District Attorney Investigators Mary Barr and Gene Stober.

                                      1

No. 100-2 & Pls. Resp., ECF No. 108; Pls. UMF, ECF No. 123, Evans Resp., ECF No. 124 & County Resp., ECF No. 125.

### A. Santana Applies for Judicial Appointment

On September 10, 2007, plaintiff Jesse I. Santana applied to the California Governor's office for a judicial appointment to the Sutter County Superior Court. Pls. UMF 43; County UMF 73; Evans UMF 9. At that time, there were no Hispanic judges in Yuba or Sutter Counties. Pls. UMF 44. Susan Green, a white prosecutor, applied for and ultimately received the same judicial appointment. Pls. UMF 49; Third Am. Compl. ("TAC"), ECF No. 94 ¶ 38 (identifying Green as a "former Sutter County Deputy District Attorney . . . who is Caucasian").

Plaintiffs contend the Yuba County District Attorney's Office ("YCDA"), the Sutter County District Attorney's Office, and defendant Timothy J. Evans, a private attorney, were opposed to Santana's judicial appointment. Pls. UMF 45 (citing Griesa testimony)[2]; *see* County Resp. (objecting to Griesa's testimony and noting plaintiffs' assertion is based only on one portion of Griesa's contradictory testimony on this point). Evans did "not believe [Santana] would make a good judge" and "believed [] Green was a better candidate," but did not endorse Green or complete a judicial nominee evaluation form for Santana. Evans Decl., Ex. C, ECF No. 100-7, ¶¶ 7, 9. Defendant Yuba County Deputy District Attorney Melanie Bendorf testified she initially had no preference as to who filled the judgeship, but she came to prefer Green over Santana after receiving the police report discussed below. Bendorf Dep., Pls. Ex. I, ECF No. 99-10,[3] 45:5−11, 57:4−11; *see* Pls. UMF 45. Bendorf also testified she believed defendant Yuba County District Attorney Patrick McGrath preferred Green over Santana. Bendorf Dep. at 57:15−18; *see* Pls. UMF 45.

/////

---

[2] As discussed below, defendants raise hearsay objections to much of Joseph Griesa's deposition testimony and the notes Griesa kept that provide the basis for his testimony. The court resolves those objections below and, in the recitation of facts here, notes where plaintiffs rely exclusively on Griesa's notes or deposition testimony concerning those notes to support a fact. Where the court ultimately sustains an objection, it does not rely on that evidence in its analysis.

[3] Excerpts of Bendorf's deposition are also provided at ECF No. 100-16.

B.     Acevedo Raises Allegations Against Griesa and Detective Elliott Begins Investigating

On November 9, 2007, Socorro Acevedo, a minor sometimes referred to as "Chata," met with Marysville Police Detective Randall Elliott to report that her boss, Joseph Griesa, had sexually assaulted and physically abused her. Pls. UMF 1; Evans UMF 12. Acevedo showed Detective Elliott text messages and bruises to corroborate her allegations. Pls. UMF 1. Acevedo claims Elliot told her it was a "he said, she said" case and encouraged her to pursue a civil rather than criminal case against Griesa. Pls. UMF 2−3; Evans Resp. (citing Elliott's Police Report documenting Acevedo's allegations as "contradict[ing] a claim that it was a 'he said/she said' type of case").[4]

C.     Vasquez Begins Representing Griesa and Santana Begins Representing Acevedo

After speaking to Acevedo, Detective Elliott informed Griesa of Acevedo's allegations. Pls. UMF 4. Griesa then hired plaintiff David Vasquez to represent him. Pls. UMF 5. Griesa and Vasquez discussed the possibility of a civil settlement at their first meeting. Pls. UMF 6.

After meeting with Detective Elliott, Acevedo met with Santana, who ultimately represented Acevedo pro bono. Pls. UMF 7, 14. Santana explained that Acevedo could either file a lawsuit or pursue a civil settlement. Pls. UMF 8. Santana also advised Acevedo that although there are certain protections for victims of sexual assault in legal cases, a judge would ultimately determine whether she would be required to testify in any case. Pls. UMF 10. He also advised Acevedo that, because she was a minor, any settlement would need to be approved by a judge. Pls.

---

[4] In response to this statement of fact and nearly all other statements of facts relying on Acevedo's, Elliott's, Greisa's or Santana's testimony, the County defendants note they object to the underlying testimony as inadmissible. *See, e.g.*, County Resp. to Pls. UMF 2 (citing Objections, ECF No. 110-3, but otherwise agreeing statement of fact is "undisputed, but immaterial"). Unless the County defendants respond that a particular statement of fact is disputed, the court will not note the objection to the underlying testimony in identifying each undisputed fact. The court addresses the parties' objections below, as necessary.

UMF 13. Acevedo later testified she did not want to testify or file criminal charges against Griesa and wanted to avoid a public suit. Pls. UMF 9, 15.

According to Santana, on an unspecified date,[5] he contacted Detective Elliott and informed him that Acevedo did not trust him and further explained that Santana would like to be present for any future discussions Detective Elliott might have with Acevedo. Pls. UMF 16. When Evans asked if Acevedo would testify if subpoenaed, Santana states he responded, "'She'll go to court. Whether she testifies or not, it's between her and the judge.'" Santana Dep., Pls. Ex. E at 124:8−11. Evans and the County dispute Santana's recollection of this conversation, citing Detective Elliott's police report memorializing a December 11, 2007 phone call in which Santana purportedly informed Detective Elliott that Acevedo "will not testify against [Griesa] if subpoeneaed [sic]" and that Santana had instructed Acevedo not to speak to Detective Elliott. County Resp. to Pls. UMF 16 (citing Police Report at 9[6]); Evans Resp. to Pls. UMF 16 (same). The parties agree Santana informed Detective Elliott that Acevedo planned to move away to attend college and did not wish to see Griesa prosecuted. Pls. UMF 22. Recalling this conversation in 2014, Detective Elliott testified that Santana's explanation of Acevedo's decision to pursue civil remedies and preference not to pursue a criminal prosecution appeared "reasonable." Pls. UMF 23; County Resp. (noting Elliott was not apprised of the settlement's terms).

    D.    <u>Santana and Vasquez Negotiate Settlement; Griesa and Acevedo Agree; Acevedo Then Decides Against Settlement and Obtains New Counsel</u>

On an unspecified date, after Detective Elliott informed Santana that Vasquez was representing Griesa, Santana contacted Vasquez, Pls. UMF 17, and in late November or early December 2007, Santana and Vasquez began negotiating a settlement between Acevedo and Griesa, Evans UMF 13. In December 2007, according to Griesa, Santana and Vasquez agreed to a

---

[5] Plaintiffs' statements of facts are not presented in chronological order and often fail to provide dates. When possible, but without combing the record, the court has attempted to identify relevant time periods.

[6] Where exhibits are not internally paginated, the court cites to the CM/ECF pagination.

$100,000 civil settlement of Acevedo's claims against Griesa, with $50,000 to be paid immediately and the balance to be paid within 60 days. Pls. UMF 18; County Resp. (treating fact as undisputed only as to amounts paid). Griesa agreed to the settlement and deposited $50,000 in Vasquez's client trust account. Pls. UMF 18; County Resp. (treating fact as undisputed only as to amount deposited).

As relevant here, the proposed release contained the following language:

> In consideration of the sum of one hundred thousand dollars ($100,000.00), Socorro Acevedo will request that criminal charges not be filed against Joe Griesa, and will exercise any privilege she may have pursuant to law, not to testify in any proceedings, and she will not file any civil action, arising out of the underlying facts, against Joe Griesa. Joe Griesa will pay $50,000.00 now, and the remaining $50,000.00 within 60 days. In exchange, Socorro Acevedo forever releases and discharges Joe Griesa from all claims, demands, damages, actions, and causes of action of every kind and nature in any way related to Joe Griesa's interactions with Socorro Acevedo . . . .

> The release should be confidential and no party to this agreement may divulge its terms, except to those authorized by law to receive such confidential information.

Pls. UMF 20; Evans UMF 14; Release, Pls. Ex. G, ECF No. 99-8. Griesa later testified he understood the settlement was "for the civil side of the case." Pls. UMF 19. In November 2008 grand jury proceedings, Acevedo answered in the affirmative when asked whether she understood that by signing the settlement, she was "going to get a hundred grand in exchange for not talking to the police, not cooperating with the police, [and] not testifying in court." County Resp. to Pls. UMF 19 (citing Grand Jury Tr., County Opp'n Ex. B, ECF No. 110-1, at 60:19−26). In 2014, however, Acevedo testified she understood the settlement only required her to not file a civil lawsuit. Pls. UMF 28; Evans Resp. (disputing, citing release language); County Resp. (disputing as Acevedo's 2014 testimony contradicts her 2008 testimony and release language goes beyond civil suit).

Detective Elliott testified Vasquez informed him the parties were working on a civil compromise.[7] *See* Pls. UMF 21 (stating plaintiffs "were open with Elliot . . . about the settlement").

---

[7] Although not entirely clear, later testimony indicates this conversation may have taken place the week of November 27, 2007. Pls. Ex. C at 61:1−5.

There is no evidence indicating Vasquez disclosed the terms of the compromise to Detective Elliott. Evans Resp. to Pls. UMF 21; County Resp. to Pls. UMF 21.

On December 13, 2007, after reviewing the release language with Santana, Acevedo and her mother signed the release. Pls. UMF 26−27; Evans UMF 16; Release at 4. On an unspecified date, Acevedo decided not to go forward with the agreement. Pls. UMF 29. A letter dated December 21, 2007 from attorney Michael J. Trezza to Detective Elliott indicates Acevedo had by that date retained Trezza to possibly "pursu[e] damages against Mr. Griesa." Warrant and Affidavit, Evans Ex. P, ECF No. 100-20, at 38[8]; *see* Pls. UMF 30−31 (citing Griesa's notes indicating Vasquez returned Griesa's $50,000 upon learning Acevedo would not go forward with agreement).

E.    Detective Elliott Submits his Police Report to the Yuba County
      District Attorney's Office ("YCDA"); YCDA Begins Its Investigation

On December 15, 2007, the YCDA received Detective Elliott's report describing Acevedo's claims against Griesa. County UMF 1; Pls. UMF 39; Evans UMF 17. Detective Elliott recommended bringing multiple criminal charges against Griesa. County UMF 2; Pls. UMF 40; Evans UMF 17. Detective Elliott also recommended the YCDA "[r]eview 138(a)(b) P.C.[9] 'Offering or taking bribes by witnesses,'" stating, "[i]t is likely that between David Vasquez

---

[8] Because Evans' exhibits are internally paginated, the court cites to the exhibits' internal pagination.

[9] Under section 138:

> (a) Every person who gives or offers or promises to give to any witness or person about to be called as a witness, any bribe upon any understanding or agreement that the person shall not attend upon any trial or other judicial proceeding, or every person who attempts by means of any offer of a bribe to dissuade any person from attending upon any trial or other judicial proceeding, is guilty of a felony.

> (b) Every person who is a witness, or is about to be called as such, who receives, or offers to receive, any bribe, upon any understanding that his or her testimony shall be influenced thereby, or that he or she will absent himself or herself from the trial or proceeding upon which his or her testimony is required, is guilty of a felony.

Cal. Penal Code § 138(a) & (b).

representing [Griesa] and Jesse Santana representing [Acevedo], a civil compromise was reached with [Griesa] paying a settlement to [Acevedo]." County UMF 3 (quoting Police Report at 9); Pls. UMF 41; Evans UMF 18.

The parties dispute whether the YCDA was aware of Detective Elliott's investigation prior to receiving Elliott's report or had communicated with Elliott about the contents of the report. County UMF 4−5; Pls. Resp. to County UMF 4 (relying on Griesa's notes and deposition testimony concerning defendants' "plan to derail Santana's judicial appointment"); Pls. Resp. to County UMF 5 (citing plaintiffs' discussions with County defendants concerning settlement, though no such discussions appear to predate Elliott's submission of his report). Defendants Yuba County District Attorney Patrick McGrath, Yuba County Deputy District Attorney Melanie Bendorf and Yuba County Deputy District Attorney John Vacek each submit declarations stating they did not encourage Detective Elliott, or anyone else at the Marysville Police Department, to include anything in the report. County UMF 5.

After receiving Detective Elliott's report, Yuba County Deputy District Attorneys Melanie Bendorf and John Vacek along with defendant Yuba County District Attorney Investigator Gene Stober were assigned to investigate the Griesa case. County UMF 6−8. These YCDA employees contend their investigation of Santana and Vasquez began later, in late February 2008. County UMF 10−11; Pls. Resp. (disputing in light of Griesa's notes identifying defendants' "plan to prosecute [Santana and Vasquez] to derail Santana's judicial appointment").

On December 20, 2007, defendant Bendorf discussed the Griesa case with Vasquez. County UMF 9. When Bendorf explained to Vasquez that the investigation was continuing, she states Vasquez responded, "What, civil comp's not good enough?" County UMF 9; Pls. Resp. (citing Vasquez testimony he told Bendorf he was attempting to resolve the civil case and she wrote down "civil compromise"). Vasquez informed Bendorf that Griesa and Acevedo's civil compromise paperwork was ready to be finalized if criminal charges were not filed against Griesa. County UMF 9; Pls. UMF 24; *see also* Pls. UMF 21 (Elliott testified Bendorf informed him at some point that Vasquez had told her the parties were working on a civil compromise). Bendorf later testified that she is not aware of a distinction between a "civil compromise" and a "civil settlement."

7

Pls. UMF 25. The County defendants respond that Bendorf's understanding of any such distinction is immaterial, as the language of the agreement, not its designation, was at issue. County Resp. to Pls. UMF 25.

In his December 21, 2007 letter to the YCDA, Acevedo's new attorney, Trezza, noted his understanding that YCDA was investigating "possible criminal action on the part of Mr. Griesa" and requested the YCDA contact his office if "you wish to speak with Ms. Acevedo. . . as we will be willing to assist in any way possible." Pls. Ex. Z, ECF No. 99-27.

On January 14, 2008, attorneys for Griesa's insurance company, apparently responding to Griesa's insurance claim arising from the proposed settlement with Acevedo, indicated they believed the proposed civil release and settlement agreement was "unenforceable." Opp'n to County Mot. Ex. HH, ECF No. 111-35; *see also* Warrant and Affidavit at 30 (identifying letters dated December 26, 2007 and January 14, 2008 from attorneys representing Griesa's insurer concerning claim).

F.    Evans Begins Representing Griesa and Turns Documents Over to YCDA

During one of at least five phone conversations that took place over an unspecified period, Griesa told Detective Elliott about the potential settlement with Acevedo and Detective Elliott advised Griesa to consult with another attorney. Pls. UMF 32, 33; *see* Pls. Ex. C at 33:13−24 (Elliott testifying in 2014 that his first phone conversation with Griesa took place on November 16, 2007, though he could not recall dates of other calls). In February 2008, Griesa retained defendant Evans to represent him in connection with the YCDA's ongoing investigation. Evans Decl. ¶ 10; Pls. UMF 57.

Evans was a former Sutter County Superior Court judge and had been a visiting judge in Yuba County Superior Court before returning to private practice. Evans Decl. ¶ 2; Pls. UMF 35. According to Griesa's deposition testimony, Evans wanted Griesa to fire Vasquez and claimed to have beneficial connections with the YCDA, including a friendship with Bendorf. Pls. UMF 36−38. Evans denies telling Griesa he was friends with Bendorf, or that he had a special relationship with the YCDA, and states he never suggested Griesa terminate Vasquez in favor of hiring Evans. Evans Opp'n Ex. EE, Evans Supp. Decl., ECF No. 124-2, ¶ 2.

While representing Griesa, Evans turned over documents from Vasquez's prior representation of Griesa to the YCDA, and members of the YCDA later used those documents to obtain a search warrant for plaintiffs' law offices, described further below. *See* Pls. UMF 58; County Response (disputing plaintiffs' assertion Evans provided documents "to assist [the YCDA] in obtaining a search warrant"); Evans Resp. (same). Specifically, on February 22, 2008, Evans provided Yuba County Deputy District Attorney Michael Byrne with two billing statements from Vasquez to Griesa, four letters from Santana to Vasquez concerning the settlement and release, a copy of the $50,000 check Griesa had given to Vasquez, and three draft copies of the release. Evans' UMF 26;[10] County UMF 12. On April 29, 2008, Evans provided the YCDA with a second packet of documents, containing the first set of documents, an additional draft of the release bearing the signatures of Acevedo and her mother. County UMF 13; Evans UMF 27.

In a letter dated April 30, 2008, one day after submitting the second set of documents to the YCDA, Evans indicated to Griesa that the YCDA's criminal investigation had concluded, stating in relevant part, "while the criminal matter has disappeared, I think that it is still important that you continue to not talk to a lot of people, or anyone who doesn't need to know, since there remains the possibility of a civil lawsuit against you . . . ." Opp'n to County Mot Ex. JJ, ECF No. 111-37.

Evans and Griesa disagree regarding whether Griesa gave Evans permission to turn documents over to the YCDA, though Griesa offers inconsistent testimony on whether he merely instructed Evans to merely "show" the documents to Bendorf rather than "turn them over" or allow her to copy them. Evans UMF 28 & Pls. Resp (both citing Griesa Dep.). Evans believed turning the documents over to the YCDA would benefit Griesa. Evans UMF 29; *see also* Evans Decl. ¶ 10 (stating Evans also believed he was ethically required to turn over documents as possible evidence of a crime). Griesa testified that Evans told him turning the documents over would help him in the criminal case pending against him, and Griesa believed this was true. Pls. UMF 56.

---

[10] While Evans represents that letters from Porter Scott, attorneys for Griesa's insurer, to Griesa were included in this packet, no such letters are in the exhibit Evans cites (the YCDA's warrant application). *See* Evans UMF 26; *see also* Warrant and Affidavit. Those letters are, however, identified as attachments to the warrant affidavit. *See* Warrant and Affidavit at 30.

The parties dispute whether Evans told Griesa that turning the documents over would assist "McGrath's plan to go after Plaintiffs." Pls. UMF 56 & County Resp. (arguing cited Griesa testimony includes "the suggestion of a plan [] loaded into the question"; also citing Griesa testimony disclaiming existence of any such plan); *see also* Pls. Resp. to Evans UMF 29−30 (citing Griesa's testimony claiming Evans complained of Santana's advantage in obtaining a judgeship because of his Mexican-American heritage and Evans' support for Green and opposition to Santana's appointment and defendants' alleged plan to derail Santana's judicial bid).

G.      The YCDA Investigates Santana and Vasquez, Obtaining and Executing
        a Warrant to Search Their Law Offices

In late February 2008, after Evans turned over the first set of documents, the County defendants contend they first began working on possible charges against Santana and Vasquez. County UMF 10−11, 4; Pls. Resp. (disputing in light of Griesa's notes identifying defendants' "plan to prosecute [p]laintiffs to derail Santana's judicial appointment"). According to defendant Yuba County District Attorney Investigator Mary Barr, she, McGrath, Bendorf, Vacek and Stober were involved in the investigation and prosecution of Santana and Vasquez. Pls. UMF 60. Stober submits under penalty of perjury that his involvement in the investigation concerned only Griesa, not plaintiffs. County Resp. to Pls. UMF 60.

In their investigation, the District Attorney's Office contacted the California State Bar for guidance on attorneys' ethical obligations, consulted with two attorneys to possibly serve as expert witnesses, reviewed the case with federal prosecutors, and contacted the California Attorney General's Office to discuss the facts of the case and address "potential conflicts of interest that would result in the AG's office adopting the case." County UMF 15; Pls. Resp. (identifying fact as "incomplete," noting YCDA called Evans to testify as an expert in grand jury proceedings and addressing unsuccessful arguments later raised by YCDA).

The County defendants prepared a warrant application to search Santana's and Vasquez's law offices. County UMF 16.[11] McGrath, Bendorf, Vacek and Barr collaborated in

---

[11] The same warrant also authorized searching the office of Acevedo's new attorney, Mr. Trezza. Warrant & Affidavit at 4; *see* Evans UMF 31.

10

preparing the warrant, with Barr verifying information and signing the affidavit supporting the statement of probable cause and Bendorf conducting legal research, drafting language describing the alleged facts and coordinating three special masters to assist in executing the warrants. County UMF 17−20. Plaintiffs contend the warrant affidavit omitted material facts, including Acevedo's claim that Detective Elliott encouraged her to pursue a civil settlement; Santana's and Vasquez's disclosure to Detective Elliott and, later, Bendorf, that they were negotiating a settlement agreement in light of Acevedo's desire to avoid prompting a criminal prosecution; Detective Elliott's belief that Acevedo's decision to settle was "reasonable"; and Griesa's insurer's letter stating the proposed release and settlement was "unenforceable" without also stating it was "unlawful."[12] Pls. Resp. to UMF 19.

The warrant affidavit included documents provided by Evans to the YCDA. Evans UMF 32. In relevant part, the affidavit stated:

> It [] appears that: 1) SANTANA entered into an attorney-client relationship with MINOR; 2) that SANTANA personally informed law enforcement MINOR would no longer cooperate with an ongoing criminal investigation, that MINOR would refuse to testify in connection with that investigation, and that SANTANA had directed MINOR not to speak with members of law enforcement; 3) that SANTANA had contact with Griesa's attorney, VASQUEZ; 4) that between SANTANA and VASQUEZ there was an attempt to reach an understanding memorialized through a signed written agreement which would result in the corruption of governmental processes and an obstruction of justice; and 5) that it further appears a significant amount of money was proposed to be provided by Griesa and received by the MINOR with the intent to prevent further law enforcement access to MINOR, prevent the filing of criminal charges against Griesa, and prevent MINOR's attendance at trial or other pre-trial judicial proceeding upon the filing of such charges.

Pls. UMF 65; County Resp. McGrath approved the warrant request and supporting affidavit on May 1, 2008. County UMF 21; Pls. UMF 64; Pls. Resp. to County UMF 18.

Evans claims it was not his idea to investigate Santana or Vasquez and he had no information that a search warrant would be served on Santana and Vasquez. Evans UMF 34, 38.

---

[12] As previously noted, the warrant and affidavit provided to the court indicates this letter was an attachment to the YCDA's statement of probable cause, Warrant & Affidavit, at 30, though the letter is not provided in that exhibit.

Plaintiffs disagree, citing Griesa's notes, Evans' testimony he was contacted by the Commission on Judicial Nominees concerning Santana's application for the judgeship and Griesa's declaration stating, "Evans [] showed me parts of the warrant to be served and executed upon the Law Offices of David Vasquez and Jesse Santana."  Pls. Resp. to Evans UMF 34; Griesa Decl., Opp'n to Evans Mot. Ex. FF, ECF No. 107-33, ¶ 9.  Plaintiffs also cite Bendorf's trial testimony that, at some point prior to June 12, 2008, Evans had encouraged her to investigate a potential criminal case against Santana.  Opp'n to Evans Mot., Ex. GG, ECF No. 107-34, at 47:5−48:15.

On May 5, 2008, Yuba County Superior Court Judge James E. Cadle signed the search warrant.  Pls. UMF 66; County UMF 22.  On May 7, 2008, the Commission on Judicial Nominees Evaluation interviewed Santana.  Pls. UMF 67.  On May 14, 2008, the search warrant was executed, with searches effected of Santana, Vasquez and Trezza's law offices and Santana and Vasquez each receiving a copy of the search warrant upon its execution.[13]  Pls. UMF 67; Evans UMF 31, 33.

H.       Santana Discloses Search Warrant to Commission on Judicial Nominees; Subsequently Rated "Not Qualified"

Santana immediately reported the search warrant to the Commission on Judicial Nominees.  Pls. UMF 68.  "Soon after providing a copy of the search warrant to the JNE Commission [Santana] was advised that [he] was not qualified for a judicial appointment and [he] was removed from consideration."  Santana Decl., Pls. Ex. P, ECF No. 99-17, ¶ 6.  No party has identified the basis for Santana's disqualification.  *See* Pls. UMF 69 & Resps. (Santana submitted May 27, 2008 letter "contest[ing] the JNE Commission's rating that [he] is not qualified to sit as a Superior Court Judge" without identifying basis for rating, Pls. Ex. R, ECF No. 99-19).

I.       Griesa Waives Attorney-Client Privilege, Sits for Interview with YCDA

On June 12, 2008, in open court with Santana's and Vasquez's counsel present, Griesa waived his attorney-client privilege concerning communications with Vasquez.  Evans UMF 35; County UMF 27.  The County defendants contend the YCDA did not request Griesa waive the

---

[13] The parties do not indicate whether Trezza was also served with the warrant that day.

12

privilege or offer him any deal in exchange for providing information. County UMF 28 (citing Bendorf Decl. ¶¶ 12−13; Vacek Decl., ECF No. 102-7, ¶ 6). Plaintiffs dispute this contention, citing Bendorf's testimony she thought it was McGrath's idea to have Griesa waive the privilege and the waiver would possibly allow a judge to release Griesa's documents. Pls. Resp. to County UMF 28.

On June 19, 2008, with Evans present, the District Attorney's Office interviewed Griesa about the allegations against him as well as the proposed compromise with Acevedo. Evans UMF 36; County UMF 23, 25. Bendorf, Vacek and Stober attended Griesa's interview. County UMF 24. The YCDA held the interview to ask Griesa about Acevedo's allegations and his knowledge of the proposed compromise. County UMF 26.

Griesa opened the interview by reading a prepared statement addressing Acevedo's allegations against him and the parties to the interview then had "a short discussion about an audio recording Mr. Griesa had and his belief the charges against him were going to be dismissed." County UMF 30.[14] The balance of the interview focused on Santana's and Vasquez's conduct. County UMF 31.

J.      Griesa Provides his Notes to the YCDA

During the interview, Griesa turned over to the YCDA his typed notes, titled, "Attorney/Client Communication − Confidential." County UMF 32; Griesa Notes, Pls. Ex. F, ECF No. 99-7. Griesa kept these notes in 2007 and 2008, on Evans' advice. Pls. UMF 52; Evans Resp. (citing Evans' testimony he did not recall telling Griesa to keep notes). The notes begin: "The events listed below, are to the best of my memory, a summarization of the incidents that have led up to the present day, to include dates, times, and discussions. I do have support [sic] documentation available upon request to support the following events." Griesa Notes at 1.

[14] The County defendants appear to contend they did not respond to Griesa's stated belief the charges against him would be dropped. *See* Vacek Decl. ¶ 6 ("I chose to simply ignore his concerns about charges against him and just continued the questioning."); Bendorf Decl. ¶ 13 ("While I discussed Mr. Griesa's criminal case with his attorney Mr. Evans, I never offered assurances that Mr. Griesa's criminal case would be dropped in exchange for his testimony, nor was such a request ever made by Mr. Evans.").

In an entry marked January 18, 2008, Griesa described "a call from a friend," in which the friend "told [Griesa] that Attorney Santana's bid for Sutter County Superior Court Judge was in jeopardy due to [Griesa's] case and the proposed civil compromise . . . ." *Id.* at 23; Pls. UMF 54. According to Griesa's notes, this friend "also told [Griesa] of a luncheon' [sic] he had been to at a local [Marysville] restaurant where members of both the Sutter and Yuba County DA's office were. . . . [and] one of the judges for Yuba County was there as well, along with the attorney who was running against . . . Santana, who also works in the DA's office." Griesa Notes at 23; Pls. UMF 48; Evans UMF 19. Griesa continued, "[o]ne of the topics at the table was the upcoming appointment of the new Superior Court Judge position for Sutter County." Griesa Notes at 23; Evans' UMF 19.

The entry continues, "A week later another attorney friend of mine . . . called me to tell me he had an investigator from the California Judicial Review Board call him and ask him questions regarding my case and what role Attorney Santana had had in my case." Griesa Notes at 23. The note goes on to summarize this "[]other attorney friend['s]" statement:

> He believed that the Yuba County DA's Office was very interested in my case but not for the obvious reasons. It was his belief that the appointment of Attorney Jesse Santana for Sutter County Superior Court Judge was highly contested by both the Yuba and Sutter County DA offices and that they wanted one of their own in that position. Neither Yuba nor Sutter County have a judge of anything other than white Caucasian [sic], and because of Jessie's [sic] Hispanic ethnicity he could get the appointment. The judicial review would be on-going until at least June of 2007 [sic] before a decision would be reached by the Governor's Office, according to my friend. There are currently at least three female superior court judges in Yuba and Sutter County and the current DA's choice is one of their own and she is a white female. According to my friend it is for that reason the Yuba County DA's office will strike before the appointment is announced. In addition, according to my friend, attorney David Vasquez has been reaping the benefits of having both of his former law office partners now on the bench for both Yuba and Sutter County. One of the judges is the presiding superior court judge for Yuba County. It was his opinion that Attorney Vasquez is often the recipient of getting the top felony court cases that are appointed by the presiding judge. In addition, Attorney Vasquez had won several high-profile criminal cases against DA McGrath to include a recent murder case in which David's client went completely free despite several felony charges. It is for these reasons that my attorney friend is concerned about my case, the potential

/////

14

political fallout, and collateral damage it could do to me and my family.  As he puts it, 'Joe you are the appetizer for the dinner McGrath is cooking.'

Griesa Notes at 23−24 (quoted in Pls. UMF 55, Evans UMF 20).

In a 2017 deposition, Griesa identified both the "friend" and the "[]other attorney friend" referred to in his January 18, 2008 entry as Evans.  Griesa Dep., Pls. Ex. D, ECF No. 99-5,[15] at 76:12−15, 93:5−11, 95:20−96:3, 103:5−11; *see* Pls. UMF 54−55 (attributing both statements to Evans without acknowledging Griesa's notes identifying them as different "friend[s]").  In that same 2017 deposition, Griesa testified that the luncheon at issue took place in December 2007 and identified the attendees as McGrath, Bendorf, Yuba County Superior Court Judge Julia Scrogin and Green.  Pls. UMF 48.  Further, although Griesa's notes indicate this information was conveyed to him by his friend or friends by phone, Griesa Notes at 23, Griesa testified at least part of the conversation actually took place in Evans' office.  Griesa Dep. at 80:18−24; *see id.* at 80:25−81:3 (Griesa responding to suggestion he perhaps "had a couple different conversations with [Evans] about this – this luncheon, maybe one over the phone and one in person," with "Yes").

Evans testified he never attended the lunch Griesa describes in his notes, and he never told Griesa he attended such a lunch.  Evans Resp. to Pls. UMF 48.  The other defendants also testified they never had lunch together, except possibly at a bar association event years prior.  Evans UMF 22.  Evans notes plaintiffs' only evidence of such a lunch is from Griesa's notes and testimony.  Evans UMF 23.

K.    The YCDA Interviews Acevedo

The District Attorney's Office interviewed Acevedo on July 15 and 17, 2008, with Stober, Bendorf, Vacek and victim advocate Liz Rodriguez present.  County UMF 34−35.  This interview concerned only Acevedo's allegations against Griesa.  County UMF 36−37; Acevedo Decl., Pls. Ex. J, ECF No. 99-11, ¶ 21 ("During my two day interview, I was never questioned about Jesse Santana [sic] David Vasquez or the civil settlement with Mr. Griesa.  I was only questioned about Mr. Griesa and his physical and sexual abuse against me.").  Plaintiffs cite Acevedo's declaration, stating, prior to the interview, Bendorf indicated "she had questions about

---

[15] Excerpts of Griesa's deposition are also provided in County Opp'n Ex. A, ECF No. 110-1.

1 [] Griesa, the settlement and [] Santana," and Acevedo told Bendorf she was not bribed and the

2 settlement concerned only the civil case. Pls. Resp. to County UMF 36. The County defendants

3 contend they believed Acevedo would refuse to answer questions about Santana. County UMF 37;

4 Pls. Resp. (citing Acevedo declaration denying being bribed).

5         L.     The YCDA Submits Charges Against Griesa and Plaintiffs to Single Grand

6                Jury Convened by Judge Scrogin; Grand Jury Returns Indictment

7         The YCDA submitted charges against Griesa and the plaintiffs to a single grand

8 jury. County UMF 39−41. On October 24, 2008, Vacek sent Santana and Vasquez letters notifying

9 them they were the subject of an investigation for which the District Attorney had requested grand

10 jury proceedings. Evans' UMF 40.

11         In October 2008, Yuba County Superior Court Judge Scrogin convened a grand jury

12 as to the charges submitted against Griesa and plaintiffs. Pls. UMF 70. In his 2017 testimony,

13 Griesa identified Judge Scrogin as one of the participants in the December 2007 luncheon Evans

14 described to him in January 2008. Pls. UMF 48. When asked whether Judge Scrogin was a Green

15 supporter, Bendorf testified she did not know "but it's a fair assumption" in light of Judge Scrogin's

16 friendship with Green. Bendorf Dep. at 57:19−58:3; Pls. UMF 50. Bendorf also testified that

17 although she "ha[d] not heard anything personally from [Judge Scrogin,]" she had heard from

18 someone, though she could not recall who, that when Scrogin was a Sutter County prosecutor,

19 Scrogin had "a dart board or something comparable, with Jesse's picture on it." *Id.* at 42:1−19;

20 Pls. UMF 51. McGrath also testified he "ha[d] heard" Scrogin disliked Santana. McGrath Dep.,

21 Pls. Ex. M, ECF No. 99-14,[16] at 308:22−24.

22         The grand jury returned an indictment against plaintiffs on November 14, 2008.

23 County UMF 42. Santana and Vasquez both were indicted for conspiracy to obstruct justice,

24 dissuading a witness, and dissuading a witness for financial gain; Vasquez was also indicted for

25 bribery of a witness, and Santana was also indicted for receiving or offering to receive a bribe as a

26 witness. County UMF 42; Evans UMF 41.

27

28   [16] Excerpts of McGrath's deposition are also provided at ECF No. 100-15.

M.    <u>Plaintiffs Challenge Indictment, with Court of Appeal Ultimately Dismissing Indictment as to Santana and Upholding Trial Court's Dismissal of Bribery Charge Against Vasquez</u>

On March 20, 2009, Santana filed a demurrer challenging the conspiracy charge against him. County UMF 43. Santana filed a second demurrer on June 1, 2009, arguing the conspiracy charge was uncertain and provided constitutionally inadequate notice. County UMF 44. On June 22, 2009, the court overruled the first demurrer but sustained the second with leave to amend, finding the acts forming the perversion or obstruction of justice were not adequately alleged. County UMF 45.

In June 2009, the California Attorney General's office associated as prosecuting counsel in Santana's and Vasquez's criminal case. County UMF 49; Pls. UMF 71; Evans UMF 44. The County contends that Deputy Attorneys General Michael Canzoneri and David Lowe assumed responsibility for the prosecution from that point forward, with the YCDA having "no responsibility for and [] not provid[ing] any direction regarding the criminal prosecution of the case." County UMF 49; Pls. Resp. (arguing the California Attorney General's prosecution "rel[ied] on the same investigation as the YCDA's Office"). Vacek, on behalf of the YCDA, filed an amended indictment on July 13, 2009, though he states he did so only as "administrative assistance" to the California Attorney General. *See* County UMF 46 (stating, "[a]n Amended Indictment was filed" rather than identifying filer); Vacek Decl. ¶ 15 (stating California Attorney General "took over complete control over [sic] the prosecution in June 2009" and he offered only "administrative assistance (filing a pleading on behalf of the AG, for example) . . . . after approximately mid-July 2009"); County Ex. E.2.[17]

Santana's and Vasquez's subsequent demurrers to the amended indictment were overruled. County UMF 47−48. On July 29, 2010, in response to Santana's and Vasquez's motion to dismiss, the Yuba County Superior Court found improper expert testimony and instructions as to the bribery charges against plaintiffs deprived the grand jury of necessary guidance and

---

[17] The County's exhibits, including those documents for which they seek judicial notice, are provided at ECF Nos. 102-12−102-15, with multiple exhibits provided within each document, none of which are individually paginated.

warranted setting aside both charges. County Ex. J.4 at 501. The court also found no probable cause for dissuading a witness for financial gain charge against Santana, but found probable cause existed for the balance of the charges. County UMF 50−53; Evans UMF 45. The court upheld its ruling after considering plaintiffs' motion for reconsideration. County UMF 54−55.

On May 16, 2012, a California Court of Appeal set aside the indictment of Santana in its entirety, finding Judge Scrogin disqualified, as she "had already declared her disqualification sua sponte in any matters in which defendant Santana appeared as counsel because a reasonable person could have doubts about her bias against him,"[18] and therefore lacking in jurisdiction to convene the grand jury in Santana's case. Pls. UMF 72; County UMF 56−57; Evans UMF 46; *Santana v. Superior Court of Yuba Cty.*, No. C066008, 2012 WL 1777801, at *10 (Cal. Ct. App. May 16, 2012), *as modified on denial of reh'g* (June 13, 2012)[19] (emphasis omitted). In light of this finding, the appellate court did not consider Santana's challenge to the merits of the indictment. County UMF 56. That court reviewed de novo and ultimately rejected Vasquez's probable cause challenges to the conspiracy and witness dissuasion charges, but affirmed the trial court's order dismissing the bribery charge against Vasquez. County UMF 56; Evans' UMF 47; *Santana*, 2012 WL 1777801, at *14.

N.    <u>Indictment Dismissed; California Attorney General Files Criminal Complaint; Trial Court Finds Probable Cause for All Charges Contained in Criminal Complaint</u>

On October 30, 2012, noting a criminal complaint had been filed against plaintiffs and "the People's intent is to have the new case supersede the Grand Jury Indictment," the superior court dismissed the criminal case pending against Santana and Vasquez. County UMF 58; Evans UMF 50; County Ex. M. The California Attorney General, without the YCDA, filed the cited

---

[18] The court described the history between Judge Scrogin and Santana, explaining, "Judge Scrogin had been the prosecutor in a 'high-profile murder case' in which [] Santana had been successful in obtaining an acquittal in 2004 after two retrials." *Santana v. Superior Court of Yuba Cty.*, No. C066008, 2012 WL 1777801, at *2 (Cal. Ct. App. May 16, 2012), *as modified on denial of reh'g* (June 13, 2012).

[19] The County defendants provide this opinion at Exhibit L.

criminal complaint, charging both plaintiffs with conspiracy to obstruct justice and dissuading a witness, and charging Vasquez alone with dissuading a witness for financial gain. Pls. UMF 74; County UMF 59−63; Evans UMF 48−49, 51; County Ex. N.1; *see also* Bowers Decl., ECF No. 102-4, ¶¶ 2−3, 5 (Deputy Attorney General Barton Bowers stating he drafted AG's October 30, 2012 criminal complaint after reviewing relevant materials and Court of Appeal decision, finding "sufficient evidence" of plaintiffs' crimes, and without direction from YCDA, though with access to "the contents of its file"); Pls. UMF 73 (arguing AG's complaint relied on "same investigation as the YCDA's Office").[20] After plaintiffs each filed demurrers, leading the California Attorney General to file an amended complaint, the case proceeded to a preliminary hearing. County UMF 64−65.

On July 8, 9 and 10, 2013, the trial court held a preliminary hearing in which the government presented witnesses, who Santana's counsel and Vasquez's counsel cross-examined, with all parties presenting oral argument. County UMF 66; Def. Ex. O at 124−25 (chronological index of hearing). Neither party called Acevedo to testify at the preliminary hearing. Pls. UMF 75; *see* Acevedo Decl. ¶ 27 (stating, if called, she "would have stated that Mr. Santana and Mr. Vasquez never attempted to bribe me or dissuade me"); County Resp. to Pls. UMF 75 (noting plaintiffs could have called Acevedo to testify). The court determined there was probable cause to hold plaintiffs to answer all charges. County UMF 67; Evans UMF 52. On November 1, 2013, the trial court denied plaintiffs' motion to dismiss the indictment, finding sufficient evidence to establish probable cause for all charges. County UMF 68−70; Evans UMF 53.

/////

/////

---

[20] Plaintiffs cite seven lines of the deposition of Gary W. Schons as support for this proposition. Pls. UMF 73. Their motion identifies Schons as "[d]efendants' own expert," without explaining his qualifications to testify as to the California Attorney General's prosecution. *See* County Resp. to Pls. UMF 73 (raising foundation objection to plaintiffs' reliance on Schons' opinion); Evans Resp. to Pls. UMF 73 (same).

O.    California Attorney General's Case Proceeds to Trial; Jury Acquits
      Plaintiffs on All Charges

The case against plaintiffs proceeded to trial and, after the court denied Santana's motion to dismiss under California Penal Code section 1118.1,[21] the case was submitted to a jury. County UMF 71−72.  On April 25, 2014, a jury acquitted Santana and Vasquez of all charges.  Pls. UMF 76.

P.    Following Plaintiffs' Acquittal, McGrath Makes a Statement to a Local Newspaper

On May 4, 2014, McGrath commented to a local newspaper that, "[a]t every state of this proceeding and investigation, evidence was found that wrongdoing had occurred by Santana and Vasquez" and their actions were "absolutely irregular, suspicious and worthy of investigation." Pls. UMF 77; Pls. Ex. X, ECF No. 99-25.  McGrath indicated "he has had little to nothing to do with the case in years, [and] did not sit in on the trial," but suggested the YCDA "would have structured" differently "the presentation that was made to this jury," noting Bowers had indicated the trial court's rulings prevented the prosecution from presenting certain issues.  Pls. Ex. X, ECF No. 99-25; Pls. UMF 77.  Plaintiffs contend McGrath's statements "painted [p]laintiffs in a negative light."  Pls. UMF 78.

Q.    The Instant Suit and Relevant Procedural History

Plaintiffs filed this suit on April 13, 2015.  ECF No. 1.  On March 13, 2018, plaintiffs filed the operative third amended complaint, raising a federal malicious prosecution claim against

---

[21] The California Penal Code provides, in pertinent part:

> In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal. If such a motion for judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right.

Cal. Penal Code § 1118.1.

all individual defendants, a *Monell*[22] claim against defendant Yuba County, a substantive due process claim against all individual defendants, a conspiracy claim against all individual defendants, and conspiracy and malicious prosecution claims under state law against Evans alone. ECF No. 94.

In late June 2018, all parties moved for summary judgment. Plaintiffs moved for summary judgment on each claim. Pls. Mot., ECF No. 99. Defendants oppose. County Opp'n, ECF No. 110, Evans Opp'n, ECF No. 114. Without leave of court, plaintiffs filed two replies, one reply to the County defendants' opposition, Pls. Reply to County, ECF No. 118, and another to Evans' opposition, Pls. Reply to Evans, ECF No. 119, exceeding the court's briefing page limit. The County defendants also moved for summary judgment on all claims, County Mot., ECF No. 102-1, which plaintiffs oppose, Opp'n to County Mot., ECF No. 111; the County filed a reply, County Reply, ECF No. 117. Finally, Evans moved for summary judgment as to each claim against him, Mot., ECF No., 100, with plaintiffs opposing, Opp'n to Evans Mot., ECF No. 107, and Evans filing a reply, Evans Reply, ECF No. 116. The court submitted each motion after hearing on November 9, 2018 and resolves the motions here.

II.     LEGAL STANDARD

A court will grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).[23]

The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the nonmoving party, which "must establish that there

---

[22] *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690−91 (1978).

[23] Rule 56 was amended, effective December 1, 2010. However, it is appropriate to rely on cases decided before the amendment took effect, as "[t]he standard for granting summary judgment remains unchanged." Fed. R. Civ. P. 56, Notes of Advisory Comm. on 2010 amendments.

is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). In carrying their burdens, both parties must "cit[e] to particular parts of materials in the record . . .; or show [] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[the nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts"). Moreover, "the requirement is that there be no genuine issue of material fact . . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247-48 (emphasis in original).

In deciding a motion for summary judgment, the court draws all inferences and views all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

A court may consider evidence as long as it is "admissible at trial." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). "Admissibility at trial" depends not on the evidence's form, but on its content. *Block v. City of L.A.*, 253 F.3d 410, 418-19 (9th Cir. 2001) (citing *Celotex Corp.*, 477 U.S. at 324). The party seeking admission of evidence "bears the burden of proof of admissibility." *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002). If the opposing party objects to the proposed evidence, the party seeking admission must direct the district court to "authenticating documents, deposition testimony bearing on attribution, hearsay exceptions and exemptions, or other evidentiary principles under which the evidence in question could be deemed admissible . . . ." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385-86 (9th Cir. 2010). However, courts are sometimes "much more lenient" with the affidavits and documents of the party opposing summary judgment. *Scharf v. U.S. Atty. Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979).

/////

22

III.    DISCUSSION

A.    Objections

The parties raise numerous objections to the evidence in the record before the court. As noted above, the court resolves objections only as necessary.

1.    Defendants' Objections to Griesa's Notes and Deposition Testimony

Plaintiffs rely on Griesa's notes and deposition testimony explaining the notes to support their contention that defendants, among others, attended a December 2007 lunch in which they created a plan to "derail" Santana's judicial application. *See, e.g.*, Pls. Mot. at 11−12, 15, 19, 23−24; Opp'n to County Mot. at 10−11, 17−18, 29−30; Opp'n to Evans Mot. at 10−12, 19, 20, 21−22. In response, the County defendants request the court exclude Griesa's notes and deposition testimony interpreting the notes, arguing such evidence is irrelevant and constitutes hearsay without an exception. ECF No. 110-4. Evans also objects to the court's considering Griesa's notes and portions of Griesa's testimony addressing his notes. ECF No. 114-1 at 6−16. As explained below, Griesa's notes and testimony constitute inadmissible hearsay.

Hearsay is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(1)−(2). "In the absence of a procedural rule or statute, hearsay is inadmissible unless it is defined as non-hearsay under Federal Rule of Evidence 801(d) or falls within a hearsay exception under Rules 803, 804 or 807." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 778 (9th Cir. 2002) (citing Fed. R. Evid. 802; 30B Federal Practice & Procedure: Evidence § 7031 at 279 (2000)).

In their briefing, plaintiffs plainly rely on Griesa's notes and testimony relying on those notes for the truth of the matter asserted. *See, e.g.*, Pls. Reply to County at 4 ("The undisputed evidence from Griesa's notes and deposition testimony shows the Defendants had a plan to prosecute Plaintiffs to derail Santana's judicial appointment and ruin Plaintiffs' personal and professional lives because they wanted a white judge appointed to the Sutter County Superior Court instead of Santana."); *id.* at 6 ("According to Griesa notes [sic], the Governor was going to make his decision by June of 2008, and therefore the Yuba County DA's Office would strike before the

23

decision was made.") (citing Griesa Notes at 24).  At the same, plaintiffs argue that Griesa's notes and deposition testimony are not hearsay because: (1) "Evans' statements to Griesa were made in furtherance of the conspiracy in order to obtain his cooperation in the prosecution" and thus fall within the co-conspirator exemption to the hearsay rule and (2) "[t]he notes are [] party admissions regarding the Defendants' plan to go after the Plaintiffs so a white prosecutor would receive the judicial appointment."  ECF No. 118-1 at 4−6; Opp'n to County Mot. at 22; Opp'n to Evans Mot. at 19−20.

A statement is not hearsay if it "is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E).  The court may admit an alleged co-conspirator's statement over an objection only when "satisfied that the statement actually falls within the definition of the [co-conspirator] Rule."  *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).  The proponent of the statement "must prove . . . by a preponderance of the evidence 'that there was a conspiracy involving the declarant and the [nonoffering party], and that the statement was made "during the course and in furtherance of the conspiracy."'"  *United States v. Vilavazo*, 666 F. App'x 657, 659 (9th Cir. 2016) (quoting *Bourjaily*, 483 U.S. at 175).  In making this determination, "[t]he statement must be considered but does not by itself establish . . . the existence of the conspiracy or participation in it under [the co-conspirator exemption]."  Fed. R. Evid. 801(d)(2).  Rather, in light of "its presumptive unreliability, 'a co-conspirator's statement implicating the defendant in the alleged conspiracy must be corroborated by fairly incriminating evidence.'"  *Vilavazo*, 666 F. App'x at 659 (quoting *United States v. Silverman*, 861 F.2d 571, 578 (9th Cir. 1988)); *United States v. Gordon*, 844 F.2d 1397, 1402 (9th Cir. 1988) ("[T]here must be some evidence, aside from the proffered statements, of the existence of the conspiracy and the defendant's involvement.").  In conducting this review, the court may examine evidence that would not be admissible.  *Bourjaily*, 483 U.S. at 178 ("[Federal Rule of Evidence 104] on its face allows the trial judge to consider any evidence whatsoever, bound only by the rules of privilege.").

Here, Griesa's statements raise serious reliability concerns.  The notes were not recorded contemporaneously.  *See* Griesa Notes at 1 ("The events listed below, are to the best of

my memory, a summarization of the incidents that have led up to the present day, to include dates, times, and discussions."); Griesa Dep. at 314:9−11 (Q: "So this summarization, was it based on your memory or was it based on notes? A: Both."). In summarizing relevant conversations, Griesa's notes do not identify the individuals he directly spoke to by name, nor do they name the individuals whose conversations were purportedly confided in him; instead, Griesa's notes refer to a "friend," "another attorney friend," a "Judge," and an unspecified number of members of "DA's offices." Griesa Notes at 23−24. Plaintiffs rely on Griesa's 2017 deposition, held more than eight years after Griesa recorded the notes, to establish the identity of individuals referred to in the notes, though Griesa's identifications and explanations are sometimes inconsistent. *See* Griesa Dep. at 323:12−324:5 (testifying he was unable to recall whether his reference to "another attorney and long-time family friend" in an entry dated December 21, 2007 referred to Evans or another attorney, explaining "I don't know that I always identified who I was talking to"); *id.* at 76:12−15, 80:18−81:3, 95:20−96:3, 103:5−11 (testifying the January 18, 2008 entry in his notes describing the purported conspiracy, which refers to two separate phone calls Griesa received from two separate individuals one week apart actually reflected several conversations with a single individual, Evans, taking place in person and, perhaps, by phone as well); *but see id.* at 93:1−11 (attributing only "a portion of" the information provided in the January 18, 2008 entry to Evans without explaining who provided other portions); *id.* at 126:2−127:13 (testifying Evans "wasn't at the lunch. He was at the restaurant" but "was sitting close enough to hear parts of their conversation"); *but see* Griesa Notes at 23 (January 18, 2008 entry noting "a friend" Griesa later identified as Evans described "a luncheon' [sic] he had been to"). Griesa admitted "there is [sic] a lot of errors in this version of [his] notes," though he does not identify all errors or explain if other versions exist. *Id.* at 123:3−4.

Because Griesa's contested statements, standing alone, cannot establish the existence of the underlying conspiracy or defendants' participation in that conspiracy, *see* Fed. R. Evid. 801(d)(2), it does not bode well for plaintiffs that they rely exclusively on Griesa's statements in responding to the objections and attempting to establish the conspiracy exemption. *See* ECF No. 118-1 at 4−6; ECF No. 119-1 at 3−4; Opp'n to County Mot. at 17 n.7, 22, 29.

In opposing Evans' motion for summary judgment and in otherwise explaining the derailment plan, however, plaintiffs attempt to offer some corroborating evidence, which the court considers here in resolving the objections. Opp'n to Evans Mot. at 20−22. During the relevant time period, McGrath was aware the then-California governor was attempting to diversify the bench. McGrath Dep. at 52:11−25. In the past, the office of at least one prior California governor had called McGrath for his assessment of a judicial candidate, though McGrath received no such call concerning Santana's candidacy. *Id.* at 165:2−22. Bendorf testified she came to prefer Green for the judgeship, Bendorf Dep. at 45:5−11, 57:4−11, and she believed McGrath and Scrogin did as well, *id.* at 57:15−23. Scrogin's negative history with Santana led her to recuse herself from hearing his cases, although she inexplicably then presided over the grand jury she convened against him, leaving it for the appellate court to nullify the findings based on her conflict. *See Santana*, 2012 WL 1777801, at *10. Evans preferred Green over Santana for the judicial appointment. Evans Dep., Pls. Ex. K, ECF No. 99-12,[24] at 42:18−24. Griesa testified that Evans informed him Santana's Hispanic ethnicity made it more likely he would be appointed, as all current judges were white. Griesa Dep. at 105:19−25.[25] Evans understood Griesa's cooperation with the YCDA's investigation, including Griesa's waiving the privilege as to Vasquez, was necessary to the YCDA's investigation of plaintiffs. *Id.* at 216:20−217:4. Evans also knew that turning Griesa's documents over to the YCDA might result in "someone other than [Santana] [] be[ing] appointed," and acknowledged that other person would likely be Green. *Id.* at 201:3−21. Evans had "no problem with" his client, Griesa, waiving the privilege, despite acknowledging that neither McGrath nor Bendorf "made any promises to [] Griesa that his criminal case would not be filed if he waived his attorney-client privilege." *Id.* at 216:9−217:9. According to Griesa, Evans encouraged Griesa to cooperate with the YCDA, telling Griesa his cooperation would benefit Griesa in the criminal investigation being conducted against him. Griesa Dep. at 123:16−25; *see also* Pls. Ex. JJ (Evans

---

[24] Excerpts of Evans's deposition are also provided at Evans Ex. D, ECF No. 100-8.

[25] As discussed below, assuming Griesa testifies to his discussions with Evans in court, Evans' statements may fall within the party admissions exemption to the hearsay rule. *See* Fed. R. Evid. 801(d)(2)(A).

letter to Griesa, following Evans' turning Griesa's documents over to the YCDA: "the criminal matter has disappeared"). Griesa's waiver allowed the YCDA to use the documents Evans had provided. Bendorf Dep. at 189:13−24. Bendorf testified Evans encouraged her to criminally investigate Santana and Vasquez. ECF No. 107-34 at 47:5−48:18.[26] Ultimately, McGrath called Evans to testify as an expert witness before the grand jury that indicted both Griesa and plaintiffs. Bendorf Dep. at 220:13−15.

This evidence may suggest Evans' representation of Griesa was less than adequate, though Evans submits he acted in service of Griesa's best interests and satisfaction of Evans' ethical obligations. *See* Evans Decl. ¶ 10. This evidence also suggests that McGrath, Bendorf and Scrogin did not wish to see Santana appointed and preferred Green, though it does not follow that they conspired to see Green appointed. The evidence may support an inference that Evans, who supported Green, wanted to see Santana prosecuted, believing prosecution would harm Santana's judicial application. But none of plaintiffs' proffered evidence supports finding, as plaintiffs argue here, "an agreement existed between the YCDA's Office and Evans to prosecute Santana and Vasquez to keep the local judiciary white." Opp'n to Evans Mot. at 21.

Other than Griesa's notes, plaintiffs have not identified any evidence supporting the existence of the December 2007 lunch in which the defendants, among others, purportedly set the conspiracy in motion: there is not a single receipt, credit card statement or witness who testifies to this lunch having occurred. Evans, McGrath and Bendorf each testified they never attended the December 2007 lunch Griesa described, or any lunch resembling it. Evans Dep. at 57:21−24; 65:15−67:2, 68:23−69:5; McGrath Dep. at 96:9−15, 96:25−97:12, 137:8−19, 140:11−21, 141:1−12; Bendorf Dep. 36:15−19, 40:13−18, 126:21−127:10. Plaintiffs' only response is to cite Griesa's statements, *see* Pls. Resp. to Evans UMF 22, and argue Griesa's lack of familiarity with the judicial appointment process means he "could only have known about the lunch . . . that the defendants wanted a white prosecutor to be appointed, and the plan to prosecute Santana and

_____

[26] While plaintiffs do not expressly rely on this testimony, and despite defendants' objections to the court's relying on trial testimony, the court may consider inadmissible evidence in conducting its analysis under the co-conspirator exemption and finds this testimony relevant.

Vasquez to derail Santana's judgeship from someone with personal knowledge – Timothy Evans," Opp'n to Evans Mot. at 21−22. Plaintiffs' corroborating evidence amounts to at most the following: the preference of a group of prosecutors, a sitting judge and a defense attorney for one judicial candidate over another, the defense attorney's arguably questionable choices in representing his client, and the ultimately unsuccessful prosecution of the disfavored judicial candidate. This is insufficient to establish the existence of the conspiracy plaintiffs advance here, the relevant parties' roles in it, or that Griesa's notes capture statements made in furtherance of that purported conspiracy.

As the proponents of these statements, plaintiffs bear the burden of proving by a preponderance of the evidence that the declarants were participants in an underlying conspiracy and their statements were made in furtherance of that conspiracy. Plaintiffs have not met their burden.

### 2. Party Admissions Exemption

Plaintiffs also contend "[t]he notes are [] party admissions regarding the Defendants' plan to go after the Plaintiffs so a white prosecutor would receive the judicial appointment." ECF No. 118-1 at 5. Under Rule 801(d)(2)(A), a statement "made by [a] party in an individual or representative capacity" may be "offered against [that] opposing party." Fed. R. Evid. 8001(d)(2)(A). Accordingly, assuming Griesa testifies in court to the statements Evans made directly to him, thus removing the levels of hearsay present in Griesa's notes, those statements are admissible against Evans. Similarly, Griesa's testimony concerning Bendorf's statements made directly to him, including Bendorf's purportedly lying "about [Griesa's] criminal case not being charged in order to get a statement from [him] about [plaintiffs]" is, in the court's preliminary view, a party statement and thus exempt from the hearsay rule. *See* Griesa Decl. ¶ 15. Any testimony Griesa may offer as to statements Evans made about statements other defendants or third parties made do not fall within this exemption, however, as plaintiffs have not provided an exception or exemption for the additional layer of hearsay. *See, e.g.*, *J.P. ex rel. Balderas v. City of Porterville*, 801 F. Supp. 2d 965, 975 n.14 (E.D. Cal. 2011) (excluding affidavit as hearsay where declarant "was not a percipient witness. . . . [and] relie[d] on notes he made about what [third party]

28

purportedly told him, and is incorporating those notes into the affidavit"); *Medina v. Multaler, Inc.*, 547 F. Supp. 2d 1099, 1108 n.13, 1121 (C.D. Cal. 2007) (sustaining objection to deposition testimony "that 'Jessica' told [the deponent] that 'Delphine' said that the Muhlethaler sisters had commented that they disliked hiring women of childbearing age because it was bad for business" as triple hearsay).

These statements may also be admissible to establish their effect on Griesa, explaining why he believed his cooperation with the YCDA would benefit his case, but not for the truth of the matter asserted. *See United States v. Lopez*, 913 F.3d 807, 826 (9th Cir. 2019) ("[A]n out-of-court statement is not hearsay if offered for any purpose other than the truth of whatever the statement asserts. . . . [including] admitting a declarant's out-of-court statement for the purpose of establishing what effect it had on the listener.") (emphasis omitted).

Insofar as these statements are presented for the truth of the matter asserted – that participants attended a lunch where they hatched a plan to derail Santana's judicial bid by conducting a bad faith and knowingly false prosecution – against declarants other than Evans and Griesa, the court SUSTAINS defendants' objections to the Griesa notes and portions of his testimony explaining and expanding on those notes.

B.    Defendants' Motions for Summary Judgment

Because the County defendants and Evans raise overlapping arguments in their respective motions, where appropriate, the court addresses those motions together.

1.    Claims One & Six: Malicious Prosecution (Federal & State Claims)

Plaintiffs contend the defendants "conduct[ed] an illegal and improper criminal investigation of Santana and Vasquez[27] in bad faith, [and] caused and induced them to be prosecuted without probable cause on felony charges of bribery, dissuading a witness, and obstruction of justice." TAC ¶ 51. Plaintiffs further contend that with the prosecution, "[d]efendants expressly discriminated against [plaintiffs] on the basis of their Hispanic ancestry,

---

[27] While plaintiffs capitalize in full party names in their complaint, the court does not follow that convention here.

thereby violating their rights to equal protection as protected by the Fourteenth Amendment." *Id.*
¶ 52.   Plaintiffs also accuse Evans of acting in bad faith and without probable cause in aiding, abetting and causing the "illegal and improper criminal investigation and prosecution." *Id.* ¶ 79.

A criminal defendant may bring a § 1983[28] action for malicious prosecution against prosecutors and others, including police officers and investigators, who wrongfully caused his prosecution.  *Smith v. Almada*, 640 F.3d 931, 938 (9th Cir. 2011) (citing *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002)).   Federal courts turn to state common law for the elements of a federal malicious prosecution claim.[29]  *Mills v. City of Covina*, 921 F.3d 1161, 1169 (9th Cir. 2019) (citing *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004)). Under California law, "a plaintiff claiming malicious prosecution [must] establish 'that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor; (2) was brought without probable cause; and (3) was initiated with malice.'"  *Id.* (quoting *Sheldon Appel Co. v. Albert & Oliker*, 47 Cal. 3d 863, 871 (1989)). Further, and in addition to satisfying the necessary state law elements, "to maintain a § 1983 action for malicious prosecution, 'a plaintiff "must show that the defendants prosecuted [him] . . . for the purpose of denying [him] equal protection or another specific constitutional right."'"  *Id.* (quoting *Awabdy*, 368 F.3d at 1066) (original alterations).

---

[28] Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.

[29] Because plaintiffs must make the same essential showing to support both their § 1983 and state law claims for malicious prosecution, it is appropriate to consider these claims together.

Both the County defendants and Evans argue plaintiffs' malicious prosecution claim is barred by the statute of limitations. County Mot. at 22−23; Evans Mot. at 17−24. The County defendants also argue the California courts' probable cause findings preclude plaintiffs from relitigating the issue here. County Mot. at 23−27. Both the County defendants and Evans argue that the prosecution was supported by probable cause. *Id.* at 27−29; Evans Mot. at 30−35. Finally, as to the § 1983 claim alone, both parties argue there is no triable issue as to whether plaintiffs were prosecuted because of their race. County Defs. Mot. at 29; Evans Mot. at 27−28.

As explained below, the court finds plaintiffs are precluded from relitigating probable cause as to some but not all charges and there is no triable issue of material fact as to whether plaintiffs were prosecuted on the basis of their race. The court thus finds, as explained below, that defendants are entitled to summary judgment on plaintiffs' § 1983 malicious prosecution claims, though plaintiffs' state law claim against Evans survives as to certain charges.

### a.    Issue Preclusion

"Federal courts must give 'preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so.'" *Wige v. City of Los Angeles*, 713 F.3d 1183, 1185 (9th Cir. 2013) (citing *Allen v. McCurry*, 449 U.S. 90, 96 (1980); 28 U.S.C. § 1738). "When an individual has a full and fair opportunity to challenge a probable cause determination during the course of the prior proceedings, he may be barred from relitigating the issue in a subsequent § 1983 claim." *Awabdy*, 368 F.3d at 1068 (citing *Haupt v. Dillard*, 17 F.3d 285, 289 (9th Cir. 1994)). Under California law, issue preclusion requires that five elements be established: (1) the issue to be relitigated must be identical to the issue decided in the earlier action; (2) the issue must have been actually litigated and (3) necessarily decided in the earlier action; (4) the earlier decision must be final and made on the merits; and (5) the party against whom issue preclusion is asserted must have been a party to the earlier action or in privity with such a party. *Wige*, 713 F.3d at 1185 (citing *Lucido v. Superior Court*, 51 Cal. 3d 335 (1990)). Issue preclusion will not apply, however, "when the decision to hold a defendant to answer was made on the basis of fabricated evidence presented at the preliminary hearing or as the result of other wrongful conduct by state or local officials." *Awabdy*, 368 F.3d at 1068; *Wige*, 713 F.3d at 1186 (issue

preclusion does not apply when "evidence known to the arresting officers is materially different from the evidence presented at the preliminary hearing") (emphasis omitted).

The underlying prosecution of plaintiffs involved multiple probable cause determinations made by multiple California courts, yielding one conclusive and final finding, affirmed by an appellate court, that probable cause was absent for a single charge at issue here, and one conclusive and final finding that probable cause supported three charges. The court briefly summarizes the necessary background before addressing the parties' arguments.

### 1. Grand Jury Indictment & Plaintiffs' Challenges

The County defendants, acting for the people of the state of California, obtained a November 4, 2008 grand jury indictment against the plaintiffs on five charges: (1) conspiracy to obstruct justice against Santana and Vasquez under California Penal Code section 182(a)(5); (2) bribery of a witness against Vasquez only under California Penal Code section 138(a); (3) receiving or offering to receive a bribe as a witness against Santana only under California Penal Code section 138(b); (4) dissuading a witness against Santana and Vasquez under California Penal Code section 136.1(b)(2); and (5) dissuading a witness for financial gain against Santana and Vasquez under California Penal Code section 136.1(c)(4). County Defs. Ex. E.1. An amended indictment raised the same charges on July 13, 2009. County Defs. Ex. E.2.

Addressing plaintiffs' lengthy motions to dismiss[30] the indictment, County Ex. J.1−J.3, the trial court found probable cause supporting the conspiracy charge against both plaintiffs, the dissuading a witness charge against both plaintiffs, and the dissuading a witness for financial gain charge as to Vasquez. County Exs. J.4 at 503−04 (tentative ruling), K.3 (final ruling from bench). The court expressly rejected plaintiffs' arguments concerning Judge Scrogin's alleged bias, and the YCDA's allegedly "caus[ing] indictments to be returned solely to destroy or impugn Mr. Santana's effort to be appointed to the bench in Sutter County," failure to present Bendorf's notes concerning her call with Vasquez as exculpatory evidence and failure to present Detective Elliott's opinion "regarding the asserted legality of the agreement." County Ex. J.4 at

---

[30] The court does not address each motion to dismiss plaintiffs filed in California courts, but instead restricts its analysis to those relied on by the County defendants.

507.  As to the bribery charges, however, the court found Santana and Vasquez were prejudiced by improper instructions and expert testimony presented to the grand jury, resulting in the court's setting aside both bribery charges.  *Id.* at 499−501.  The court also found that because Santana never received consideration, the dissuading a witness for financial gain charge against him was not supported by probable cause.  *Id.* at 501−03.

A California Court of Appeal ultimately set the entire indictment aside as to Santana in light of its determination Judge Scrogin lacked jurisdiction to convene a grand jury against him, thus reversing the trial court's ruling on  Judge Scrogin's potential bias, but without addressing Santana's arguments on the merits of the charges against him and without addressing the lower court's finding that the dissuading a witness for financial gain charge against Santana was not supported by probable cause.  County Defs. Ex. L at 101; *see* County Mot. at 26 n.3 (noting "charges against Santana were dismissed on procedural grounds only").  That court rejected Vasquez's argument that improper expert testimony and instructions made it reasonably possible the grand jury indicted him for conspiracy and dissuasion on less than probable cause.  County Defs. Ex. L at 101−102.  But that court affirmed the trial court's dismissal of the bribery charge against Vasquez, finding the charge could not be sustained without evidence that the agreement required Acevedo to refuse to appear at any criminal proceedings.  *Id.*

## 2.    Criminal Complaints & Preliminary Hearing

On remand from the Court of Appeal, the California Attorney General initiated a new case against plaintiffs with an October 30, 2012 criminal complaint, and, at the government's request, the trial court dismissed the original case against plaintiffs.  County Ex. N.1 (complaint); County Ex. M (court docket entry dismissing County's case based on the People's representation the case would proceed on the California Attorney General's criminal complaint).  The California Attorney General's complaint brought three charges: (1) conspiracy to obstruct justice against Santana and Vasquez under California Penal Code section 182(a)(5); (2) dissuading a witness against Santana and Vasquez under California Penal Code section 136.1(b)(2); and dissuading a witness for financial gain against Vasquez only under California Penal Code section 136.1(c)(4).  County Defs. Ex. N.1.  These charges were renewed in the California Attorney General's amended

criminal complaint. County Defs. Ex. N.2. Notably, the California Attorney General's criminal complaint abandoned the bribery charges against both plaintiffs and the dissuading a witness for financial gain charge against Santana. *See id.* In other words, the complaint renewed only those claims the trial court or Court of Appeal found were supported by probable cause. *See id.*

The plaintiffs challenged the entirety of the criminal complaint in a three-day preliminary hearing at which Griesa and Detective Elliott, among other witnesses, testified. County Defs. Ex. O (transcript). At the conclusion of the preliminary hearing, the judge found "sufficient cause to believe that the offenses in the complaint have been committed, and that both Mr. Vasquez and Mr. Santana are guilty thereof" and ordered both defendants to answer. *Id.* at 327:12−19. The trial court, "sit[ting] as an appellate judge reviewing the determinations of [] a magistrate" in a preliminary hearing, denied plaintiffs' motions based on California Penal Code section 995 to set aside the indictment; the court again found sufficient evidence to hold Santana and Vasquez to answer on each count charged. County Exs. P.5 (tentative), P.7 (final). Following the government's presentation of its case, the trial court later denied Santana's motion to dismiss based on California Penal Code section 118.1, finding sufficient evidence to sustain a possible conviction. County Defs. Ex. Q.2. The case then proceeded until plaintiffs were acquitted by a jury of all charges.[31]

3. Issue Preclusion Applies to California Courts' Decisions that Conspiracy and Dissuading Witness Charges Against Santana and Vasquez and Dissuading Witness for Financial Gain Charge Against Vasquez Supported by Probable Cause

Plaintiffs fully litigated the issue of probable cause for each charge against them in the underlying proceedings. California courts repeatedly found probable cause existed for the conspiracy charges and dissuading a witness charges against both plaintiffs, and the dissuading a witness for financial gain charge against Vasquez. For issue preclusion purposes, the trial court's preliminary hearing held on the California Attorney General's amended complaint resulted in a final finding, actually litigated and necessarily decided, that probable cause existed for these

---

[31] None of the parties explain how long the trial or jury deliberations lasted.

charges. *See McCutchen v. City of Montclair*, 73 Cal. App. 4th 1138, 1146–47 (1999) ("In [California] . . . , a preliminary hearing is an adversary judicial proceeding, designed to litigate the issue of probable cause to try the accused on criminal charges, in which the accused may cross-examine witnesses pertinent to the issue of probable cause to arrest, . . . and present evidence negating the existence of probable cause. . . . giv[ing] the accused ample opportunity to litigate the issue of probable cause to arrest."); *Patterson v. City of Yuba City*, 748 F. App'x 120, 121 & n.1 (9th Cir. 2018) (continuing to apply *McCutchen* "as a guide for how the California Supreme Court would decide [false arrest] case" after that Court denied certification request concerning *McCutchen*'s continuing viability); *Wige*, 713 F.3d at 1185 (citing *McCutchen* for proposition, "[a]s a general rule, each of the[] [issue preclusion] requirements will be met when courts are asked to give preclusive effect to preliminary hearing probable cause findings in subsequent civil actions for false arrest and malicious prosecution"); *see also Mills*, 921 F.3d at 1169–70 ("A final judgment [for issue preclusion purposes] is defined as one that is free from direct attack. Stated differently, [t]o be final for purposes of collateral estoppel the decision need only be immune, as a practical matter, to reversal or amendment.") (original alterations) (quoting *People v. Cooper*, 149 Cal. App. 4th 500, 521 (2007)). As plaintiffs concede, the probable cause determination "constitutes *prima facie*—but not conclusive—evidence of probable cause." *Awabdy*, 368 F.3d at 1067 (emphasis omitted); 5 Witkin, Summary 11th Torts § 568 (2019); *see* Opp'n to County Mot. at 16. Accordingly, as plaintiffs also concede, they must rebut that prima facie finding to survive summary judgment. Opp'n to County Mot. at 16. On the record before the court, they are unable to do so.

Relying on Griesa's notes and testimony addressing those notes, plaintiffs argue defendants had a plan to derail Santana's judicial application through a bad faith investigation and prosecution and that plan was not presented to any court that made a probable cause determination; that plan, plaintiffs say, therefore "is not shielded from re-litigation" here. *Id.* at 17−18. As the County defendants note, *see* County Reply at 11, plaintiffs raised this argument to the trial court, which expressly rejected it. *See* County Ex. J.1 at 65−66 (arguing McGrath was conducting a "Political Prosecution" motivated by Santana's judicial application, quoting Griesa notes as support); County Ex. J.4 at 507 (court rejecting plaintiffs' argument "that the District Attorney

35

caused indictments to be returned solely to destroy or impugn Mr. Santana's effort to be appointed to the bench in Sutter County").  Moreover, at the preliminary hearing, when Santana's counsel attempted to cross-examine Griesa about his "note concerning Mr. Santana's judgeship, and the D.A.'s [] trying to derail Mr. Santana's judgeship," the court sustained the government's hearsay objection.  County Defs. Ex. O at 181:11−23.  Similarly, here, this court finds plaintiffs may not introduce evidence of the derailment plan for the truth of the matter asserted because the only evidence of that plan, namely Evans' statements to Griesa summarizing other parties' statements, is hearsay without an exception.  While Griesa's testimony concerning Evans' purported statements may be admissible against Evans or to show their effect on Griesa, neither hearsay exemption provides an avenue for plaintiffs to relitigate the California courts' probable cause determinations as to these charges. *Cf. Wige*, 713 F.3d at 1186 noting (plaintiff did "not rely on mere speculation that [the police] Officer [] fabricated evidence; he relie[d] on testimony under oath from [the victim] himself that the officers pressured him into making a false identification").

Ultimately, plaintiffs make much of defendants' purported bad faith in attempting to rebut the California courts' probable cause findings without providing any evidence that defendants' conduct affected the probable cause finding.  In so doing, plaintiffs appear to rely on *Awabdy*'s observation that "a plaintiff can rebut a *prima facie* finding of probable cause [] by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith," *Awabdy*, 368 F.3d at 1067; plaintiffs read this passage to mean an investigation motivated by malice may rebut a finding of probable cause, regardless of whether probable cause existed despite the malice, *see* Opp'n to County Mot. at 16−18.  But this is too broad a reading of *Awabdy*.  A plaintiff must show both malice and the absence of probable cause to establish a claim for malicious prosecution.  *Mills*, 921 F.3d at 1169. While malice may be properly inferred from lack of probable cause, 5 Witkin, Summary 11th Torts § 570(3) (2019), the reverse is not true, *see id.* § 566(1) ("Lack of probable cause must be independently proved; it cannot be inferred from proof of malice[32] . . . for, despite malice, one may

---

[32] In noting this distinction, the court need not reach the question whether plaintiffs have satisfied their burden in establishing malice.

have knowledge of facts that give rise to a reasonable and honest belief of guilt.") (citations omitted). Plaintiffs have not shown the probable cause determination was tainted by, for example, "intentional and knowingly false accusations," *see Awabdy*, 368 F.3d at 1067, "false police reports," *see Dirks v. Martinez*, 414 F. App'x 961, 963 (9th Cir. 2011), failure to disclose exculpatory evidence, *Haupt*, 17 F.3d at 290 n.5, or any wrongful conduct capable of rebutting the probable cause determination at issue here.

In responding to defendants' arguments that probable cause supported the investigation and prosecution regardless of whether issue preclusion applies here, plaintiffs argue the YCDA warrants to search plaintiffs' offices were not supported by probable cause. Pls. Opp'n to County Mot. at 19−22; Pls. Opp'n to Evans Mot. at 26−28. To the extent plaintiffs contend their challenges to the warrant application rebut the California court's final probable cause findings at the preliminary hearing, the court rejects that argument. Specifically, citing their experts' opinions, plaintiffs argue the warrant affidavit: erroneously stated there was probable cause to support bribery charges; erroneously stated plaintiffs were preparing an unlawful civil compromise when there was no criminal case pending, rendering civil compromise statuses inapplicable; wrongfully omitted Elliott's encouraging Acevedo to pursue a civil settlement and his belief the settlement was reasonable; wrongfully omitted plaintiffs' "openly" telling Elliott and Bendorf they were pursuing a civil settlement; and wrongfully failed to interview Acevedo about an alleged bribe, when she would have denied being bribed, before applying for the warrant. Opp'n to County Mot. at 19−22; Pls. Opp'n to Evans Mot. at 26−28; Sprinkles Dec., Pls. Ex. Y, ECF No. 99-26, ¶¶ 25−29 (finding warrant affidavit misled magistrate and did not provide probable cause for bribery or illegal civil compromise allegations); Shore Decl., Pls. Ex. AA, ECF No. 99-28, ¶¶ 24−26 (opining prosecutors did not interview Acevedo because "either [] they knew the civil settlement was not a bribe and/or they were not interested in discovering the truth . . . .").

None of plaintiffs' arguments provide an avenue under which they may rebut the probable cause findings with respect to the conspiracy charges and dissuading a witness charges. Plaintiffs' experts' opinions concerning the inapplicability of the civil compromise statutes were expressly considered by the Court of Appeal, as plaintiffs acknowledge in citing that court's

decision.  *See* Opp'n to County Mot. at 19−20 (citing California Court of Appeal decision).
Plaintiffs also raised this issue at the preliminary hearing and again in their briefing following that
hearing, *see* County Defs. Ex. P.1 at 31, 62, with the court finding sufficient evidence to order
Santana and Vasquez to answer on all charges, despite the inapplicability of the statutes.  County
Defs. Ex.7 at 174−75.  Moreover, neither plaintiffs nor their experts explain how including the
purported wrongfully withheld information, such as Elliott's belief the settlement was reasonable
or plaintiffs' disclosing the existence of the agreement, but not its terms, may rebut any of the
findings of probable cause in the record before the court.  *See, e.g.*, County Ex. J.4 at 507 (trial
court rejecting plaintiffs' argument defendants' failure to present Elliott's opinion "regarding the
asserted legality of the agreement" precluded finding of probable cause); *see also* Sprinkles Decl.
¶ 25 (opining this information "would have been relevant for the Magistrate's determination of
probable cause" without opining probable cause finding would have changed had such evidence
been included).  In any event, each of plaintiffs' attorneys cross-examined Detective Elliott at
length at the preliminary hearing, addressing plaintiffs' disclosure of the settlement agreement to
Detective Elliott and Bendorf and Detective Elliott's belief that the settlement was reasonable.
Defs. Ex. O at 379−98 (Vasquez counsel's cross-examination); *id.* at 398−415 (Santana counsel's
cross-examination).  Finally, while plaintiffs attack the sufficiency of the warrant application they
do not attempt to address the probable cause findings that followed execution of the warrant; in
particular, they present no evidence that the later probable cause findings were somehow infected
by the defective warrant.

In light of the trial court's finding sufficient evidence to order Santana and Vasquez
to answer after a contested preliminary hearing, the court finds plaintiffs are estopped from
relitigating probable cause as to the conspiracy charges and the dissuading a witness charges against
both plaintiffs, as well as the dissuading a witness for financial gain charge against Vasquez.
Accordingly, the County defendants' motion for summary judgment on plaintiff's § 1983 malicious
prosecution claims and Evans' motion for summary judgment on plaintiffs' state law malicious
prosecution claim arising from those charges are GRANTED.

4. The California Courts Did Not Find Bribery Charges
Against Both Plaintiffs or Dissuading Witness Charge
Against Santana Supported by Probable Cause

The conclusion above, however, does not extend to the bribery charges initially brought against both plaintiffs, as well as the dissuading a witness for financial gain charge against Santana, all of which were rejected by the California courts and which the prosecution abandoned when the California Attorney General filed its criminal complaint. The County defendants do not explain how a state court decision declining to address whether probable cause exists for a charge it dismissed on procedural grounds, or expressly finding probable cause did not support a charge, could preclude plaintiffs from establishing the absence of probable cause here. The County defendants appear to proceed under the belief that if any charge in a prosecution with multiple charges is supported by probable cause, a plaintiff cannot establish the necessary absence of probable cause to support his malicious prosecution claim. *See, e.g.*, County Mot. at 25 (noting trial court found no probable cause supporting dissuading witness for pecuniary gain charge against Santana but concluding court's other findings of probable cause "bar Plaintiffs' malicious prosecution claim"). Evans appears to share this belief. *See* Evans Mot. at 35 ("At every turn in the underlying criminal proceedings, 'reasonable persons' found probable cause to pursue charges against Plaintiffs . . . .").

Defendants provide no authority supporting their positions, and in fact authority to the contrary exists. *See Mazzetti v. Bellino*, 57 F. Supp. 3d 1262, 1268 (E.D. Cal. 2014) ("That probable cause existed, or a conviction may have resulted, as to some charges does not preclude a plaintiff from pursuing a claim based on those charges to which no probable cause existed and to which there was a favorable termination.") (collecting cases); *Aleman v. City of Bakersfield*, No. 1:11-CV-2006 AWI JLT, 2013 WL 3936740, at *10 (E.D. Cal. July 30, 2013) (same); *Singleton v. Perry*, 45 Cal. 2d 489, 498 (1955) ("[P]laintiff, having shown that defendant maliciously joined an unjustified charge with a justified charge, does not have the further burden of showing that her damage was specifically attributable to the malicious prosecution as opposed to the prosecution which the jury found was not malicious.").

Here, the County defendants have not shown plaintiffs are precluded from establishing the bribery charges against Santana and Vasquez and dissuading a witness for financial gain charge against Santana were not supported by probable cause. Moreover, while the County defendants generally argue probable cause existed for their investigation and prosecution regardless of whether issue preclusion applies, they do not address whether probable cause supported each charge. *See* County Mot. at 27−28. Similarly, although Evans argues "there was probable cause for charging Plaintiffs with dissuading a witness and obstruction of justice as a matter of law," he does not specifically address the bribery charges against both plaintiffs or the dissuading a witness for financial gain charge against Santana. Evans Mot. at 30−35. Accordingly, the defendants have not met their burdens in showing an absence of probable cause as to these charges.

The County defendants' motions based on their issue preclusion argument and the County defendants' and Evans' arguments probable cause existed as to these claims, are DENIED.

b. Statute of Limitations

The statute of limitations for both § 1983 and California malicious prosecution claims is two years. *Medeiros v. City of Palo Alto*, No. 17-CV-05913-LHK, 2019 WL 2568861, at *4 (N.D. Cal. June 21, 2019). "A malicious prosecution cause of action does not accrue until the case has been terminated in favor of the accused." *Cline v. Brusett*, 661 F.2d 108, 110 (9th Cir. 1981); *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1060 n.11 (9th Cir. 2002) (section 1983 claim for malicious prosecution accrues only when the plaintiff is acquitted). Under California law, a state law claim for malicious prosecution also "accrue[s] at the conclusion of the litigation in favor of the party allegedly prosecuted maliciously." *Yagman v. Cornell Companies, Inc.*, 693 F. App'x 495, 498 (9th Cir. 2017) (quoting *Babb v. Superior Court*, 3 Cal. 3d 841 (1971)).

Both the County defendants and Evans argue the plaintiffs' claims accrued and the statute of limitations began running on October 30, 2012, when the criminal case initiated by the YCDA was dismissed and the case proceeding under the California Attorney General's criminal complaint began. County Mot. at 22−23; Evans Mot. at 17−24. Plaintiffs respond that their claims accrued only when they were acquitted on April 25, 2014. Opp'n to County Mot. at 14.

Defendants' arguments in this respect cannot apply to the conspiracy and dissuading a witness charges against both plaintiffs and the dissuading a witness for financial gain charge against Vasquez that proceeded in the California Attorney General's prosecution. Regardless of whether the defendants remained active in that prosecution, plaintiffs' claim accrued only when they obtained a legal termination in their favor on April 25, 2014. *See RK Ventures, Inc.*, 307 F.3d at 1060. In any event, because the court found the malicious prosecution claim as to these charges cannot proceed, the argument is moot.

Whether the bribery charges against both plaintiffs and the dissuading a witness for financial gain charge against Santana are barred by the statute of limitations presents a closer question, one that has not been properly briefed by the parties. Neither party cites any authority for the proposition that, in an ongoing criminal prosecution in which some charges are dropped but others continue to trial, a plaintiff's claim for malicious prosecution accrues[33] and his statute of limitations clock begins running upon the dropping of charges rather than upon his ultimate acquittal. The court notes the "concerns for finality and consistency" that have led the Supreme Court to "generally decline[] to expand opportunities for collateral attack" while a criminal trial is pending appear to apply here, regardless of whether the YCDA or the California Attorney General's Office prosecuted the case to its final conclusion. *See Heck v. Humphrey*, 512 U.S. 477, 485 (1994). With the defendants' failure to properly raise and brief this issue, they have not met their burden, and the court therefore DENIES the motion for summary judgment as to the statute of limitations arguments.

c.  Racial Animus

A claim for malicious prosecution is not cognizable under § 1983 if a remedy is available within the state judicial system. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). "[A]n exception exists to [this] general rule when a malicious prosecution is conducted with the intent to deprive a person of equal protection of the laws or is otherwise intended to subject a

_____

[33] Under both federal and California law, a claim accrues upon a favorable termination, and no party addresses whether the dismissal of charges here was favorable. The court declines to address that issue sua sponte.

person to a denial of constitutional rights." *Bretz v. Kelman*, 773 F.2d 1026, 1031 (9th Cir. 1985) (en banc). Therefore, to establish a § 1983 malicious prosecution claim, a plaintiff must show that the purpose of the allegedly malicious prosecution was to deny "equal protection or another specific constitutional right." *Awabdy*, 368 F.3d at 1066 (quoting *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995)).

Both the County defendants and Evans contend plaintiffs cannot show defendants' prosecution was motivated by racial animus and, accordingly, cannot support the equal protection component of their malicious prosecution claim. County Mot. at 29; Evans Mot. at 27−28; *see Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."). Plaintiffs contend several factual disputes preclude summary judgment here. Pls. Opp'n to County Mot. at 22−23; Pls. Opp'n to Evans Mot. at 22−24. Having carefully reviewed plaintiffs' proffered evidence, the court finds plaintiffs have not established a triable fact as to this element of their § 1983 claim.

Plaintiffs identify the following evidence[34] of defendants' racial animus: (1) "Plaintiffs were prominent Hispanic attorneys in Sutter and Yuba Counties . . . [with] a number of successes against the YCDA's Office," Opp'n to Evans Mot. at 23 (citing Bendorf Dep.); (2) "McGrath was not a fan of Plaintiffs" and "[i]t was McGrath's decision to investigate [plaintiffs]" *id.* (citing Bendorf Dep.); (3) Vasquez was a Santana supporter, *id.* (citing Vasquez Dep., Pls. Ex. BB, ECF No. 99-29); (4) Vasquez and other Hispanic attorneys "speak Spanish in front of the DAs about [their] cases" in court and "it irritates them" because "[t]hey always want to know what we're talking about," Vasquez Dep. at 140:19−24 (quoted in part in Opp'n to Evans Mot. at 23); (5) Vasquez feels Yuba and Sutter Counties District Attorney's Offices have a "built in bias" against Hispanic attorneys "[b]ecause we're Hispanic and we represent a lot of Hispanic

---

[34] Plaintiffs also rely on Griesa's notes and testimony concerning those notes to establish the prosecution was motivated by race. Opp'n to County Mot. at 22−23; Opp'n to Evans Mot. at 22−24. As explained above, plaintiffs cannot rely on Griesa's notes for the truth of the matter asserted, including, at least as plaintiffs interpret those notes, to establish defendants' desire to see a white prosecutor appointed instead of Santana. Because Evans' statements to Griesa may be admissible against Evans, the court includes such statements here.

people and they don't like it . . . . they don't like the fact that we make money off the criminal element, especially people of our own nationality or ethnicity," *id.* at 147:19−148:5 (paraphrased in Opp'n to Evans' Mot. at 23); (6) McGrath "knew the Governor's Office was diversifying the bench," Opp'n to Evans Mot. at 23 (citing McGrath Dep.); (7) "Evans told Griesa that because Santana was Mexican and everyone else was white, he had a better than average shot at being a judge, *id.* (citing Griesa Dep.) and (8) Santana was extremely qualified to be a judge and plaintiffs' expert opines that "[b]ut for the criminal investigation . . . Santana would likely have received the Sutter County judicial appointment," *id.* at 24 (quoting Ravel Decl.).

Viewed in a light most favorable to plaintiffs, this evidence suggests that, in Vasquez's view, the Yuba County prosecutors are biased against prominent and successful Hispanic defense attorneys who speak Spanish in court and represent defendants in criminal cases, many of whom are also Hispanic. It is not clear from the cited testimony how much of this purported bias Vasquez attributes to ethnicity and how much he attributes to the prosecutors and Hispanic defense attorneys being adversaries in court. To the extent Vasquez attributes prosecutors' irritation with Hispanic defense attorneys discussing cases in Spanish to the defense attorneys' race rather than the prosecutors' desire to "know what [the defense attorneys are] talking about," Vasquez's basis for that attribution is unclear. *See* Vasquez Dep. at 140:19−24. Similarly, if Vasquez contends Yuba County prosecutors generally dislike "the criminal element" but dislike those individuals even more when they happen to be Hispanic, this appears to be based on Vasquez's speculation alone. *See id.* at 147:19−148:5.

Notably, Vasquez attributes his general observations to all Yuba County prosecutors as a group without specifically identifying a single defendant, though plaintiffs present his testimony as if he had directly implicated each defendant. *See* Opp'n to County Mot. at 22−23 (arguing "Defendants' motives motive [sic] stemmed from the fact Plaintiffs speak Spanish with their clients in court, which irritates the deputy district attorneys" and "Plaintiffs made money off people accused of crimes especially Hispanics" because "Defendants considered Hispanic defendants to have dirty money"). Plaintiffs do not identify any authority that allows them to attribute bias to an entire group and then rely on that bias to show specific members of the group

acted with discriminatory intent in carrying out a specific action. *Cf. Foster v. Med. Bd. of California*, No. C-01-0355-PJH, 2002 WL 1812341, at *6 (N.D. Cal. Aug. 5, 2002), (rejecting "guilt-by-association" theory under which defendant's relying in part on a report plaintiff had flagged as "racially motivated" tainted defendant's actions and constituted circumstantial evidence of defendant's racial animus), *aff'd sub nom. Foster v. Ball*, 79 F. App'x 263 (9th Cir. 2003). Notably, plaintiffs do not provide any specific examples of any defendant's conduct to support Vasquez's general impressions. *See Orellana v. Cty. of Los Angeles*, No. CV 12-01944 MMM (CWx), 2013 WL 12122692, at *12 (C.D. Cal. Apr. 29, 2013) (police officer's use of derogatory term referring to people of Hispanic descent provided "circumstantial evidence that she harbors animus towards Hispanics as a class," which "in turn, lends credence to [plaintiff]'s allegation that she was maliciously stopped and arrested due to her race"), *aff'd*, 630 F. App'x 730 (9th Cir. 2016); *Usher*, 828 F.2d at 562 (allegations police officers used racist terms "sufficient to demonstrate racial animus" at pleading stage). While plaintiffs presumably could have deposed other Yuba County attorneys, including Hispanic attorneys, to develop evidence of defendants' behavior manifesting racial animus, plaintiffs present no such evidence here.

The court clarifies that it is not discounting the general observation that bias and in particular impermissible bias exists in society at large. Nor does it doubt, as a general proposition, that Hispanic attorneys at times confront racial animus in their professional practice. The court also recognizes the obstacles plaintiffs face in establishing racial animus and the need to rely on circumstantial evidence to meet their burden. But a party's general observations and conjecture cannot fill gaps in the evidentiary record on summary judgment.

Nothing in the record presented to the court, viewed in plaintiffs' favor, would allow a reasonable juror to conclude defendants initiated the investigation and prosecution at issue here with the intent or motive to discriminate against plaintiffs on the basis of their race. The court therefore GRANTS defendants' motion for summary judgment on the equal protection element of plaintiffs' § 1983 malicious prosecution claim.

/////

/////

44

d.    State Law Malicious Prosecution Claim

That plaintiffs' inability to establish racial animus is fatal to their § 1983 malicious prosecution claim does not resolve the malicious prosecution claim under California law against Evans alone.  In light of the preclusive effect owed to the California courts' probable cause determinations, discussed above, this claim remains live only as to the bribery charges against both plaintiffs and the dissuading a witness for financial gain charge against Santana.

While Evans argues he lacked the power or authority to commence or direct plaintiffs' prosecution and therefore cannot be held liable for malicious prosecution, he cites no California authority on this point.  Evans Mot. at 29−30; *see also id.* at 26−27 (arguing cooperation with defendants was in service of his client, not a conspiracy).  Evans notes Detective Elliott recommended the YCDA investigate plaintiffs months before he became involved in that investigation in any way.  *Id.* at 26, 29.

"One who procures a third person to institute a malicious criminal prosecution is liable, to the same extent as if he or she instituted it.  The test is whether the defendant was actively instrumental in causing the prosecution." 5 Witkin, Summary 11th Torts § 561 (2019).  "[M]erely giving testimony and responding to law enforcement inquiries in an active criminal proceeding does not constitute malicious prosecution." *Zucchet v. Galardi*, 229 Cal. App. 4th 1466, 1482 (2014) (citing *Cedars–Sinai Medical Center v. Superior Court*, 206 Cal. App. 3d 414 (1988)).  But a defendant who "take[s] an active part in the[] prosecution after learning that there is no probable cause for believing the accused guilty" such "as by insisting upon or urging further prosecution" may be liable.  *Id.* at 1483 (quoting Restatement Second of Torts, § 655, cmt. c); *see, e.g.*, *Rupp v. Summerfield*, 161 Cal. App. 2d 657, 663 (1958) (upholding malicious prosecution verdict against private individual who "was not merely a witness at the preliminary hearing but initiated the proceeding by knowingly making a false report to law enforcement officers and . . . intentionally and knowingly testified falsely at the preliminary hearing").

Here, the evidence indicates Evans encouraged his client, Griesa, the subject of a live criminal investigation, to waive his attorney-client privilege and turn over otherwise privileged documents to aid in the investigation of plaintiffs, arguably with no clear benefit to Griesa.  Evans

45

testified at grand jury proceedings against plaintiffs, which also involved proposed charges against Griesa. While Evans contends his conduct was in service of his client, this contention is the kind of self-serving statement only a factfinder can assess. It is perhaps an odd result, where prosecutors are relieved of liability in a malicious prosecution claim while a private attorney's liability remains at issue. But any such result here owes to plaintiffs' decision to plead their state law claim against Evans alone, and Evans' decision to attack the merits of that claim without citing state law and while relying on disputed facts.

Accordingly, the motion, on this basis, is DENIED.

### 2.   Claim Four: Section 1983 Defamation-Plus/Stigma-Plus

Plaintiffs assert a substantive due process claim under the "stigma plus" theory, contending McGrath's statements to the press following plaintiffs' acquittal defamed plaintiffs, "portray[ing] Santana and Vasquez as dishonorable and unethical attorneys, and thereby substantially further injur[ing] their reputations, both personal and professional, and caus[ing] significant damage to their law practices." TAC ¶¶ 69−70.

"Damage to reputation alone is not actionable under § 1983." *Hart v. Parks*, 450 F.3d 1059, 1069 (9th Cir. 2006) (citing *Paul v. Davis*, 424 U.S. 693, 711–12 (1976)). To assert a § 1983 claim, a plaintiff must establish he "was stigmatized in connection with the denial of a 'more tangible' interest." *Id.* at 1069–70 (quoting *Paul*, 424 U.S. at 701–02; *Cooper v. Dupnik*, 924 F.2d 1520, 1532 (9th Cir. 1991), *rev'd on other grounds*, 963 F.2d 1220 (9th Cir. 1992) (en banc)). To do so, and satisfy the "stigma-plus" test, a plaintiff must show either: (1) "the injury to his reputation was inflicted *in connection with* the deprivation of a federally protected right," *id.* at 1070 (original emphasis) (citing *Gobel v. Maricopa County*, 867 F.2d 1201, 1205 (9th Cir. 1989), *abrogated on other grounds by Merritt v. County of Los Angeles*, 875 F.2d 765, 769 (9th Cir. 1989)), or (2) "the injury to reputation *caused* the denial of a federally protected right," *id.* (original emphasis) (citing *Vanelli v. Reynolds School Dist.*, 667 F.2d 773, 777–78 (9th Cir. 1982)).

Without addressing whether McGrath's statement was defamatory, the County defendants argue plaintiffs cannot satisfy either stigma-plus requirement. County Defs. Mot. at 29−31. The County defendants also argue they are entitled to qualified immunity. *Id.* at 31−33.

46

Plaintiffs argue their claim survives summary judgment under either test. Opp'n to County Mot. at 24−26. Because the court finds plaintiffs have not established a claim under either test, as explained below, it does not address the County defendants' qualified immunity argument.

a. <u>Reputational Injury in Connection with Deprivation of Federally Protected Right</u>

Plaintiffs argue McGrath's made his defamatory comments in connection with the alleged malicious prosecution, satisfying the first test. *Id.* at 24−25. The court has rejected plaintiffs' § 1983 malicious prosecution claim above, however, disposing of this argument.

b. <u>Reputational Injury Caused Denial of Federally Protected Right</u>

Plaintiffs also argue triable issues remain as to their claim under the second stigma-plus test, as evidence shows McGrath's allegedly defamatory statements (1) "involved direct interference with Plaintiffs' goodwill," which plaintiffs argue California law recognizes as a property interest, (2) "impair[ed] [] their reputation for honesty and morality," and (3) caused plaintiffs to "suffer[] 'permanent exclusion from, or protracted interruption of, gainful employment within the trade or profession." *Id.* at 25−26 (citations omitted). In support of their second prong arguments, plaintiffs cite Vasquez's testimony that he "stopped receiving court appointed cases even after he was acquitted . . . . cost[ing] him $25,000 - $50,000 per year, and "Santana['s] lost [] opportunity to join the judiciary," characterizing Santana's prospects at this point for future appointment as "slim." *Id.* at 26.

The Ninth Circuit has declined to find "injury to [] business goodwill [that] does not go beyond injury to its business reputation" amounts to deprivation of a federally protected property interest. *WMX Techs., Inc. v. Miller*, 197 F.3d 367, 375–76 (9th Cir. 1999) (distinguishing *Soranno's Gasco v. Morgan*, 874 F.2d 1310, 1313 (9th Cir. 1989), which "clearly involved much more than an injury to the reputation of a business," including letters sent directly to plaintiff's customers threatening to revoke customers' operating permits, and "directly deprived [plaintiffs] of the 'expectation of continued public patronage'")); *Cooper*, 924 F.2d at 1534 (quoting, with approval, *Sullivan v. State of New Jersey*, 602 F. Supp. 1216, 1222 (D.N.J. 1985), *aff'd* 853 F.2d

47

921 (3d Cir. 1988): "If plaintiff only has to show that the state defamed him—and not that the state did something else as well—in order to state a claim for deprivation of liberty under § 1983, the effect would be to transmute all defamation actions against state actors in which plaintiff can show some harm resulting from the defamation into § 1983 actions.").

Plaintiffs make no attempt to show they have a federally protected right to their reputations for honesty or morality or, in Santana's case, to a judicial appointment. While "permanent exclusion from, or protracted interruption of, gainful employment within [a] trade or profession" might warrant protection, *Stretten v. Wadsworth Veterans Hosp.*, 537 F.2d 361, 366 (9th Cir. 1976), "people do not have liberty interests in a specific employer." *Llamas v. Butte Cmty. Coll. Dist.*, 238 F.3d 1123, 1128 (9th Cir. 2001), *as amended* (Mar. 14, 2001). Accordingly, Vasquez's lack of court-appointed cases and Santana's inability to obtain a judicial appointment, while both are indisputably still able to work as attorneys, does not establish the necessary exclusion or interruption.

Defendants' motion for summary judgment on the defamation claim is GRANTED.

3.     Conspiracy Claims

a.     Section 1983 Conspiracy Claim

Because plaintiffs cannot establish an underlying constitutional tort, they also cannot establish a § 1983 conspiracy claim. *See Rezek v. City of Tustin*, 684 F. App'x 620, 622 (9th Cir. 2017) (citing *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 935 (9th Cir. 2012) (en banc) ("Conspiracy is not itself a constitutional tort under § 1983" and "there must always be an underlying constitutional violation.")).

Defendants' motions for summary judgment as to the § 1983 conspiracy claim are GRANTED.

b.     Section 1985(3) Conspiracy Claim

A § 1985(3) conspiracy claim has four elements: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of this conspiracy; (4) whereby a person is either injured in his person or property or

48

deprived of any right or privilege of a citizen of the United States." *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992) (quoting *United Bhd. of Carpenters and Joiners of Am. v. Scott*, 463 U.S. 825, 828–29 (1983)). The second element requires more specifically that the plaintiff demonstrate the defendants were motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Id.* (quoting *Griffith v. Breckenridge*, 403 U.S. 33 88, 102 (1971)). As discussed above, plaintiffs are not able to establish defendants were motivated by racial animus. Accordingly, their § 1985(3) claim cannot survive.

Defendants' motions for summary judgment as to the § 1985(3) conspiracy claim are GRANTED.

### c. State Conspiracy Claim

Plaintiffs also assert a conspiracy claim under state law as to Evans alone, contending "Evans entered into a conspiracy with the other individual Defendants for the purpose of derailing Santana's candidacy for judicial appointment, and their overt acts pursuant to the conspiracy included conducting in bad faith an illegal and improper criminal investigation of Santana and Vasquez, thereby causing the prosecution without probable cause of Santana and Vasquez on felony charges of bribery, dissuading a witness, and obstruction of justice, and formulating and conducting the above-alleged press conference or press release challenging the jury acquittals of Santana and Vasquez." TAC ¶ 83.

Because this claim relies wholly on the hearsay evidence the court has excluded above, *see supra* § III.A.1, it cannot be sustained. While Evans' statements to Griesa may be admissible as party admissions, his statements summarizing other declarants' statements, which form the basis for plaintiffs' conspiracy allegations, are hearsay without an exception. Evans' motion for summary judgment on this claim is GRANTED.

### 4. *Monell* Liability

A *Monell* claim also requires an underlying constitutional violation. *See Lee v. City of L.A.*, 250 F.3d 668, 681–82 (9th Cir. 2001) (plaintiff must establish defendant's policy was "the 'moving force behind the constitutional violation[s]'" as element of *Monell* claim) (original

49

alteration).  With no surviving constitutional claim here, the County defendants' motion for summary judgment as to the *Monell* claim is GRANTED.

      C.    <u>Plaintiffs' Motion for Summary Judgment</u>

      For reasons discussed above, plaintiffs' motion is largely moot, and they have not established the absence of triable facts as to their sole remaining claim for malicious prosecution under state law.  *See* Pls. Mot. at 16−19, 26.  Accordingly, the motion is DENIED.

IV.    <u>SUMMARY</u>

      The County defendants' motion for summary judgment is GRANTED in full and defendants McGrath, Vacek, Barr, Stober, Bendorf and the County of Yuba are DISMISSED. Evans' motion is GRANTED as to all claims except the state law claim for malicious prosecution. Plaintiffs' motion is DENIED.

      The court SETS a final pretrial conference for **Thursday, October 24, 2019, at 3 p.m.**

      SO ORDERED.

DATED: September 27, 2019.

                                  UNITED STATES DISTRICT JUDGE